RENE L. VALLADARES
Federal Public Defender
Nevada Bar No. 11479
DAVID ANTHONY
Assistant Federal Public Defender
Nevada Bar No. 7978
David_Anthony@fd.org
BRAD D. LEVENSON
Assistant Federal Public Defender
California Bar No. 166073
Brad_Levenson@fd.org
TIMOTHY R. PAYNE
Assistant Federal Public Defender
Ohio Bar No. 0069329
Tim_Payne@fd.org
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577
(702) 388-5819 (Fax)

Attorneys for Zane M. Floyd

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

ZANE M. FLOYD,

Plaintiff,

v.

CHARLES DANIELS, Director, Nevada Department of Corrections; HAROLD WICKHAM, NDOC Deputy Director of Operations; WILLIAM GITTERE, Warden, Ely State Prison; WILLIAM REUBART, Associate Warden at Ely State Prison; DAVID DRUMMOND, Associate Warden at Ely State Prison; IHSAN AZZAM, Chief Medical Officer of the State of Nevada; DR. MICHAEL MINEV, NDOC Director of Medical Care, DR. DAVID GREEN, NDOC Director of Mental Health

Case No. _____
(to be supplied by the Clerk)

**FLOYD'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF DUE TO PROPOSED METHOD OF EXECUTION PURSUANT TO 42 U.S.C. § 1983**

**(DEATH PENALTY CASE)**

**EXECUTION WARRANT SOUGHT BY THE STATE FOR THE WEEK OF JUNE 7, 2021**

1    Care, LINDA FOX, NDOC Director of
Pharmacy; JOHN DOES I-XV, NDOC

2    execution team members,

3           Defendants.

4

5       DATED this 16th day of April, 2021.

6                             Respectfully submitted
RENE L. VALLADARES

7                             Federal Public Defender

8                             */s/ David Anthony*

9                             DAVID ANTHONY
Assistant Federal Public Defender

10

11                             */s/Brad D. Levenson*

12                             BRAD D. LEVENSON
Assistant Federal Public Defender

13                             */s/ Timothy R. Payne*

14                             TIMOTHY R. PAYNE
Assistant Federal Public Defender

15

16

17

18

19

20

21

22

23

1

TABLE OF CONTENTS

2

3

COMPLAINT .................................................................................. 6

4

I.      INTRODUCTION .............................................................. 6

5

II.     PARTIES ............................................................................ 9

6

7

III.    JURISDICTION ............................................................... 11

8

IV.     VENUE ............................................................................. 11

9

10

V.      EXHAUSTION OF ADMINISTRATIVE REMEDIES .................................. 12

11

VI.     FACTS ............................................................................... 12

12

        A.    Nevada's September 5, 2017 execution protocol .................................. 12

13

14

        B.    Nevada's November 9, 2017 execution protocol .................................. 14

15

        C.    Nevada's current execution protocol ............................................... 17

16

              1.    The risks created by the three drugs in Nevada's execution
                    protocol .............................................................................. 18

17

                    a.    Risks created by Nevada's intended use of midazolam ... 18

18

19

                          i.    Midazolam is not a proper anesthetic. .................. 19

20

                          ii.   Midazolam itself causes pain and suffering. ......... 22

21

                          iii.  Midazolam is known to cause a paradoxical
                                reaction that increases, instead of decreases,
                                sensations of pain. ............................................ 27

22

23

iv.    The State has provided no assurances that it will properly store and administer midazolam to decrease the risk it will cause unconstitutional pain and suffering. ..................... 28

    b.    Risks created by Nevada's intended use of fentanyl ....... 31

    c.    Risks created by Nevada's intended use of cisatracurium .................................................................. 32

    2.    Risks presented by inadequate provisions for staff training ..... 34

    3.    Failure to provide right of access to counsel and to the courts.. 38

VII.    CLAIMS FOR RELIEF ................................................................. 39

    Count I:  Proceeding with Floyd's execution under the current protocol violates his Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment. ..................................... 39

    A.    Nevada's execution protocol presents a substantial risk of serious harm. ................................................................................ 39

    1.    The three drugs in Nevada's execution protocol create an unconstitutional risk of pain and suffering. ............................... 40

    a.    Midazolam, the first drug, does not function as needed, causes pain and suffering, and has been linked to numerous botched executions. ........................... 40

    b.    Fentanyl, the second drug, cannot be relied on to induce unawareness. .......................................................... 40

    c.    Cisatracurium, the third drug, is a paralytic that could cause Floyd to be paralyzed and awake while dying of suffocation. .......................................................... 41

    2.    The lack of necessary safeguards in Nevada's protocol increases the substantial risk of harm. ...................................... 42

    a.    Nevada's execution protocol does not provide for adequate training of members of the execution team. ..... 43

iv

b.   Nevada's execution protocol fails to provide adequate access to counsel and the courts on the day of an execution...................................................................... 46

B.   There are feasible, readily implemented alternative methods available that would significantly reduce the substantial risk of severe pain........................................................................ 47

1.   Execution by firing squad........................................... 48

a.   Execution by firing squad is a feasible alternative. ........ 48

b.   Execution by firing squad significantly reduces the substantial risk of pain inherent in Nevada's current protocol. .................................................... 48

2.   Lethal injection by two-drug protocol ......................... 50

a.   The two-drug alternative is feasible. .............................. 51

b.   The two-drug alternative significantly reduces the substantial risk of pain inherent in Nevada's current protocol. ...................................................... 52

Count II: Proceeding with Floyd's execution under the current protocol violates his Eighth and Fourteenth Amendment rights to medical care and to be free from serious harm.................................... 53

Count III: Proceeding with Floyd's execution under the current protocol violates his Fifth and Fourteenth Amendment rights to due process................................................................ 55

Count IV: Proceeding with Floyd's execution under the current protocol violates his First, Sixth, and Fourteenth Amendment rights of access to courts, counsel, and to meaningful litigate claims. ............... 56

VIII.   PRAYER FOR RELIEF ................................................... 61

DECLARATION UNDER PENALTY OF PERJURY ............................. 63

CERTIFICATE OF SERVICE................................................... 64

v

## COMPLAINT

1.      Plaintiff Zane Floyd, through his counsel, seeks both preliminary and permanent relief, requesting this Court declare and enforce his rights under the United States Constitution and issue an injunction under 42 U.S.C. § 1983 and the Eighth Amendment commanding defendants not to carry out any lethal injection of Floyd. Nevada's execution protocol and procedures pose an unnecessary risk of causing substantial pain and suffering in violation of his right to be free from the infliction of cruel and unusual punishment.

## I.   INTRODUCTION

2.      The State of Nevada, through an April 14, 2021 state court application for an Order of Execution filed by the Office of the Clark County District Attorney, seeks to execute Plaintiff during the week commencing on the 7th day of June, 2021. The State intends to execute Floyd using a novel, experimental lethal injection procedure. The State's execution protocol sets forth a three-drug procedure using midazolam, fentanyl, and cisatracurium, with the drugs to be sequentially injected intravenously into Floyd's body. No state, including Nevada, has ever used this combination of drugs in an execution.

3.      The uniqueness of Nevada's protocol stems largely from the first ever intended use of a paralytic agent, cisatracurium, as the final drug administered, *i.e.*, the killing agent. Expert evidence establishes that cisatracurium presents a wholly unnecessary, substantial risk of serious harm to the condemned inmate. If the inmate has not achieved the requisite depth of anesthesia, the cisatracurium, which freezes the body's muscles including the diaphragm, will cause the inmate to

suffer a torturous death by suffocation. Indeed, the only court to address the lawfulness of Nevada's proposed use of cisatracurium as the killing agent found it presented an unconstitutional "substantial risk of serious harm" and "an objectively intolerable risk of harm" under the Eighth Amendment.

4.      The harmfulness inherent in using a paralytic drug as a killing agent is amplified in Nevada's protocol, as the other two drugs cannot reliably produce the depth of anesthesia necessary to avoid awareness during the torturous suffocation caused by cisatracurium. The protocol problematically specifies midazolam as the initial drug to be administered. Traditionally, three-drug protocols have used a barbiturate, such as sodium thiopental or pentobarbital, as the first drug. The purpose of using a barbiturate is to induce general anesthesia and render the subject unconscious and insensate to pain. Midazolam, however, is a short-acting benzodiazepine. It is not an analgesic drug and is pharmacologically incapable of inducing general anesthesia. Moreover, midazolam is linked to numerous botched executions. In neighboring Arizona for instance, problems incurred with the use of midazolam—most notably during the execution of inmate Joseph Wood (who snorted, gasped and choked for nearly two hours and was injected fifteen times before he died) caused the State of Arizona to forever ban its use in executions.

5.      Nevada's use of fentanyl, an opioid, as the second drug in its lethal injection procedure contributes to the substantial risk of harm presented by Nevada's experimental protocol. Fentanyl has been used only once in an execution in the United States, as part of a four-drug protocol. It has never been used in a

three-drug protocol, and its efficacy for use in the manner intended under Nevada's protocol is essentially unknown. Importantly, because Nevada's first drug, midazolam, is inadequate for the intended purpose, it is imperative that the second drug reliably induce the requisite depth of anesthesia and render the inmate completely unconscious, unaware, and insensate to pain. Fentanyl, however, is demonstrated to be unreliable, even in high doses, for inducing unawareness. Its experimental use in Nevada's protocol creates an undue and substantial risk that Floyd will be aware, will experience "air hunger," and will suffer a horrific death when the third drug, cisatracurium, is introduced into his body. The protocol presents an unnecessary risk of serious harm and an objectively intolerable risk of harm in violation of the Eighth Amendment.

6.      Finally, the constitutional problems in Nevada's protocol are further multiplied by its missing components—there are no requirements that members of the execution team are properly trained and no assurances that the condemned inmate will be able to reach his attorneys or the courts leading up to the execution. This concern is heightened by the State's timing of its execution warrant, in the midst of a pandemic, while prisons are closed to attorneys.

7.      In sum, Nevada seeks to execute Floyd using a novel protocol, unnecessarily risking that Floyd is suffocated to death while fully conscious and aware, and at the same time restrict Floyd's access to counsel and the courts. Allowing the State to proceed with its execution of Floyd would subject him to cruel and unusual punishment, in violation of the Eighth Amendment.

## II.   PARTIES

8.      Zane Floyd is a state death row inmate at Ely State Prison in Ely, Nevada. Floyd brings this Complaint pursuing legal, administrative, and any other appropriate remedies to ensure the protection of his physical person and his constitutional rights while under the custody of the State of Nevada, pursuant to 42 U.S.C. § 1983, and the First, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, seeking declaratory and injunctive relief.

9.      Defendant Charles Daniels is the current Director of the Nevada Department of Corrections (NDOC). Daniels is responsible for managing the operations of Nevada's state prison facilities and the custody of the inmates confined therein, including Ely State Prison (ESP). Daniels is ultimately responsible for the overall operations and policies of NDOC, including overseeing executions pursuant to appropriately authorized state court issued warrants of execution, and ensuring those executions are carried out in conformity with the Constitution of the United States. Daniels and all other individuals identified as defendants in this Complaint are sued in their official capacities.

10.      Defendant Harold Wickham is the Deputy Director of Operations at NDOC. Wickham is responsible for overseeing the daily operations of NDOC facilities, including ESP.

11.      Defendant William Gittere is the Warden at ESP, and as with the agents and employees at ESP that are under his supervision and control, establishes and implements practices and policies of the prison relating to security, as well as the custody and care of ESP inmates, inclusive of practices and policies

for preparing, training staff for, supervising and conducting executions. Gittere is responsible for ensuring that ESP carries out executions in conformity with the Constitution of the United States.

12.    Defendants William Reubart and David Drummond are both Associate Wardens at ESP. Reubart and Drummond share, along with Warden Gittere, in the responsibilities for day-to-day operations of ESP and, in conjunction with the agents and employees at ESP that are under their supervision and control, share in responsibilities for establishing and implementing practices and policies of the prison relating to security at ESP, as well as the custody and care of ESP inmates, inclusive of practices and policies for preparing, training staff for, supervising and conducting executions.

13.    Defendant Dr. Ihsan Azzam is the Chief Medical Officer of the State of Nevada. Dr. Azzam is responsible for enforcing all public health laws and regulations in the State. He also has the responsibility of providing consultation to the NDOC Director regarding the selection of the drug or combination of drugs to be used in executions.

14.    Defendant Dr. Michael Minev is the Director of Medical Care for NDOC and is responsible for the overall delivery of medical services to the inmates in the custody of NDOC. Dr. Minev's responsibilities include oversight of NDOC's Central Pharmacy, which is responsible for dispensing medications to NDOC's inmate population.

15.    Defendant Dr. David Green is the Director of Mental Health for NDOC

and is responsible for the overall delivery of mental health services to the inmates in the custody of NDOC.

16.     Defendant Linda Fox is the Pharmacy Director of NDOC and responsible for the operations of NDOC's Central Pharmacy and the overall delivery of pharmaceutical services to NDOC's inmate population.

17.     Defendants John Does I through XV are unnamed and anonymous execution team members, employed by or acting under contract with, NDOC to consult with, prepare for, participate in, and/or carry out the execution of Floyd. Floyd does not know, and the NDOC Defendants have not revealed, the identities of these defendants.

## III.    JURISDICTION

18.     Jurisdiction is conferred by 28 U.S.C. §1331 and §1343, which provide for original jurisdiction of this Court in suits based respectively on federal questions and authorized by 42 U.S.C. § 1983, which provides a cause of action for the protection of rights, privileges, or immunities secured by the Constitution of the United States. Jurisdiction is further conferred by 28 U.S.C. §2201 and §2202, which authorize actions for declaratory and injunctive relief.

## IV.    VENUE

19.     Venue is proper in the District of Nevada under 18 U.S.C. §1391(b)(1)–(3) because the defendants reside in the territorial jurisdiction of this district, and because a "substantial part of the events or omissions giving rise to the claim[s] occurred," and are continuing to occur, in this district, at ESP in Ely, Nevada.

## V.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

20.    Exhaustion of administrative remedies is not necessary because this action does not challenge prison conditions and because there are no available administrative remedies capable of addressing the violations of federal law challenged in this pleading. Moreover, because the defendants, particularly Daniels and Gittere, have the discretion to change the Execution Protocol at any time—even after providing notice as to certain aspects—any attempt to grieve would be futile.

## VI.  FACTS

### A.  Nevada's September 5, 2017 execution protocol

21.    In July 2017, the Clark County District Attorney's Office sought and obtained an execution warrant from the state district court for the Eighth Judicial District Court of Nevada, scheduling the execution of death row inmate Scott Dozier. At that time, Nevada's execution protocol was unknown. Counsel from the District Attorney's Office were unable to provide the court with any information about how, and with what drugs, NDOC intended to carry out Dozier's execution. Instead, counsel simply pointed to a radio program, where an NDOC official said that, if an execution warrant was signed, they would be able to obtain the needed drugs.

22.    Over a month later, pursuant to litigation in Dozier's state post-conviction case regarding the constitutionality of his planned execution, the State produced a new execution protocol, dated September 5, 2017. The new protocol provided for a novel three-drug lethal injection procedure utilizing the drugs

diazepam (a benzodiazepine), fentanyl (an opioid), and cisatracurium (a paralytic).[1]

23. Counsel on behalf of Dozier thereafter retained and consulted with an expert in anesthesiology, Dr. David Waisel, regarding Nevada's new protocol.[2] Dr. Waisel was highly critical of the State's protocol and provided a signed declaration, dated October 4, 2017, to that effect.[3] He opined that the protocol constituted a "sea change" from every other protocol of which he was aware, because the paralytic drug was designed to be the agent of death.[4] Specifically, the third drug, the paralytic cisatracurium, kills by preventing an inmate's ability to breathe, not through drugs that anesthetize (thereby ensuring an unconscious person during the process), but through drugs that paralyze muscles.

24. Premised upon the expert's opinions, counsel for Dozier argued that the protocol and drugs chosen created a substantial risk of causing cruel pain and suffering because its use creates a substantial risk of the condemned inmate being

---

[1] The three-drug protocol, the nation's first using fentanyl and first to use a paralytic agent as the final, killing drug, was devised by Nevada's former Chief Medical Officer, John DiMuro, D.O. DiMuro later interviewed with the Washington Post after he resigned from his position, and told the paper that he settled on the protocol in a matter of minutes. The December 11, 2017 article quoted him as saying, "I honestly could have done it in one minute. It was a very simple, straightforward process." *See* Ex. 1.

[2] Dr. Waisel is board certified with the American Board of Anesthesiology, and practices anesthesia at Boston Children's Hospital. Ex. 2 at 7–8. He is also an Associate Professor of Anesthesia at Harvard Medical School. Ex. 3 at 1. Dr. Waisel has practiced anesthesiology for twenty-five years, consulted on lethal injection protocols, testified approximately ten times in court, and authored almost fifty peer reviewed publications on anesthesiology. *Id.* He is familiar with the three drugs used in NDOC's 2017 execution protocol, diazepam, fentanyl, and cisatracurium, having used them in his clinical practice. *See* Ex. 2 at 11–13.

[3] Ex. 3 at 1 (declaration of Dr. David B. Waisel, October 4, 2017).

[4] *Id.* at 3.

paralyzed and awake while dying of suffocation.[5] "The horror of being awake and unable to move is beyond description," Dr. Waisel observed, citing a known example of a patient undergoing surgery who was aware and paralyzed, and reported she "desperately wanted to scream or even move a finger to signal to the doctors that she was awake."[6] Nevada's execution protocol, in his opinion, was "practically designed to ensure substantial harm of 1) air hunger following the injections of diazepam and fentanyl and 2) awareness while being paralyzed after the cisatracurium injection."[7]

25.     The expert's opinions also included a concern that the dosage amounts allocated for the first two drugs (diazepam and fentanyl) were markedly low.[8] In his declaration, Dr. Waisel made specific recommendations to significantly increase the dosages of the first two drugs.[9]

**B.     Nevada's November 9, 2017 execution protocol**

26.     After receiving the opinions from Dozier's expert anesthesiologist, the State amended its execution protocol. Although the revised protocol was not officially signed and made effective until November 9, 2017, the State informed the state district court in the latter part of October 2017 that they were making

---

[5] *See* Ex. 2 at 44 (*State v. Dozier*, District Court of Clark County, Nevada, Case No. C215039, Recorder's Transcript of Evidentiary Hearing of Chief Medical, Nov. 3, 2017).
[6] Ex. 3 at 4.
[7] *Id.*
[8] *Id.*
[9] *Id.*

changes, including: (1) increasing the loading (starting) dosages for the drugs[10], clarifying that those loading amounts were never meant to be a cap; (2) instructing that the drugs be "titrated to effect"; (3) conducting "consciousness assessments"; to determine how the condemned inmate is responding to the drugs, and if he is still conscious, then gradually increasing the dosages, and repeating the process, until the inmate no longer provides responses to stimuli and (4) following the administration of fentanyl with use of a tactile stimulus, "some sort of pinch I imagine," before the execution team would move on to the paralytic drug.[11]

27.    Although the State decided that these changes were appropriate, the State was unwilling to agree to other changes recommended by Dozier's expert and continued to insist on using a three-drug protocol that employed a paralytic agent as the third and final (lethal) drug.[12]

28.    The state district court held an evidentiary hearing concerning the revised protocol on November 3, 2017, where Dr. Waisel testified. (The State presented no expert testimony).

29.    Dr. Waisel testified that the proper administration of 100 mg of Diazepam followed by 7,500 mcg of Fentanyl would be sufficient, with a high degree of certainty, to kill the condemned inmate by stopping his breathing.[13] He estimated that the time from administration of the drugs to death would be approximately ten

---

[10] As it turned out, the dosages were increased dramatically in the revised protocol, consistent with Waisel's recommendations,

[11] Ex. 4 at 5.

[12] *See generally id.*

[13] Ex. 2 at 21.

minutes.[14]

30.     The expert further testified that the paralytic drug contained in the protocol was unnecessary to effectuate death because, if the dosages of the first two drugs at the levels he recommended were properly administered, the inmate would have already stopped breathing by the time the third drug was administered.[15] On the other hand, if the first two drugs were not properly administered, there is a substantial risk that the use of the paralytic drug will cause cruel pain and suffering, as the condemned inmate would still be sentient when the paralytic was administered.[16]

31.     Following the evidentiary hearing, the district court granted an injunction and ordered a stay of the impending execution.[17] The court found that the State's proposed use of a paralytic drug in the execution presented an unconstitutional substantial risk of harm and an objectively intolerable risk of harm in violation of the Eighth Amendment.[18]

32.     The State challenged the district court's ruling by petitioning for writ of mandamus in the Nevada Supreme Court. The Nevada Supreme Court eventually reversed the district court, but only on procedural grounds, holding that the lower court abused its discretion in considering the matter because there is no mechanism in post-conviction proceedings for bringing a lethal injection challenge.

---

[14] *Id.* at 22.
[15] *Id.*
[16] *Id.*
[17] Ex. 7.
[18] *Id.*

*Nevada Department of Corrections v. Eighth Judicial Dist. Court*, Nos. 74679, 74722, 2018 WL 2272873, *2 (Nev. May 10, 2018) (unpublished order).

### C.   Nevada's current execution protocol

33.     While the State's petition for writ of mandamus was pending before the Nevada Supreme Court, the State altered its execution protocol. Because it had run out of its supply of diazepam, the State substituted the drug midazolam (like diazepam, a benzodiazepine) as the first drug in the protocol. The new protocol continues to utilize fentanyl as the second drug, and cisatracurium as the third and final killing drug. In June 2018, NDOC officially signed and adopted the new execution protocol, which represents the State's current protocol as of the date of the filing of this Complaint.[19]

34.     Nevada's current execution protocol presents essentially the same problems as presented by the November 9, 2017 protocol. The current protocol provides for the following procedure:

35.     **Step One:** Drug administrators are to inject the condemned inmate with 500 milligrams (10 syringes) of midazolam; executioners then wait 2 minutes; personnel then perform a verbal stimulus check (*i.e.* move fingers, thumbs up, open eyes) and a painful stimulus check in the form of a "medical grade pinch"; if no response from the inmate is perceived, the executioners proceed to Step Two.

36.     If the condemned inmate responds to the verbal or physical stimulus checks, drug administrators are to inject an additional 500 milligrams of midazolam

---

[19] Ex. 5 (Nevada Department of Corrections Execution Manual (2018)).

17

into the body of the inmate.

37.     **Step Two**: Drug administrators are to inject the inmate with 5,000 micrograms (10 syringes) of fentanyl; executioners then wait 90 seconds; personnel then perform a physical stimulus check in the form of a "medical grade pinch"; if no response from the inmate is perceived, the executioners proceed to Step Three.

38.     If the inmate responds to the physical stimulus check, drug administrators inject an additional 2,500 micrograms of fentanyl into the body of the inmate.

39.     **Step Three:** Drug administrators are to inject the condemned inmate with 100 milligrams (5 syringes) of cisatracurium; executioners then wait 5 minutes; drug administrators then inject the inmate with an additional 100 milligrams (5 syringes) of cisatracurium; personnel then turn on the cardiac monitor, and the attending physician or other medical personnel observe until the monitor until there is no longer any electrical activity, i.e., the heart has stopped.

40.     The Coroner is then called into the death chamber and pronounces the inmate deceased and pronounces the time of death.

### 1.  The risks created by the three drugs in Nevada's execution protocol

41.     Each of the three drugs in Nevada's protocol carry risks of pain and suffering.

#### a.   Risks created by Nevada's intended use of midazolam

42.     The intended purpose of midazolam, the first drug in Nevada's three-drug protocol, is to anesthetize the prisoner, rendering him or her unconscious and

18

insensate to pain and suffering throughout the execution procedure. Midazolam, however, is physically and pharmacologically incapable of inducing general anesthesia, regardless of how large the dose of the drug administered.[20]

### i.   Midazolam is not a proper anesthetic.

43.   Under traditional three-drug execution protocols, the initial drug delivered is a barbiturate, such as sodium thiopental or pentobarbital, for the purpose of inducing general anesthesia and rendering the subject unconscious and insensate to pain. Unlike sodium thiopental and pentobarbital, midazolam is not a barbiturate. Rather, midazolam is a benzodiazepine.[21] Benzodiazepines are a class of drugs used primarily for treating anxiety. Midazolam is a central nervous system depressant that produces sedative, hypnotic, muscle relaxant, anxiety inhibitory, and anticonvulsant effects. It is capable of inducing sedation and amnesia, but it

---

[20] Ex. 11 at 11, 29 (Declaration of Dr. David J. Greenblatt, Mar. 5, 2021); Ex. 12 at 9, 23 (Declaration of Dr. Craig W. Stevens, Jan. 14, 2021).

David J. Greenblatt, M.D., is a professor of anesthesiology at Tufts University School of Medicine and a Board-certified clinical pharmacologist. In addition to his training and work experience, Dr. Greenblatt is arguably the preeminent scholar on the pharmacological effects of benzodiazepines, including midazolam. He co-authored C.A. Naranjo et al., *A method for estimating the probability of adverse drug reactions*, Clinical Pharmacology and Therapeutics 30:239–45 (1981), which has been cited in more than 8000 subsequent scholarly works. *See In re Ohio Execution Protocol Litigation*, 2:11cv1016, 2019 WL 244488 at \*27 (S.D. Ohio, January 14, 2019); *see also* Google Scholar, David J. Greenblatt, https://scholar.google.com/citations?user=IBsLHTcAAAAJ&hl=en&oi=sra.

Craig Stevens, PhD., is a Professor of Pharmacology at the Oklahoma State University, College of Osteopathic Medicine, and a recognized expert in the field of pharmacology.

[21] Ex. 11 at 10; Ex. 12 at 23.

cannot protect against sensations of pain. It has no pain-relieving properties (studies have shown that midazolam actually increases the perception of pain). And it cannot produce the level of unconsciousness, unawareness, and lack of sensation necessary to not feel the severe pain from paralysis of the lungs—i.e., the lack of consciousness, awareness and sensation associated with the state of general anesthesia in a medical context.

44.   Midazolam is typically administered prior to the administration of an anesthetic.[22] Midazolam itself is not used, nor is it FDA-approved for use, as a standalone anesthetic.

45.   An individual can still consciously experience one's surroundings and feel severe pain and horrific stimuli, such as that associated with the third drug, cisatracurium, while under sedation using midazolam.[23]

46.   Midazolam has a "ceiling effect" (estimated at 25 to 40 milligrams) which limits the effect of large doses and prevents it from reliably causing a person to become unconscious, unaware, and insensate during the administration of severely painful stimuli.[24] Midazolam binds with a neurotransmitter known as "GABA" to produce sedation.[25] Because GABA is present in the brain in limited quantities, midazolam's sedative properties are limited, thereby producing ceiling effect phenomenon.[26] Consequently, any dose of midazolam more than 25 to 40

---

[22] Ex. 12 at 9.
[23] Ex. 11 at 13–15, 28; Ex. 12 at 9–11.
[24] Ex. 12 at 5–9.
[25] Ex. 11 at 11; Ex. 12 at 6–10.
[26] Ex. 11 at 18–20; Ex. 12 at 8–9.

milligrams will have no effect and serves no purpose.[27] The administration of 500 milligrams of midazolam (as required by the Execution Protocol) may sedate Floyd, but it will not produce general anesthesia and will not render Floyd insensate to pain and suffering.[28]

47.    The crucial fault of midazolam is that it is a sedative-hypnotic, a drug designed to put someone to sleep. Thus, an inmate given midazolam would fall asleep and appear unconscious, but once pain or suffering is introduced, the body would overcome the inhibitory effect of midazolam and rouse the inmate, who would then awaken to extreme pain and suffering. *See Irick v. Tennessee*, 139 S. Ct. 1, 2 (2018) (Sotomayor, J., dissenting from denial of application for stay) (noting midazolam will not prevent prisoner from "experienc[ing] sensations of drowning, suffocating, and being burned alive from the inside out")); *accord Zagorski v. Parker*, 139 S. Ct. 11 (2018). (Sotomayor, J., dissenting from denial of application for stay).

48.    The State's use of midazolam in their execution protocol creates a substantial risk that Floyd will suffer "air hunger" and feel the effects of suffocation.[29] Air hunger is the inability to satisfy the physiologic and psychologic urge to breath Air hunger is a terrifying, horrifying, and painful experience. *See, e.g., In re Ohio Execution Protocol Litigation*, 994 F. Supp. 2d 906, 912 (S.D. Ohio 2014). Midazolam will not prevent Floyd from being conscious, or feeling and being

---

[27] Ex. 12 at 9.
[28] Ex. 11 at 15, 29; Ex. 12 at 12.
[29] Ex. 11 at 15, 23.

aware of the severe pain, horrific sensation and agony of air hunger, or the effects of dying from IV injection of the third drug in Nevada's three-drug execution protocol.

### ii. Midazolam itself causes pain and suffering.

49. In addition, there is substantial evidence that midazolam causes "flash" or acute pulmonary edema.[30] Flash or acute pulmonary edema results from direct toxic/caustic damage to the small blood vessels in the lungs (alveolar capillaries), which causes immediate leakage of fluid through the damaged capillaries into the lungs.[31] This is because of midazolam's acidity, which is significantly lower than normal blood pH. As a result of that low pH, a large dose of midazolam, injected in the bloodstream—like the 500 milligram dose provided in the execution protocol—is very likely to cause pulmonary edema.[32]

50. Flash pulmonary edema produces foam or froth in the airways of the lung (bronchi and trachea) resulting from the mixture of air, edema fluid, and pulmonary surfactant (a detergent-like secretion normally present in the airspaces). As a result, flash pulmonary edema causes obstruction or partial obstruction of the upper airway, thus greatly increasing the work of breathing, such that the chest muscles and diaphragm strain as they expend greater effort to try to move air into the lungs. Acute pulmonary edema produces "feelings such as an inability to get enough oxygen, suffocation, gasping and fighting desperately for breath."[33] The

---

[30] *Id.* at 21–25, 29.

[31] *Id.* at 22. "Flash" or non-cardiogenic pulmonary edema is distinguished from cardiogenic pulmonary edema which occurs more gradually when fluid backs up in the lungs as a result of heart failure.

[32] *Id.* at 23–25.

[33] *Id.* at 23.

feeling can be "terrifying," as "the person suffering it … fight[s] ever harder to take in oxygen as the lungs fill with fluid."[34]

51.     Thus, pulmonary edema prior to the loss of consciousness produces excruciating feelings and sensations similar to drowning and asphyxiation as fluid occupies a greater volume of the air spaces in the lungs. The experience of pulmonary edema in a prisoner who is still sensate will cause the prisoner "to endure great suffering as he will struggle to breathe with damaged lungs that cannot exchange air."[35] For an inmate restrained in a prone position, like Floyd would be, those feelings would be heightened.

52.     Autopsies performed on prisoners who were executed with midazolam confirm that acute pulmonary edema occurs in virtually every instance, revealing signs of heavy, congested lungs and bloody froth in the lungs and upper airways. Witness reports of midazolam executions support the autopsy findings, demonstrating that prisoners who were executed with midazolam were sensate and continued to breathe after the onset of the pulmonary edema, experiencing burning sensations, labored breathing, gasping, and other signs of severe pain and respiratory distress.

53.     Flash pulmonary edema will occur immediately upon administration of a large dose of midazolam. "The damage from a volume of acid like that involved in Nevada's execution protocol will be immediate, as it will start to happen on the

---

[34] *Id.*
[35] *Id.* at 29.

very first circulation."[36] It is Dr. Greenblatt's expert opinion that injecting large doses of midazolam in IV injection solution will cause severe burning sensations in the blood vessels due to the acidic nature of the midazolam in that form."[37]

54.    Because midazolam is not an analgesic drug and will not render the condemned inmate unconscious and insensate to pain and suffering, the inmate is sure or very likely to experience the severe pain and suffering associated with the drugs in the Nevada execution protocol, including sensations of drowning and suffocation.[38]

55.    In recent lethal injection litigation, following an evidentiary hearing at which several lay witnesses and eight expert witnesses testified, the Southern District of Ohio found the use of midazolam in Ohio's three-drug execution procedure (with the same dosage as used in the State's protocol)  was likely to cause unconstitutional pain and suffering. *In re Ohio Execution Protocol Litigation,* No. 2:11-cv-1016, 2019 WL 244488 at *63 (S.D. Ohio Jan. 14, 2019). [39] Based on

---

[36] *Id.* at 23.
[37] *Id.* at 29.
[38] *Id.* at 11, 15, 28.
[39] The decision addressed death row inmate Warren Henness's motion for preliminary injunction. The court, applying *Glossip*'s two-pronged test, ultimately denied the motion. The court determined Henness had satisfied *Glossip*'s first prong by demonstrating Ohio's three-drug procedure "present[ed] a risk that is sure or very likely to cause serious pain and needless suffering," but the court concluded Henness had failed to satisfy *Glossip*'s second prong because he had not shown an alternative method of execution was available, feasible, and capable of being readily implemented. *See In re Ohio Execution Protocol Litigation, supra,* 2019 WL 244488 at *10, *70. The Sixth Circuit agreed with respect to the second prong, *In re Ohio Execution Protocol Litigation*, 946 F.3d 287 (6th Cir. 2019), but disagreed with the district court that Henness had satisfied *Glossip*'s first prong, *id.* at 290. In doing

testimony from "experts who were not just qualified, but in many cases preeminent in their fields of specialization," the court first found that midazolam is not an analgesic drug. *Id.* at \*62, \*64. On this basis the court determined midazolam is incapable of preventing the physical pain known to be caused by injection of the second and third drugs (a paralytic followed by potassium chloride) under Ohio's execution protocol. *In re Ohio Execution Protocol Litigation.* 2019 WL 244488 at \*62–63.

56.     The court next found that Ohio's use of a 500-milligram dose of midazolam as the initiatory drug was "certainly or very likely to cause pulmonary edema, which is both physically and emotionally painful to a severe level." *Id.* The district court found credible the testimony of expert Dr. Mark Edgar, who had reviewed twenty-eight autopsies of inmates executed with a drug protocol that included midazolam. His review confirmed the presence of pulmonary edema in 24 of the 28 of the inmates executed. *Id.* at \*59. The court observed that 28 autopsy reports appeared to represent the entire number of such reports available for review and noted that when "more than eighty-five percent of the entire possible sample has a confirmed diagnosis, it is good science to infer that midazolam caused it, since they all were executed with midazolam." *Id.* at \*63.

---

so, however, the panel did not invalidate the district court's specific findings of fact regarding the risk of pain and suffering presented by Ohio's use of midazolam in its procedure; rather, the panel reasoned that the constitutional standard required the pain caused by the method of execution be akin to the pain resulting from methods such as "breaking on the wheel, flaying alive, [and] rending asunder with horses," which Henness had not shown. *Id.*

57.    The court further found that the occurrence of pulmonary edema was itself painful:

> [P]ulmonary edema itself certainly or very likely causes severe pain and needless suffering. In all the hearings in this case, the Court has heard lay descriptions of labored breathing of various sorts by condemned inmates after injection of midazolam, commonly referred to as air hunger. Dr. Edgar has now provided a medical explanation of air hunger: it comes from pulmonary edema, which means the airways in the lungs are filling up with fluid instead of air.

*Id.* The court described the pain vividly: "All medical witnesses to describe pulmonary edema agreed it was painful, both physically and emotionally, inducing a sense of drowning and the attendant panic and terror, much as would occur with the torture tactic known as waterboarding." *Id.*

58.    Since those 2019 findings, additional evidence has surfaced demonstrating that midazolam causes pulmonary edema. An investigation by National Public Radio expanded upon the evidence of pulmonary edema in executed inmates significantly. A review of more than 200 autopsies—obtained through public records requests—showed signs of pulmonary edema in 84% of the cases, closely matching the findings in the Ohio litigation.[40] The findings were similar across death penalty states.[41]

59.    Accordingly, midazolam not only will fail to protect Floyd from experiencing the excruciating pain and needless suffering caused by the third drug

---

[40] NPR Investigations, *Gasping for Air: Autopsies Reveal Troubling Effects of Lethal Injection*, https://www.npr.org/2020/09/21/793177589/gasping-for-air-autopsies-reveal-troubling-effects-of-lethal-injection.

[41] *Id.*

in Nevada's protocol, but it also will independently and separately cause Floyd to experience severe pain and suffering, by triggering the agonizing effects of flash pulmonary edema. The protocol thus creates a substantial, foreseeable, and avoidable risk that prisoners will suffer significant pain and suffering.

                                  **iii.**     **Midazolam is known to cause a paradoxical reaction that increases, instead of decreases, sensations of pain.**

60.    Use of midazolam in an execution carries a substantial risk of creating a paradoxical reaction, where the inmate becomes hyperaware, instead of unaware, of the proceedings. As a result of that heightened state of awareness, the inmate would experience even more pain from injection of the paralytic drug, suffocation, a heart attack, or other pain associated with the process as the injected lethal drug does its work.

61.    The risk of a paradoxical effect is even greater when the individual in whom the drug is injected has suffered a brain injury or head trauma, or has a history of aggression or impulsivity, substance abuse, psychiatric disorders, or PTSD. Floyd was born with brain damage caused by his prenatal exposure to alcohol.[42] He then endured a childhood full of physical and verbal violence from his step-father, and, as a result of that abuse and consequent PTSD, as well as a pre-genetic disposition for addiction due to his FASD, began abusing drugs and alcohol at an early age.[43] He joined the military at age 18, exacerbating his PTSD and

---

[42] *See* ECF No. 66 at 83–97.
[43] *See id.* at 37–40.

27

psychiatric disorders.[44]  Combined, Floyd's history puts him at an increased risk of experiencing this paradoxical effect.

> **iv.    The State has provided no assurances that it will properly store and administer midazolam to decrease the risk it will cause unconstitutional pain and suffering.**

62.    There is no evidence that the State will properly titrate the drug. The FDA-approved intravenous dose for an adult patient is 1 milligram to 2.5 milligrams to induce sedation. Labeling instructions caution that high doses (e.g., more than 1 milligram) must be titrated (the "push rate") slowly in order to be effective. Specifically, the FDA-approved label counsels that doses of 1 to 2 milligrams be administered over the course of three minutes.

63.    There is also no evidence that the State will store the drug at the correct temperature. To be effective, midazolam must be stored at temperatures between 68 and 77 degrees Fahrenheit.

64.    Finally, there is no evidence that the State will use unexpired drugs. Midazolam typically has a shelf life of three years from the date of manufacture. These risks presented by midazolam are not merely speculative. As an ever-growing body of evidence from executions using midazolam demonstrates, the drug is unsuitable for use in executions.

65.    For example, in April 2014 Oklahoma executed Clayton Lockett using

---

[44] *See id.* at 41.

28

midazolam for the first time as the initial drug.[45] After working for nearly an hour to establish intravenous access, the execution team injected midazolam, vecuronium bromide, and most, but not all, of the potassium chloride.[46] Lockett then regained consciousness, beginning to strain against the restraints, buck his head, and speak.[47] The Director of the Oklahoma Department of Corrections and the Governor of Oklahoma eventually called off the execution, but Lockett died a short time later.[48] President Obama described the execution as "deeply troubling."[49]

66.    Undeterred, Oklahoma used midazolam again in the execution of Charles Warner in January 2015.[50] After the executioners administered 500 milligrams of midazolam, witnesses heard Warner say his body was "on fire."[51]

67.    Similarly, in Arizona, just a few months after Lockett's botched execution, Joseph Wood gasped on the execution table for nearly two hours before dying.[52] A media witness compared Wood's breathing to a "fish gulping for air," and

---

[45] Jeffrey E. Stern, *The Cruel and Unusual Execution of Clayton Lockett*, The Atlantic, https://www.theatlantic.com/magazine/archive/2015/06/execution-clayton-lockett/392069/.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] Andrew Buncombe, *Charles Warner execution: Oklahoma inmate's last words are 'my body is on fire' as state carries out first death penalty in nine months*, Independent, https://www.independent.co.uk/news/world/americas/charles-warner-execution-my-body-fire-9981842.html.

[51] *Id.*

[52] *See* Michael Kiefer, *Reporter describes Arizona execution: 2 hours, 640 gasps*, AZ Central, July 24, 2014. https://www.azcentral.com/story/news/arizona/politics/2014/07/24/arizona-execution-joseph-wood-eyewitness/13083637/.

a second reported counted Wood gasping more than 600 times.[53] Senator John

McCain of Arizona described Wood's execution as tantamount to "torture."[54]

68.     There are several other examples. In Arkansas in 2017, Kenneth

Williams coughed and convulsed after the executioners administered the drugs.[55] At

points during the execution, his breathing was so heavy that a media witness saw

his back arch off the gurney.[56] In Ohio in 2017, Gary Otte's stomach rose and fell

repeatedly after executioners injected midazolam.[57] Otte's attorney observed that

his face was teary and his hands were clenched.[58] And in Tennessee in 2018, Billy

Ray Irick moved during his execution, leading witnesses to believe the midazolam

he was given did not render him fully unconscious and insensate to pain.[59]

69.     These are just a handful of more recent cases; other examples abound.

*See, e.g.*, Deborah W. Denno, *When Legislatures Delegate Death: The Troubling*

*Paradox Behind State Uses of Electrocution and Lethal Injection and What it Says*

---

[53] *Id.*

[54] Ben Brumfield & Mariano Castillo, *McCain: Prolonged Execution Was Torture*, CNN, http://www.cnn.com/2014/07/25/justice/arizona-execution-controversy/.

[55] *See* Jacob Rosenberg, *Arkansas Executions: I Was Watching Him Breathe Heavily and Arch His Back*, The Guardian, https://www.theguardian.com/us-news/2017/apr/25/arkansas-execution-eyewitness-marcel-williams.

[56] *Id.*

[57] *Rising and falling of Ohio inmate's stomach was not enough to stop his execution, judge explains*, NY Daily News, https://www.nydailynews.com/news/crime/inmate-drug-reaction-not-stop-execution-judge-article-1.3508904.

[58] *Id.*

[59] Dave Boucher & Adam Tamburin, *Tennessee execution: Billy Ray Irick tortured to death, expert says in new filing*, The Tennessean, https://www.tennessean.com/story/news/crime/2018/09/07/tennessee-execution-billy-ray-irick-tortured-filing/1210957002/.

1      *About Us*, 63 Ohio St. L.J. 63, 139 (2002); Deborah W. Denno, *Getting to Death: Are*

2      *Executions Unconstitutional?*, 82 Iowa L. Rev. 319, 428–29 (1997). Due to these

3      significant problems associated with midazolam, at least three states, Kentucky,[60]

4      Florida,[61] and Arizona[62] have ceased using the drug in executions.

                 **b.**      **Risks created by Nevada's intended use of fentanyl**

6         70.      Fentanyl is a powerful synthetic opioid. As an opioid, fentanyl has

7      analgesic properties, but it can be lethal in minute amounts.[63] Fentanyl, however,

8      cannot be relied on to induce unawareness. Like midazolam, is not a general

9      anesthetic. Thus, the inclusion of fentanyl in Nevada's novel drug protocol does not

10      alleviate the substantial and unjustified risk that Floyd will be aware while he is

11      being killed, and that he will agonizingly suffocate to death. Neither midazolam nor

12      fentanyl, alone or together, can reliably obtain a sufficient state where Floyd is

13      unaware of what is happening to him.

14         71.      It is well established that even high doses of fentanyl cannot reliably

15      block awareness. This recognition in the field of anesthesiology dates back thirty-

16      five to forty years, when practitioners utilizing high doses of fentanyl by itself, or

---

[60] *Kentucky drops 2-drug executions, reworking method*, Daily Mail, http://www.dailymail.co.uk/wires/ap/article-2834665/Kentucky-drops-2-drug-executions-reworking-method.html.

[61] Death Penalty Information Center, *Overview of Lethal Injection Protocols*, https://deathpenaltyinfo.org/executions/lethal-injection/overview-of-lethal-injection-protocols.

[62] *See Wood v. Ryan*, No. 2:14-cv-1447, ECF No. 145 at 2 (D. Ariz. Oct. 17, 2016) (brief explaining that Arizona "has committed to removing midazolam as an option from [Arizona's execution protocol] and now unequivocally commits not to use midazolam again, even if it becomes available").

[63] Ex. 11 at 26.

with a limited additional agent such as a benzodiazepine, in performing open heart surgeries discovered instances of patient awareness during the operation.[64] As a result, doctors stopped the practice of using high-dose fentanyl to achieve anesthetic depth, and other formulas, including fentanyl (in lower dosages) but used in combination with myriad other chemical agents, became the standardized practice.

### c. Risks created by Nevada's intended use of cisatracurium

72.     Nevada's intended use of the third drug, cisatracurium, under its protocol is unprecedented—this protocol represents the first time any state has proposed using a paralytic as the final killing drug. The use of paralytics in other states' execution protocols is limited to administration prior to the final killer drug (typically potassium chloride), to ensure paralysis by the time the potassium chloride induced a heart attack, hiding the condemned inmate's torment to those viewing the execution. Here, in contrast, the State intends to use the paralytic to actually kill Floyd, by freezing his muscles, including his diaphragm, causing Floyd to die by suffocation.

73.     Using a paralytic agent this way presents a substantial and unjustified risk of causing pain and suffering. As Chief Justice Roberts noted in *Baze v. Rees*, "failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation

---

[64] *See*, *e.g.*, Jonathan B. Mark & Leslie M. Greenberg, *Intraoperative Awareness and Hypertensive Crisis during High-Dose Fentanyl-Diazepam-Oxygen Anesthesia*, 62 Anesth Analg. 698–700 (1983); Nagaprasadarao Mummanemi, M.D., *Awareness and Recall with High-Dose Fentanyl-Oxygen Anesthesia*, 59 Anesth Analg, 948–49 (1980).

from the administration of pancuronium bromide [a paralytic]." 553 U.S. 35, 53 (2008). Just so here: should the first two drugs fail to achieve the desired state of unconsciousness, "there is a substantial, constitutionally unacceptable risk of suffocation from the administration of" cisatracurium. *Id.*

74.    Because the State's execution plan is unique, only one court has ever considered the constitutionality of using a paralytic as a killing agent—the Eighth Judicial District Court in Clark County, Nevada. That court recognized the harm presented by Nevada's protocol. The substantial risk of harm created by use of cisatracurium as the third drug was established during state court litigation involving Nevada's November 2017 protocol that utilized the same second and third drugs.[65] Expert witness Dr. David Waisel, an anesthesiologist from Boston Children's Hospital in Boston, Massachusetts, considered Nevada's execution protocol and found the use of cisatracurium unjustifiable. The paralytic third drug, Dr. Waisel explained, was unnecessary to effectuate death because, if the dosages of the first two drugs at the levels he recommended were properly administered, the inmate would have stopped breathing by the time the third drug was administered.[66] It is therefore unnecessary to use cisatracurium to hasten death— there is no benefit to using the paralytic.[67] On the other hand, if the first two drugs

---

[65] The protocol at issue in that case was substantially similar to the one at issue here, with the only difference being the first drug: diazepam, a benzodiazepine, used in the former protocol, replaced by midazolam, also a benzodiazepine, in the current protocol.

[66] Ex. 2 at 25.

[67] *Id.* at 26–27.

are not properly administered, there is a substantial risk that the paralytic drug will cause cruel pain and suffering, as the inmate will be aware and sensate as he is slowly suffocated to death.[68]

75.     Thus, the expert concluded, the paralytic drug provides no benefit while at the same time creating a substantial risk of pain and suffering.[69] In a medical setting, such a risk would never be taken: "In medicine, every risk we take we want a benefit for. We never take a risk that does not give a benefit."[70]

76.     The state court found Waisel's testimony credible and persuasive. Following the evidentiary hearing, the court enjoined NDOC from conducting an execution utilizing its three-drug protocol, specifically finding the State's use of a paralytic drug presented an unconstitutional risk of injury and an objectively intolerable risk of harm, in violation of the Eighth Amendment and the corresponding provision of the Nevada Constitution.[71]

### 2. Risks presented by inadequate provisions for staff training

77.     Nevada's execution protocol fails to provide for proper training of execution team members and to ensure minimum qualifications of medical personnel participating in executions, exacerbating the risks presented by Nevada's experimental lethal injection procedure.

78.     The lack of adequate provision for training was also the subject of expert testimony in the state court litigation concerning the potential execution of

---

[68] *Id.*
[69] Ex. 2 at 107–08.
[70] *Id.* at 108.
[71] Ex. 7 at 15–16.

34

volunteer Scott Dozier.[72] The expert anesthesiologist for the Floyd, Dr. David

Waisel, who additionally possessed expertise in lethal injection executions, provided

oral testimony and sworn declarations in which he opined that Nevada's protocol

failed to adequately set forth the execution staff qualifications and training needed

for conducting an execution.

79.     As Dr. Waisel testified in state court proceedings on Nevada's

execution protocol, ensuring proper training and qualification is crucial:

> The protocol is predicated on an assessment of anesthetic
> depth. That is whether [the inmate] can respond. That is
> a skill that comes from training and experience. Without
> knowing that, it is impossible to assess the risk of an
> error in this rather—in this assessment, which is actually
> an art. It's not a black-and-white matter. It's an ability to
> assess for subtle signs that may indicate that there's a
> potential for response.[73]

80.     In other words, executions require a trained, qualified medical

professional to assess the condemned inmate's level of anesthetic depth. Under

Nevada's current protocol, assessment of the anesthetic depth of the inmate prior to

administering the final, killing drug, is achieved by the "attending physician *or*

other medical personnel," who must attempt to elicit a response to tactile stimuli—

in the form of a "medical grade pinch. Just because an individual does not respond

to tactile stimuli, however, does not necessarily mean the person is unaware.[74]

Indeed, the expert noted that even a medical school graduate practicing as  a

---

[72] Provision for training in Nevada's 2018 protocol is the same as that
provided in the November 2017 protocol about which Dr. Waisel provided
testimony.

[73] Ex. 2 at 32.

[74] Ex. 2 at 33.

licensed surgeon would not necessarily know when a person was sufficiently unaware to accurately administer the cisatracurium: "this assessment is not something that is part of surgical training, nor is it part of something that they practice on a daily basis or a frequent basis."[75] And Dr. Waisel further testified to being unaware of the term "medical grade pinch" used by Nevada's protocol and being unaware of any objectively ascertainable definition of the term.[76]

81.    Dr. Waisel ultimately opined that if execution staff's ability to assess anesthesia is limited by inadequate training or lack of experience, an error is more likely to occur. "If they are wrong, in other words, if he's not sufficiently anesthetized and he receives cisatracuriam, he is at risk for being aware and paralyzed, which is quite harmful to [the condemned inmate]."[77] In addition, as Dr. Waisel explained, a prison setting is a dramatically unfamiliar situation and location for execution team personnel, which increases the risk of errors.[78] Risks are further increased if staff is inexperienced, and thus high quality practice is "of critical importance."[79] Practice means having a sufficient number of rehearsals prior to the execution to ensure the execution team is prepared and ready. However, having reviewed Nevada's updated execution protocol, Dr. Waisel noted that it failed to provide any assurances regarding the training, practice, and experience of

---

[75] *Id.*
[76] *Id.* at 34.
[77] *Id.* at 35.
[78] Ex. 8 at 2–3.
[79] *Id.* at 3, 5.

its personnel involved in the execution.[80] He specifically noted the protocol failed to state the amount of experience minimally required for the EMTs responsible for placing the IV lines, and it failed to require the attending physician to have specialized training and sufficient experience assessing and monitoring anesthetic depth.[81] Dr. Waisel opined that the combination of factors presented by the shortcomings in Nevada's execution protocol created a substantial risk of harm:

> In short, having inexpert executioners in an unfamiliar and suboptimal location performing an event they have not done before and have not had sufficient high-quality practice performing, using a novel unproven technique, creates a substantial risk for an error that causes substantial harm.[82]

82.     Dr. David Greenblatt, who reviewed Nevada's June 2018 Protocol, shares the same opinion as Dr. Waisel regarding the need for an appropriately trained and qualified medical professional to assess the inmate's level of anesthetic depth:

> [I]t is absolutely necessary that a current, active licensed physician, experienced with anesthesia or emergency medicine, be present during the procedure to, at minimum, direct and oversee the actions or performance of the other execution team members involved in carrying out the execution.[83]

83.     Thus, Nevada's execution protocol is insufficient in that it does not provide any assurance that the individual, even if he or she is a physician, is adequately trained and professionally qualified to assess the condemned inmate's anesthetic depth. This flaw in the protocol is exacerbated by the ambiguity

---

[80] *Id.* at 3, 6.
[81] *Id.* at 6.
[82] *Id.* at 3.
[83] Ex. 11 at 27–28.

regarding the presence of an attending physician—as opposed to some undefined "other medical personnel"—to monitor the anesthetic depth and to perform the verbal and physical stimuli checks.

84.    In addition, the current protocol assigns to "Drug Administrators" the responsibility of injecting the drugs.[84] The protocol fails to set forth any minimal qualifications and experience required of the drug administrators.

85.    Nevada's June 2018 protocol appears to provide for no more execution team training than that provided in the November 2017 protocol, with one exception. The 2018 protocol added a provision in EM 110 "Execution Procedure" stating that, prior to the execution, the Warden is to receive "practical training" in measuring and reporting level of consciousness, and monitoring the IV sites for signs of compromise.[85] Even with practical training, however, the Warden is not qualified to perform these tasks. Having unqualified personnel carrying out a lethal injection creates undue risk of harm and a botched execution.

### 3.  Failure to provide right of access to counsel and to the courts

86.    The execution protocol spells out various procedures and a timeline for the day of the inmate's scheduled execution, including final visitation rights of the condemned inmate, and right to have a representative family member present at the execution, but it glaringly omits any reference to the condemned inmate's counsel.[86] Thus, Nevada's current execution protocol fails to provide the condemned

---

[84] Ex. 5 at 48.
[85] Ex. 5 at 47.
[86] *See generally* Ex. 5.

inmate with adequate access to counsel and to the courts on the day of his

scheduled execution. This includes a failure to provide such access during the final

hours leading up to, and at the time of, the execution. This omission is exacerbated

by the State's scheduling of an execution during a pandemic, with only one month's

notice, while the prison is closed to visitors—including attorneys representing

condemned inmates.

## VII.   CLAIMS FOR RELIEF

### Count I:  Proceeding with Floyd's execution under the current protocol violates his Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment.

1.      Nevada's three-drug execution protocol, utilizing midazolam, fentanyl

and cisatracurium, violates Floyd's right to be free from infliction of cruel and

unusual punishment under the Eighth Amendment to the United States

Constitution.

2.      Floyd realleges and incorporate herein by reference all of the preceding

paragraphs of this Complaint as if set forth in full below.

### A.      Nevada's execution protocol presents a substantial risk of serious harm.

3.      The Eighth Amendment forbids the Government, in carrying out a

death sentence, from inflicting pain beyond that necessary to end the condemned

prisoner's life. *In re Kemmler*, 136 U.S. 436, 447 (1890). "Punishments are cruel

when they involve torture or a lingering death . . . something more than the mere

extinguishment of life." *Id.*; *see also Baze v. Rees*, 553 U.S. 35, 50 (2008) (explaining

an execution violates the Eighth Amendment if it presents a "substantial risk of

serious harm"); *Bucklew v. Precythe*, 139 S. Ct. 1112, 1126 (2019).

1.   **The three drugs in Nevada's execution protocol create an unconstitutional risk of pain and suffering.**

4.      Nevada's execution protocol presents a substantial risk of serious harm in violation of the Eighth Amendment. The experimental, never-before-used procedure creates a risk of inflicting excruciating pain.

a.   **Midazolam, the first drug, does not function as needed, causes pain and suffering, and has been linked to numerous botched executions.**

5.      Specifically, the first drug to be utilized, midazolam, is not an analgesic drug and at any dosage is unable to put the inmate in a state of being so deeply sedated as to be unconscious and insensate.[87] Even after the maximum sedative effect is reached, Floyd will nevertheless remain sensate and is sure or very likely to experience the severe pain and suffering associated with the third drug in the Nevada protocol.[88] In addition, Floyd is sure or very likely to suffer from acute pulmonary edema, causing a sensation of severe burning in his blood vessels and feelings of suffocation, including gasping and fighting desperately for breath.[89] Following administration of the required midazolam, Floyd is also certain or very likely to remain sensate to the severe pain and suffering associated with injecting the third drug under Nevada's protocol.[90]

b.   **Fentanyl, the second drug, cannot be relied on to induce unawareness.**

6.      Nevada's use of fentanyl, an opioid, as the second drug in its lethal

---

[87] Ex. 11 at 28.
[88] *Id.*
[89] *Id.* at 23, 29.
[90] *Id.*

injection procedure contributes to the substantial risk of harm presented by Nevada's experimental protocol. Specifically, because Nevada's first drug, midazolam, is inadequate for the intended purpose, it is imperative that the second drug reliably induce the requisite depth of anesthesia and render the inmate completely unconscious, unaware, and insensate to pain. Fentanyl, however, is demonstrated to be unreliable, even in high doses, for inducing unawareness.[91] Its experimental use in Nevada's protocol creates an undue and substantial risk that Floyd will be aware, will experience "air hunger," and will suffer a horrific death when the third drug, cisatracurium, is introduced into his body.

> **c.    Cisatracurium, the third drug, is a paralytic that could cause Floyd to be paralyzed and awake while dying of suffocation.**

7.    Finally, the third drug, the paralytic cisatracurium, will paralyze Floyd's muscles, including his diaphragm, causing him to experience "air hunger" and die by suffocation. This will cause extreme pain should the first two drugs not be properly administered—a likely outcome given the other problems with the State's execution protocol. Worse yet, there is no need for taking this risk— cisatracurium, is wholly unnecessary in the execution process:  *Proper* delivery of the second drug, fentanyl, will kill Floyd.

8.    "[T]he purposeless and needless imposition of pain and suffering" is by

---

[91] *See*, *e.g.*, Jonathan B. Mark & Leslie M. Greenberg, *Intraoperative Awareness and Hypertensive Crisis during High-Dose Fentanyl-Diazepam-Oxygen Anesthesia*, 62 Anesth Analg. 698–700 (1983); Nagaprasadarao Mummanemi, M.D., *Awareness and Recall with High-Dose Fentanyl-Oxygen Anesthesia*, 59 Anesth Analg, 948–49 (1980).

definition "unconstitutional punishment." *Atkins v. Virginia*, 536 U.S. 304, 319 (2002) (quoting *Enmund v. Florida*, 458 US 782, 798 (1982)); *see Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (pronouncing that a "sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering"); *see also Hope v. Pelzer*, 536 U.S. 730 (2002) (explaining that punishment involving hitching post "amounts to gratuitous infliction of 'wanton and unnecessary' pain" and violates "basic concept underlying the Eighth Amendment [which] is nothing less than the dignity of man."); *Coker v. Georgia*, 433 U.S. 584, 592 (1977) (plurality opinion) (explaining  punishment is excessive if it is "nothing more than the purposeless and needless imposition of pain and suffering"); *La ex rel. Francis v. Resweber*, 329 US 459, 463 (1947) ("The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence."). That is precisely the case here.  The State's proposed use of cisatracurium as the third drug in its protocol presents a risk of severe, substantial, and  serious pain and suffering—the risk that Floyd will experience "air hunger," while aware yet paralyzed and suffocating to death.  Executing Floyd under the current protocol, despite of less harmful alternatives, would violate his Eighth Amendment right to be free from cruel and unusual punishment.

### 2. The lack of necessary safeguards in Nevada's protocol increases the substantial risk of harm.

9.    On their own, the harm from the three drugs render any execution under the current protocol unconstitutional. But the substantial risk of harm is

heightened even further by the protocol's failure to provide for adequate training, access to counsel, and access to the courts.

**a.    Nevada's execution protocol does not provide for adequate training of members of the execution team.**

10.     As anesthesiologist Dr. Waisel testified in 2017, the State's current execution protocol fails to provide for adequate training of execution team members to ensure a lawful execution. The protocol is predicated on an assessment of anesthetic depth. That is whether [the inmate] can respond. That is a skill that comes from training and experience. Without knowing that, it is impossible to assess the risk of an error in this rather—in this assessment, which is actually an art. It's not a black-and-white matter. It's an ability to assess for subtle signs that may indicate that there's a potential for response.[92]

11.     In other words, the State, in order to properly assess anesthetic depth, must include in the execution team a trained, qualified medical professional. But the current protocol lacks that provision, failing to provide any assurances regarding the training, practice, and experience of its personnel involved in the execution.[93] Dr. Waisel specifically noted the protocol fail to state the amount of experience minimally required for the EMTs responsible for placing the IV lines, and it failed to require the attending physician to have specialized training and sufficient experience assessing and monitoring anesthetic depth.[94]

12.     Instead of providing for the needed level of training, the protocol

---

[92] Ex. 2 at 32.
[93] Ex. 8 at 3, 6.
[94] *Id.* at 6.

43

simply states that the attending physician *or other medical personnel* must attempt to elicit a response to tactile stimuli (in the form of a "medical grade pinch") from the inmate.[95] This is insufficient for multiple reasons.

13.     First, as Dr. Waisel testified, lack of response to tactile stimuli does not necessarily mean the person is unaware.[96]

14.     Second, even a licensed surgeon would not necessarily know when a person was sufficiently unaware for purposes of the protocol: "this assessment is not something that is part of surgical training, nor is it part of something that they practice on a daily basis or a frequent basis."[97]

15.     Third, Dr. Waisel—a licensed anesthesiologist—testified he was unaware of the term "medical grade pinch," and he further was unaware of any objectively ascertainable definition of the term.[98]

16.      A prison is a dramatically different location than most medical personnel are used to.[99]

17.     The expert ultimately opined that if execution staff's ability to assess anesthesia is limited by inadequate training or lack of experience, an error is more likely to occur. "If they are wrong, in other words, if he's not sufficiently anesthetized and he receives cisatracuriam, he is at risk for being aware and

---

[95] Ex. 5 at 48 (emphasis added).
[96] Ex. 2 at 33.
[97] *Id.*
[98] *Id.* at 34.
[99] Ex. 8 at 2–3.

paralyzed, which is quite harmful to [the condemned inmate]."[100] Dr. Waisel added

that the combination of factors presented by the shortcomings in Nevada's

execution protocol created a substantial risk of harm:

18.     In short, having inexpert executioners in an unfamiliar and likely

suboptimal location performing an event they have not done before and have not

had sufficient high-quality practice in doing, using a novel unproven technique

dangerous[ly] creates a substantial risk for an error that causes substantial

harm.[101]

19.     Nevada's current protocol is identical to the protocol Dr. Waisel

reviewed, with one exception. The current protocol provides that at some

unspecified time prior to the execution:

> [T]he Warden will receive practical training in:
>
> 1.     Measuring and reporting the condemned inmate's
>        level of consciousness.
>
> 2.     Monitoring the IV sites for signs of compromise.[102]

20.     It is the expert opinion of Dr. David Greenblatt, however, that "the

tasks of monitoring and reporting the level of consciousness (anesthetic depth) of

the inmate, and monitoring the IV sites for signs of compromise, are not for the

prison warden to be handling."[103]

---

[100] Ex. 2 at 35.
[101] Ex. 8 at 3.
[102] Ex. 5 at 47.
[103] Ex. 11 at 28.

### b. Nevada's execution protocol fails to provide adequate access to counsel and the courts on the day of an execution.

21.     Nevada's protocol also fails to provide the condemned inmate with adequate access to counsel and to the courts on the day of his scheduled execution, including during the final hours leading up to, and at the time of, the execution. Without access to counsel and the courts, Floyd will be unable to seek vindication of his constitutional rights at the end of his life, including his right to be free from cruel and unusual punishment during the execution.

22.     Specifically, the protocol provides no assurances that Floyd will be able to communicate with his counsel and, through his counsel, the courts, should the proceedings go awry. Nor will Floyd's counsel have available means to directly communicate with Floyd and with prison officials in the event a last-minute stay of execution or commutation.

23.     These concerns are amplified by the timing of the State's execution warrant (execution to be held the week of June 7, 2021). All NDOC facilities, including Ely State Prison, have been closed to visitors since the COVID-19 pandemic began more than a year ago.[104] And the State has provided no assurances that Floyd's counsel will be able to confidentially communicate with him leading up to his execution, let alone visit in person.

24.     These shortcomings of Nevada's execution protocol exacerbate the risk that Floyd will suffer pain or severe harm during his execution.

---

[104] *See NDOC COVID-19 Updates*, State of Nevada, Department of Corrections, https://doc.nv.gov/About/Press_Release/covid19_updates/.

1

2

### B. There are feasible, readily implemented alternative methods available that would significantly reduce the substantial risk of severe pain.

25.     In *Baze*, a plurality of the Supreme Court held that, to establish an Eighth Amendment violation based on a method of execution, an inmate must identify a "feasible, readily implemented" alternative procedure that would "significantly reduce a substantial risk of severe pain." 553 U.S. at 52.[105] The Supreme Court reiterated this rule two years ago, holding that, to establish an Eighth Amendment violation, "a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019) (citing *Glossip*, 576 U.S. 863, 868–78 (2015)); *see Baze v. Rees*, 553 U.S. 35, 52 (2008). "An inmate seeking to identify an alternative method of execution," however, "is not limited to choosing among those presently authorized by a particular State's law." *Bucklew*, 139 S. Ct at 128.

26.     Here, solely for the purposes of this Complaint, and because the Supreme Court has made it a prerequisite to a successful Eighth Amendment method-of-execution challenge, counsel for Floyd identifies the following two methods of execution as feasible and readily implemented alternatives: (1) execution by firing squad; and (2) execution by a two-drug lethal injection procedure using a barbiturate as the second drug. Floyd specifically prefers to be executed by

---

[105] The Supreme Court reaffirmed this test in a majority opinion in *Glossip v. Gross*, 576 U.S. 863 (2015).

47

firing squad.

### 1.   Execution by firing squad

27.   Execution by firing squad is a feasible alternative method of execution that would significantly reduce the substantial risk of pain from Nevada's current three-drug protocol. *See Bucklew*, 139 S. Ct. at 1125.

### a.   Execution by firing squad is a feasible alternative.

28.   Three states currently authorize execution by firing squad (Mississippi, Oklahoma and Utah). Other countries have also used firing squads in executions, including the former Soviet Union, Belarus, and China.[106] Nevada has the means and ability to join these jurisdictions.

29.   For example, Utah executed Ronnie Lee Gardner on June 18, 2010, using a firing squad. And the United States military has used firing squads to execute at least eleven United States military servicemen, including Private Eddie Slovik on January 31, 1945, as well as foreign nationals during times of war. One of those executions, of German Army General Anton Dostler, was officially filmed by the United States Army Signal Corps. That film is now kept as an official United States Government record in the National Archives.[107]

### b.   Execution by firing squad significantly reduces the substantial risk of pain inherent in Nevada's current protocol.

30.   Execution by firing squad eliminates several of the risks inherent in Nevada's current protocol. For example, a firing squad eliminates risks associated

---

[106] Ex. 10.

[107] *See Anton Dostler*, Wikipedia, https://en.wikipedia.org/wiki/Anton_Dostler.

48

with establishing IV access. And a firing squad eliminates concerns with inmates' physical and medical conditions.

31.     Execution by firing squad also causes a faster and less painful death than execution by lethal injection. *See Arthur v. Dunn*, 137 S. Ct. 725, 733–34 (2017) (Sotomayor, J., dissenting) (citing reports that a firing squad may cause nearly instantaneous death, be comparatively painless, and have a lower chance of a botched execution); *see also Bucklew*, 139 S. Ct. at 1136 (Kavanaugh, J., concurring) (addressing the availability of firing squad as an alternative). And execution by firing squad "is significantly more reliable" than lethal injection. *Glossip v. Gross*, 135 S. Ct. 2726, 2796 (2015) (Sotomayor, J., dissenting). Recent studies have confirmed that execution by firing squad statistically is much less likely to result in "botched" executions than lethal injection.[108] Indeed, since the death penalty was reinstated by the Supreme Court in 1976, the firing squad has been successfully used in three executions, in 1977, 1996, and 2010.[109]

32.     Floyd specifically requests using a .22 Winchester Magnum Rimfire caliber bullet of 40 to 60 grains, fired by 2 to 3 rifles of the .22 WMR rifle class, which will ensure that the 2 to 3 bullets fired into the brainstem would have more than sufficient energy to penetrate through to the brainstem. Further, , using these

---

[108] *See* Austin Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty* (2014).
[109] *Utah Reaches Ten Years With No Executions*, Death Penalty Information Center, June 18, 2020, https://deathpenaltyinfo.org/news/utah-reaches-ten-years-with-no-executions#.

types of bullets and rifles will ensure that energy from those bullets will dissipate quickly, making it unlikely the bullets will exit the skull on the opposite side. And the relatively lower energy of this combination of bullet and ammunition would be insufficient to cause the explosive expansion of the cranial vault seen with high-velocity rifle rounds, while still yielding rapid destruction of the key components of the central nervous system at the brainstem.

33.     Additionally, by targeting the brainstem, Floyd's death would be extremely rapid.  The bullets would transect the brainstem milliseconds after reaching the external surface of the head, faster than neural transmissions from the sensory nerves could communicate that event to the conscious brain, and faster than the speed of sound. Thus, Floyd would neither hear the reports of the rifles nor feel the impact of the bullets before the bullets hit his brainstem. Thus, while not truly instantaneous, such a mechanism would be instantaneous for all practical purposes, causing instant and catastrophic damage to Floyd brainstem, along with irreversible loss of consciousness, awareness, and sensation, and followed almost immediately by death.

### 2.     Lethal injection by two-drug protocol

34.     A second method of execution is also feasible—Execution using two drugs, with an analgesic such as fentanyl as the first drug, and a barbiturate such as pentobarbital or sodium pentothal (thiopental) as the second drug. This method, like the firing squad, would significantly reduce the substantial risk of pain inherent in Nevada's current protocol.

35.     Unlike midazolam, pentobarbital is a barbiturate that acts as a

50

sedative hypnotic drug. Barbiturates do not have a ceiling effect. And a barbiturate like pentobarbital reliably induces and maintains a coma-like state that renders a person insensate to pain. Thus, when properly administered, barbiturates eliminate the risk that a prisoner will feel the administration of other lethal drugs.

### a.   The two-drug alternative is feasible.

36.    Five states—Georgia, Idaho, Missouri, South Dakota, and Texas—use a single-drug pentobarbital protocol as their method of execution. And, according to former United States Attorney General William Barr, pentobarbital is "widely available."[110] Indeed, several jurisdictions, including Texas and the federal government, have recently used pentobarbital in carrying out executions. Recently, Arizona announced that it too had accessed pentobarbital.[111]

37.    In addition, the State has admitted that fentanyl, the proposed first drug, is available, as the drug is included in the State's current protocol.

38.    The Supreme Court has also suggested a similar procedure was constitutional (using pentobarbital as the killing agent). In a decision denying an application for a stay of execution, the Court explained pentobarbital "'is widely conceded to be able to render a person fully insensate' and 'does not carry the risks'

---

[110] Katie Benner, *U.S. to Resume Capital Punishment for Federal Inmates on Death Row*, N.Y. Times, https://www.nytimes.com/2019/07/25/us/politics/federal-executions-death-penalty.html.

[111] *Arizona finds pharmacist to prepare lethal injections*, Assoc. Press, https://apnews.com/article/arizona-doug-ducey-phoenix-df8203ee5c11d43ca84ce79c77616ffdd; Jeremy Duda, *Arizona finds pharmacist willing to supply execution drugs*, Tucson Sentinel, http://www.tucsonsentinel.com/local/report/102820_pharma_executions/arizona-finds-pharmacist-willing-supply-execution-drugs.

of pain that some have associated with other lethal injection protocols." *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (*per curiam*) (quoting *Zagorski v. Parker*, 139 S. Ct. 11 (2018) (Sotomayor, J., dissenting from denial of application for stay and denial of certiorari)). The Court further observed that single-dose pentobarbital protocols had become "a mainstay of state executions," and additionally noted that pentobarbital:

> Has been adopted by five of the small number of States that currently implement the death penalty.
>
> Has been used to carry out over 100 executions, without incident.
>
> Has been repeatedly invoked by prisoners as a *less* painful and risky alternative to the lethal injection protocols of other jurisdictions.
>
> Was upheld by this Court last year, as applied to a prisoner with a unique medical condition that could only have increased any baseline risk of pain associated with pentobarbital as a general matter.
>
> Has been upheld by numerous Courts of Appeals against Eighth Amendment challenges similar to the one presented here.

*Id.* (internal citation omitted).

### b. The two-drug alternative significantly reduces the substantial risk of pain inherent in Nevada's current protocol.

39. Using a barbiturate instead of a paralytic as the killing agent would minimize pain and suffering—The trend among the death penalty states to go to a simpler method of execution utilizing a barbiturate as the fatal drug aligns with the concerns for humanity and for minimizing pain and suffering—a fact recognized by the veterinary community for decades in its proscription of paralytics in animal

52

euthanasia.[112]

40.     While the trend has been to utilize a single-drug protocol, Petitioner's proposed two-drug alternative aligns with that trend but simply adds an analgesic as the first drug additionally prevents suffering due to flash pulmonary edema, an effect caused by an overdose a barbiturate. Recent studies are finding that the administration of a heavy dose of pentobarbital in a short amount of time causes pulmonary edema to occur to the condemned inmate. As an additional alternative to the above, execution by a two-drug procedure utilizing as the second drug compounded pentobarbital or sodium pentothal (thiopental) that complies with all state and federal compounding requirements, and has been tested for purity and potency, with records of testing, chain of custody, and compounding formula disclosed to prisoners and their counsel, presents another feasible method of execution that—along with implementation of necessary measures and safeguards to assure a lawful and humane execution that complies with the guarantees afforded to all citizens including Floyd under the Eighth Amendment—is available to Nevada and NDOC.

### Count II: Proceeding with Floyd's execution under the current protocol violates his Eighth and Fourteenth Amendment rights to medical care and to be free from serious harm.

1.     Floyd realleges and incorporates herein by reference all the preceding

---

[112] It is well established throughout the veterinary community—including in Nevada—that a single-drug protocol using a barbiturate is the only humane method for animal euthanasia. American Veterinary Medical Association, *AVMA Guidelines for the Euthanasia of Animals*, at 43–44, 49, 102 (2013); *see also* Ty Alper, *Anesthetizing the Public Conscience: Lethal Injection and Animal Euthanasia*, 35 Ford. Urb. L. J. 817, 834-35, 841–42 (2008); Nev. Rev. Stat. § 638.005.

paragraphs of this Complaint as if set forth in full below.

2.    The Eighth Amendment forbids "deliberate indifference" to "serious medical needs of prisoners," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and to a substantial risk of serious harm to a prisoner, *see Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

3.    The choice of a course of medical treatment may violate the Eighth Amendment where it is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974), *vacated and remanded on other grounds sub nom. Cannon v. Thomas*, 419 U.S. 813 (1974).

4.    Defendants are required to provide Floyd with appropriate medical care until the moment of his death. Thus, the Eighth Amendment's proscription against deliberate indifference requires that they administer the death penalty without the "unnecessary and wanton infliction of pain." *Gregg*, 428 U.S. at 173.

5.    The current execution protocol constitutes deliberate indifference to a substantial risk of serious harm to Floyd. Floyd has alleged several feasible and readily implemented alternatives to the execution protocol that would substantially reduce the risk of substantial harm.

6.    The execution protocol violates rights secured and guaranteed to Floyd by the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution.

**Count III: Proceeding with Floyd's execution under the current protocol violates his Fifth and Fourteenth Amendment rights to due process.**

1.     Floyd realleges and incorporates herein by reference all the preceding paragraphs of the instant Complaint as if set forth in full below.

2.     The Due Process Clause of the Fifth Amendment and the companion provision of the Fourteenth Amendment entitle Floyd to notice and an opportunity to be heard before being deprived of life, liberty, or property.

3.     Being "deprived of life" unequivocally implicates a constitutionally protected interest under the Fifth Amendment, and the United States Supreme Court has held that constitutionally protected "liberty interests are implicated" when the government plans to "inflict[] appreciable physical pain." *Ingraham v. Wright*, 430 U.S. 651, 674 (1977).

4.     The State has not disclosed sufficient information or details regarding the development and drafting of the Execution Protocol or the procedures that will be utilized in carrying out Floyd's execution. This has prevented Floyd from determining all aspects of the execution protocol that violate provisions of federal law or constitute cruel and unusual punishment, from consulting medical experts concerning those aspects, and from determining and seeking to remedy the ways in which the Execution Protocol presents an avoidable risk of unconstitutional pain and suffering.

5.     Executing Floyd pursuant to the execution protocol would violate Floyd's right to due process because it would deprive Floyd of his life and liberty without providing sufficient notice and opportunity to be heard on the execution

procedures to be used.

### Count IV: Proceeding with Floyd's execution under the current protocol violates his First, Sixth, and Fourteenth Amendment rights of access to courts, counsel, and to meaningful litigate claims.

1.   Floyd realleges and incorporates herein by reference all the preceding paragraphs of the instant Complaint as if set forth in full below.

2.   The current execution protocol has no provision ensuring Floyd can communicate directly and in person with his counsel at and around the time of the scheduled execution, including on the day of his execution. Nor does the protocol have any provision ensuring Floyd shall have ready access to a phone or otherwise be able to communicate directly and immediately with the federal and state courts or other governmental officials at and around the time of his execution.  And the protocol further lacks any assurances that Floyd's counsel can communicate directly to prison officials in the death chamber or adjacent equipment room who are responsible for carrying out the execution. Finally, the protocol fails to provide for counsel's attendance as a witness to Floyd's execution to oversee that Floyd's constitutional rights are protected throughout the process of his execution.

3.   Nevada's Execution Manual Section 109, entitled Execution Process Timeline, specifically provides for family members to visit with Floyd on the day of his execution, but it has no such provision for Floyd's counsel.[113] And it is unclear whether even family will be able to visit, given the restrictions on visiting due to the COVID-19 pandemic.

---

[113] Ex. 5.

56

4.      Nevada's Execution Manual Section 109, entitled Execution Process Timeline, specifically provides for allowing one inmate family member on-site to witness the execution at the invitation of NDOC's director, but it has no such provision for Floyd's counsel.

5.      Nevada's Execution Manual Section 109, entitled Execution Process Timeline, specifically authorizes the condemned inmate to receive visits, following his last meal, from his "Spiritual Advisor/Chaplain, Attorney General (or designee), Director, Deputy Director, Warden, or PIO," (EM 109.05.K), but provides no such authorization for Floyd's counsel. This provision adds that "Any other visitors must be approved by the Director."

6.      The only reference to Floyd's counsel regarding the day of execution is at EM 109.05.L, which authorizes Floyd to send out a letter or make a final telephone call to his attorney-of-record.

7.      Nevada's Execution Manual, section EM 102, entitled "Witness Selection Criteria and Instructions," sets forth those individuals who the Director of the Department of Corrections "shall" invite, and those individuals who the Director "may" invite, to the execution.[114] Neither list includes or references Floyd's counsel. The protocol specifically states in accord with NRS 176.355(4), that "A person who has not been invited by the Director may not witness the execution."[115]

8.      Nevada's Execution Manual, section EM 100.02.A.e, provides that the

---

[114] *Id.*
[115] *Id.*

1  NDOC Director is to determine the maximum number of persons who may be

2  present for the execution.[116]

3        9.     Floyd has a constitutional right of access to the courts that is

4  "adequate, effective, and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822 (1977).

5  Meaningful access means that inmates must have the opportunity to "communicate

6  privately with an attorney." *See Ching v. Lewis*, 895 F.2d 608, 609 (9th Cir. 1990);

7  *Mann v. Reynolds*, 46 F.3d 1055, 1061 (10th Cir. 1995) (invalidating prison policy

8  preventing contact visits between inmates and attorneys); *see also DeMallory v.*

9  *Cullen*, 855 F.2d 442, 446 (7th Cir. 1988) ("A prison inmate's right of access to the

10  courts is the most fundamental right he or she holds. 'All other rights of an inmate

11  are illusory without it, being entirely dependent for their existence on the whim or

12  caprice of the prison warden[,]'" (quoting *Adams v. Carlson*, 488 F.2d 619, 630 (7th

13  Cir. 1973)).

14        10.    A prison regulation impinging on an inmate's constitutional rights is

15  only "valid if it is reasonably related to legitimate penological interests." *Turner v.*

16  *Safley*, 482 U.S. 78, 89 (1987). In evaluating a claim of denial of meaningful access

17  to the courts, a court must "weigh[] the interests of the prison as an institution (in

18  such matters as security and effective operation) with the constitutional rights

19  retained by the inmates." *Cooey v. Strickland*, 2011 WL 320166, at *9 (S.D. Ohio

20  Jan. 28, 2011) (internal citation and quotation omitted).

21        11.    The Sixth Amendment right to counsel, as well as the due process

22

23  ───────────────

[116] *Id.*

58

clause, demands that if circumstances arise immediately prior to, or during, a

prisoner's execution that present constitutional concerns, the prisoner has the

means—through counsel—to petition the courts for appropriate relief. *Cooey,* 2011

WL 320166, at *10 ("If Floyds cannot communicate with counsel [on the day of

execution], then this Court can hardly conclude as a matter of law that Floyds have

adequate, effective, and meaningful access to the courts."). Condemned prisoners

are thus constitutionally entitled to in-person visitation with their attorneys at this

critical time. *See also Ching*, 895 F.2d at 610 (holding that a prisoner must be

permitted attorney visitation absent justification from prison); *Johnson by Johnson*

*v. Brelje*, 701 F.2d 1201, 1207–08 (7th Cir. 1983) (prison's restrictive telephone

policy unconstitutional); *Mann v. Reynolds*, 46 F.3d 1055, 1061 (10th Cir. 1995);

*Cooey*, 2011 WL 320166, at *9 (execution protocol that limited attorney contact on

the morning of an execution was unconstitutional).

      12.    The Supreme Court has made clear that the right of access to courts

under the First Amendment is implicated where the state "hinder[s]" a prisoner's

"efforts to pursue a legal claim." *Casey v. Lewis*, 518 U.S. 343, 351 (1996); *see also*

*First Amendment Coalition of Arizona, Inc. v. Ryan*, 938 F.3d 1069, 1083 (9th Cir.

2019) (Berzon, J., concurring in part and dissenting in part). In her partial

concurrence in *First Amendment Coalition of Arizona, Inc.*, Judge Berzon observed

that execution procedures depriving a condemned inmate of "the opportunity to be

heard at a meaningful time and in a meaningful manner" would constitute a

procedural due process violation. 938 F.3d at 1085 (citing *Mathews v. Eldridge*, 424

U.S. 319, 333 (1976)). Judge Berzon added that execution procedures that render inmates unable to litigate meaningfully their liberty interest in avoiding an unconstitutionally painful execution would be sufficient to violate procedural due process. *Id.* (citing *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003)).

13.     Nevada's execution protocol denies or places impermissible restrictions on Floyd's right—particularly on the day of, and at the time of, his execution--to confidential communication with his counsel, and impermissibly restricts his counsel's ability to access the courts (thereby denying Floyd's right to access the courts and/or his right to petition the applicable authorities to seek redress of his grievances), in violation of Floyd's rights under the First, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

/ / /

/ / /

# VIII. PRAYER FOR RELIEF

WHEREFORE, Floyd requests the following relief:

1. That this Court assume jurisdiction of this cause and set this case for a hearing on the merits.

2. That this Court issue a declaratory judgment declaring and enforcing Floyd's rights under the Eighth Amendment and, further, issue a temporary restraining order or a preliminary or permanent injunction commanding Defendants not to carry out any lethal injection on Floyd until such time as Defendants take the reasonable and necessary steps to devise a new procedure or procedures to carry out a lawful execution and produce a new execution protocol, with reasonable and necessary adjustments made, so that Floyd may be executed in a constitutional manner.

3. That this Court issue a declaratory judgment declaring and enforcing the rights of Floyd, as alleged above, and further issue a temporary restraining order or preliminary or permanent injunction to enforce Floyd's rights under the Sixth, Eighth and Fourteenth Amendments, commanding defendants to permit Floyd access to his counsel and to the courts on the day of his execution, including during the final hours and moments leading up to the execution, and to permit Floyd the right to the presence of his counsel to witness and observe the execution of his client.

4. Floyd also seeks this Court's order under 42 U.S.C. § 1988 awarding him a reasonable attorneys' fee and costs, and such further relief as this Court deems just and proper.

1

2

WHEREFORE, Floyd prays this Court for its order and judgment as stated above.

3

DATED this 16th day of April, 2021.

4

5

Respectfully submitted
RENE L. VALLADARES
Federal Public Defender

6

7

*/s/ David Anthony*
DAVID ANTHONY
Assistant Federal Public Defender

8

9

*/s/Brad D. Levenson*
BRAD D. LEVENSON
Assistant Federal Public Defender

10

11

12

*/s/ Timothy R. Payne*
TIMOTHY R. PAYNE
Assistant Federal Public Defender

13

14

15

16

17

18

19

20

21

22

23

62

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury under the laws of the United States of America and the State of Nevada that the facts alleged in this petition are true and correct to the best of counsel's knowledge, information, and belief.

DATED this 16th day of April, 2021.


*/s/ David Anthony*                    */s/ Brad D. Levenson*
DAVID ANTHONY                          BRAD D. LEVENSON
Assistant Federal Public Defender      Assistant Federal Public Defender


                                       */s/ Timothy R. Payne*
                                       TIMOTHY R. PAYNE
                                       Assistant Federal Public Defender

**CERTIFICATE OF SERVICE**

In accordance with LR IC 4-1(c) of the Local Rules of Practice, the undersigned hereby certifies that on the 16th day of April, 2021, a true and correct copy of the foregoing FLOYD'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF DUE TO PROPOSED METHOD OF EXECUTION PURSUANT TO 42 U.S.C. § 1983 was filed electronically with the CM/ECF electronic filing system and sent via email, addressed to counsel as follows:

D. Randall Gilmer
Chief Deputy Attorney General
Office of the Nevada Attorney General
Public Safety Division
555 E. Washington Avenue, Suite 3900
Las Vegas, NV 89101
Phone: 702.486.3427
Fax:  702.486.3773
drgilmer@ag.nv.gov

*/s/ Sara Jelinek*
An Employee of the Federal Public
Defenders Office, District of Nevada

64