RENE L. VALLADARES
Federal Public Defender
Nevada Bar No. 11479
DAVID ANTHONY
Assistant Federal Public Defender
Nevada Bar No. 7978
david_anthony@fd.org
BRAD D. LEVENSON
Assistant Federal Public Defender
California Bar No. 166073
brad_levenson@fd.org
TIMOTHY R. PAYNE
Assistant Federal Public Defender
Ohio Bar No. 0069329
tim_payne@fd.org
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577
(702) 388-5819 (Fax)

Attorneys for Zane M. Floyd

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| ZANE M. FLOYD,<br><br>    Plaintiff,<br><br>    v.<br><br>CHARLES DANIELS, Director, Nevada Department of Corrections, et al.,<br><br>    Defendants. | Case No. 3:21-cv-00176-RFB-CLB<br><br>**MOTION FOR PRELIMINARY INJUNCTION AND STAY OF EXECUTION**<br><br>**(DEATH PENALTY CASE)**<br><br>**EXECUTION WARRANT SOUGHT BY THE STATE FOR THE WEEK OF JULY 26, 2021** |

TABLE OF CONTENTS

I.   FACTUAL BACKGROUND ............................................................. 2

   A.   The State was unable to execute volunteer Scott Dozier using its 2018 execution protocol. ................................................................. 2

   B.   The Clark County District Attorney announced that he intended to seek Floyd's execution. ................................................................. 4

   C.   The defendants repeatedly argued for delaying litigation until the execution protocol was finalized. ............................................. 5

   D.   NDOC released its novel four-drug execution protocol on June 10, 2021. ......................................................................................... 8

II.   ANALYSIS ................................................................................... 9

   A.   Floyd brought his challenge to Nevada's protocol at the earliest possible time. ............................................................................... 9

   B.   Floyd is entitled to a stay of execution. .................................... 10

      1.   Floyd is likely to succeed on the merits. ..................... 11

      2.   The balance of the equities weighs heavily in Floyd's favor. ...... 18

      3.   Conclusion ................................................................... 20

   C.   This Court is also authorized to grant a stay under the All Writs Act. ............................................................................................. 21

   D.   Judicial estoppel ........................................................................ 21

III.   CONCLUSION .......................................................................... 22

Zane Floyd is in a unique position. The State seeks to execute him using a novel execution protocol. Only one of the six proposed drugs and alternates has an established (though contentious) history of use in executions; the others have been used rarely, accidentally, or not at all. The critical anesthetic, ketamine, has never been used before in an execution. As for the proposed sequence of drugs, it has never been tried. Thus, no court until now has had the opportunity to consider the protocol's constitutionality. And there is good reason to question the protocol's constitutionality: fentanyl and alfentanil in bolus doses cause chest wall rigidity, preventing breathing; ketamine produces worrisome side effects, even at much lower doses than the protocol provides; cisatracurium paralyzes muscles leading to suffocation while providing no medical benefit; and potassium chloride and potassium acetate cause excruciating pain.

In addition, the State's actions in this case have unnecessarily delayed Floyd's litigation. The State began the process to execute Floyd months ago, yet the Nevada Department of Corrections (NDOC) did not disclose its new execution protocol until June 10, 2021. For the two months preceding that disclosure, the defendants insisted this Court not address Floyd's motions and refused to disclose basic information known to NDOC that would have allowed Floyd to begin preparing his legal challenge months ago. And now NDOC insists this litigation be completed in short order so that Floyd can be executed by the end of July, just thirty-eight days from now.

Consequently, Floyd respectfully requests this Court stay his execution so he can meaningfully litigate NDOC's experimental and never-before-tested protocol. But he is not seeking to unnecessarily delay his case. He instead is simply seeking adequate time to litigate for the *first* time in *any* court nationwide Nevada's novel execution protocol. He brought his challenge to the execution protocol at the earliest possible opportunity. And the factors governing stays and injunctions strongly favor granting one here.

## I.    FACTUAL BACKGROUND

The execution protocol now in place is brand new. It is materially different from the protocol developed in 2018 (a protocol never actually used). And it is materially different from the protocol developed for Nevada's last execution, in 2006. As a result, until June 10, 2021, Floyd has had no way of knowing how the State will execute him and no way of bringing an informed challenge to that execution.

### A.    The State was unable to execute volunteer Scott Dozier using its 2018 execution protocol.

In July 2017, more than ten years after Nevada's last execution, the Clark County District Attorney's Office sought a warrant to execute volunteer Scott Dozier.[1] At that time, the State had no execution protocol. Counsel from the District Attorney's Office were unable to provide the state court with any information about how, and with what drugs, NDOC intended to carry out Dozier's execution. Instead,

---

[1] Jenny Wilson, *Las Vegas judge grants killer his wish, orders execution*, Las Vegas Review Journal, https://www.reviewjournal.com/crime/courts/las-vegas-judge-grants-killer-his-wish-orders-execution/.

counsel simply said that, if an execution warrant was signed, they would be able to obtain the needed drugs.

After nearly a year of litigation and two discarded iterations of the execution protocol, the State on June 11, 2018, released the final protocol it intended to use for Dozier's execution. ECF No. 4-5. The protocol specified three drugs: midazolam, a benzodiazepine, as the first drug; fentanyl as the second drug; and cisatracurium as the third drug and killing agent. *Id.*

Difficulties with drug manufacturers ultimately derailed the State's attempt to execute Dozier. Alvogen, Inc., a pharmaceutical company that produces midazolam, sued in state court in 2018 to prevent the drug from being used in the execution.[2] The State, Alvogen claimed, had improperly obtained the drug. The state court granted Alvogen a temporary restraining order and then a preliminary injunction, preventing the State from using midazolam in an execution.[3]

The State appealed, but the Nevada Supreme Court eventually dismissed the appeal and vacated the preliminary injunction as moot, after Dozier committed suicide and the execution drugs at issue were set to expire. *State v. Alvogen, Inc.*, 450 P.3d 390, 2019 WL 5390459 (Nev. 2019) (unpublished table disposition).[4] The

---

[2] *Scott Dozier case: Hours before execution, judge in pharma company suit halts use of drug*, CBS News, https://www.cbsnews.com/news/scott-dozier-case-nevada-judge-halts-use-of-drug-hours-before-execution-after-companys-suit/.

[3] *Id.*; David Ferrara, *Judge stops Nevada from using drug in execution*, Las Vegas Review Journal, https://www.reviewjournal.com/crime/courts/judge-stops-nevada-from-using-drug-in-execution/.

[4] *See* Vanessa Romo, *Nevada Death Row Inmate Found Dead In Apparent Suicide*, National Public Radio, https://www.npr.org/2019/01/07/683112885/nevada-death-row-inmate-found-dead-in-apparent-suicide.

State then returned its supply of execution drugs to the manufacturers.[5] "Nevada State Attorney General Aaron Ford indicated that upon relinquishing the drugs, the state would no longer have the drugs necessary to carry out an execution."[6]

### B. The Clark County District Attorney announced that he intended to seek Floyd's execution.

Three months after Attorney General Ford acknowledged Nevada lacked the drugs to carry out an execution, the Supreme Court denied Floyd's petition for writ of certiorari in his federal habeas proceedings. *Floyd v. Gittere*, No. 19-8921, 141 S. Ct. 660 (Nov. 2, 2020). This ended all then-pending litigation for Floyd, and, for the following five months, the State made no suggestion of moving forward with Floyd's execution.

That changed on March 26, 2021, when the Clark County District Attorney announced to the media that he would be seeking an execution warrant against Floyd.[7] That same article, however, noted some of the issues with the drugs obtained for Dozier's execution.[8] Floyd filed his Complaint for Injunctive and Declaratory Relief on April 16, 2021. That same month, NDOC confirmed that it

---

[5] *Nevada Agrees to Return Supply of Execution Drugs to Manufacturers*, American Bar Association, https://www.americanbar.org/groups/committees/death_penalty_representation/project_press/2020/summer/nevada-to-return-execution-drugs/.

[6] *Id.*; *see also* Ken Ritter, *Battle over drugs for Nevada execution ends with no decision*, News 3 Las Vegas, https://news3lv.com/news/local/battle-over-drugs-for-nevada-execution-ends-with-no-decision.

[7] David Ferrara, *DA to proceed with death penalty against gunman in 1999 store killings*, Las Vegas Review Journal, https://www.reviewjournal.com/crime/courts/da-to-proceed-with-death-penalty-against-gunman-in-1999-store-killings-2315637/.

[8] *Id.*

would be creating a new execution protocol with new drugs for Floyd's execution. *See* ECF Nos. 22, 23, 24, 25. NDOC Director Charles Daniels testified on May 6, 2021, that creation of that new protocol could take an additional 90 to 120 days. ECF No. 49 at 44–45.

### C.   The defendants repeatedly argued for delaying litigation until the execution protocol was finalized.

Until just last week, when the new protocol was disclosed, defendants have maintained that this Court should delay considering any of Floyd's motions, including his motions for a temporary restraining order, preliminary injunction, and stay of execution. For example, in response to Floyd's motion for a temporary restraining order, NDOC noted it did "not currently have a finalized execution protocol" and did "not anticipate using midazolam in the final protocol." ECF No. 22 at 7–10; ECF No. 23 at 7–10; ECF No. 28. Thus, NDOC insisted, "Floyd's arguments as to the use of midazolam in the execution protocol—as well as the rest of the protocol—are nothing more than speculation, conjecture, and hypothetical." ECF No. 22 at 7–10; ECF No. 23 at 7–10; ECF No. 25 at 2; ECF No. 29. Counsel for NDOC repeated this argument on May 6, in response to questioning from this Court about releasing the names of drugs still under consideration. ECF No. 49 at 14–19. And, again, on May 20, counsel for NDOC argued that the stay motion was premature. ECF No. 81 at 33–40, 46–47, 58.

After hearing the defendants' arguments, this Court noted a tension between the Clark County District Attorney seeking an execution in June, the defendants' delay finalizing the execution protocol, and the defendants' opposition to a stay. In a

hearing on May 3, 2021, this Court asked counsel for NDOC why the case shouldn't be stayed "temporarily at least until the protocol was finalized." ECF No. 40 at 5; *see id.* at 6–9, 11–13, 31–32. Counsel responded with several reasons, none of which addressed the tension in the defendants' position: federalism, comity, lack of ripeness, and potential mootness. *Id.* at 5–6, 9–12, 29–30. And the defendants further refused to concede that a stay might be necessary when those procedural obstacles no longer existed. *Id.* at 9–12, 20–23, 29–31. This Court then noted that the State might be judicially estopped from maintaining these opposing positions. *Id.* at 10.

The defendants took a similar position with respect to discovery, refusing to disclose information before the protocol was finalized, while at the same time not conceding to the necessity of a stay after it was finalized. Floyd on April 16, 2021, moved for disclosure of the method of execution. ECF No. 7. The defendants responded that was not possible: "because there is no final execution protocol to provide, there is nothing NDOC can provide at this time." ECF No. 24 at 2; *see* ECF No. 28. The defendants further noted their intent to assert "the deliberative process and official information privileges," with respect to communications between the NDOC Director and Chief Medical Officer (CMO). ECF No. 24 at 5.

After the defendants argued privilege, this Court ordered them to produce privilege logs, so this Court could determine what, if anything, could be disclosed to Floyd. ECF No. 49 at 32–36, 80–99. At the next court date, the NDOC defendants reported being in the process of reviewing 1,500 unique files and thousands of

pages, most of which, according to the NDOC defendants, was irrelevant to Floyd's litigation. ECF No. 61 at 5–6; *see* ECF No. 54. The NDOC defendants ultimately included a much smaller number of documents on the privilege log (a mere twenty items), reporting that the vast majority of the unique files were pleadings from the litigation on Nevada's prior execution protocol. ECF No. 81 at 60. Although this Court ordered the defendants to regularly update the privilege logs until the protocol was finalized, no new documents were added, and this Court has not yet ruled on disclosing the documents on the privilege log. ECF No. 91 at 19; ECF No. 96 at 29–33.

In addition to the privilege log, the defendants maintained their position on discovery in response to this Court's suggestion of an evidentiary hearing to question the NDOC Director and CMO about the protocol. A hearing was premature, the defendants argued, and the deliberative-process privilege would protect much of the information sought from disclosure, including the drugs under consideration. *Id.* at 21–22, 27–28; *see* ECF Nos. 37, 38. This Court nevertheless ordered the hearing take place, but the defendants expanded their assertion of privilege to include all internal communications between state employees concerning the 2018 protocol and the new protocol. ECF No. 49 at 7–8, 11–20, 30–32, 34–35, 38–39, 97–98. That even included, according to the defendants, purely factual information, such as drug availability and side effects. *Id.* at 11–12, 97–98. At one point counsel for NDOC insisted that the privilege would cover any topic of examination except whether a final decision had been made on the drugs. *Id.* at 31–

32. And, indeed, during direct examination of the NDOC Director, counsel for NDOC asserted the privilege eight times, in response to a wide range of questions: how staffing would change with different protocols, *id.* at 58–61; whether drugs were proposed at a meeting with the CMO, *id.* at 62–63; what actions were taken after that meeting, *id.* at 63; the availability of other drugs, *id.* at 67–68; whether concerns were voiced with the proposed execution date in June, *id.* at 68–69; whether the possibility of litigation was a consideration by the Director to delay disclosure of the protocol, *id.* at 77–78; and whether there were any plans to consult with any other individuals on the protocol, *id.* at 78–79. At that same hearing, the defendants reiterated their opposition to a stay. *Id.* at 20–24.

The defendants' refusal to provide information relevant to Floyd's complaint continued for the following month, alongside their opposition to a stay. ECF No. 61 at 19–22; ECF No. 81 at 33–47, 57–58.[9] It was not until June 3, 2021, that counsel for Floyd learned of the various drugs chosen for the final protocol. And it was not until the following week, June 9, that counsel learned the dosages for those drugs and the sequence of their administration.

### D.   NDOC released its novel four-drug execution protocol on June 10, 2021.

On June 10, 2021, NDOC provided Floyd's counsel with a redacted version of the final execution protocol and filed a redacted version of the protocol with this Court. ECF No. 93-1; *see* ECF No. 91 at 3–9. The protocol specifies the following

---

[9] The parties submitted a proposed discovery schedule, however, with the defendants proposing a total time of 125 days for discovery, disclosures, and pretrial motions, and Floyd proposing 180 days.

combinations of drugs and alternates: (1) fentanyl or alfentanil, (2) ketamine, (3) cisatracurium, and (4) potassium chloride or potassium acetate. ECF No. 93-1 at 23. An alternative three-drug protocol repeats the drugs in steps one, two, and four, but omits cisatracurium. *Id.* The protocol additionally specifies dosages, concentrations, and preparation instructions, among other subjects. *Id.* at 24–28.

## II.   ANALYSIS

Floyd seeks an equitable remedy of a preliminary injunction and stay of his execution. *See Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012); *Nooner v. Norris*, 491 F.3d 804, 807–08 (8th Cir. 2007). As a result, this Court must consider the parties' conduct in the litigation, assess the merits of Floyd's underlying claims, and balance the equities involved. *See Towery*, 672 F.3d at 657–58, 661; *Beardslee v. Woodford*, 395 F.3d 1064, 1068 (9th Cir. 2005). Those factors strongly favor granting Floyd's motion.

### A.   Floyd brought his challenge to Nevada's protocol at the earliest possible time.

Courts disfavor last-minute litigation over executions. *See Pizzuto v. Tewalt*, 997 F.3d 893, 899–900 (9th Cir. 2021); *Beardslee*, 395 F.3d at 1068.[10] Because of this, Floyd filed his complaint while the State had no viable execution protocol and well before NDOC released its final  protocol. ECF No. 2. Concurrently with his complaint, Floyd moved for a temporary restraining order and preliminary injunction. ECF Nos. 5, 6. And five days later, Floyd moved for a stay of execution.

---

[10] *See also Floyd v. Filson*, Ninth Circuit Oral Argument (January 31, 2019) (Judge Berzon at minute 51:00), https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000014998.

ECF No. 10. Now, after the protocol has been released, Floyd renews his request for a preliminary injunction and stay of execution. This represented the earliest possible time for Floyd to do so. *See Nooner*, 491 F.3d at 808; *see also Pizzuto*, 997 F.3d at 901 (recognizing existence of execution protocol "a particularly relevant marker for ripeness"); *Andrews v. Davis*, 944 F.3d 1092, 1121–22 n.16 (9th Cir. 2019) (concluding petitioner's Eighth Amendment claim was unripe because no valid execution protocol existed); *Payton v. Cullen*, 658 F.3d 890, 893 (9th Cir. 2011) (same); *contra Henyard v. Sec'y, DOC*, 543 F.3d 644, 648–49 (11th Cir. 2008) (reasoning plaintiff had unnecessarily delayed by waiting 13 months after revisions to execution protocol); *Jones v. Allen*, 485 F.3d 635, 640 (11th Cir. 2007) (same when plaintiff waited until well after drugs and risks were known). Even the defendants, in arguing that Floyd's claims were unripe, recognized that Floyd had not delayed.[11]

## B.   Floyd is entitled to a stay of execution.

The same factors applicable to injunctive relief apply to a request for a stay of execution. *See Towery*, 672 F.3d at 657; *Grayson v. Warden, Comm'r, Ala. DOC*, 869 F.3d 1204, 1239 n.90 (11th Cir. 2017); *Jackson v. Danberg*, 656 F.3d 157, 162 (3d Cir. 2011). There are four factors this Court must consider: (1) the likelihood Floyd will succeed on the merits; (2) the possibility of irreparable injury to Floyd if the

---

[11] ECF No. 23 at 7–10 (no "actual case or controversy," "speculation, conjecture, and hypothetical," "unripe," "premature"); ECF No. 25 at 2 ("nothing to stay," "illusory"); ECF No. 40 at 5–6, 9–12, 29–30 ("wait to see," "nothing for the court to stay," "very hypothetical"); ECF No. 49 at 14–19 ("putting the cart before the horse"); ECF No. 81 at 33–40, 46–47, 58 ("premature," "premature," "puts the cart before the horse," "still not ripe," "premature").

stay is not granted; (3) the possibility of injury to other parties; and (4) the public interest. *United States v. Mitchell*, 971 F.3d 993, 996 (9th Cir. 2020); *see Towery*, 672 F.3d at 657. Moreover, when a plaintiff seeking temporary injunctive relief has adequately established irreparable harm and the balance of hardships weigh in his favor, the probability-of-success requirement is relaxed: "where the balance of hardships tips sharply towards the plaintiff, a plaintiff need only show serious questions going to the merits, rather than likelihood of success on the merits, to warrant preliminary injunctive relief." *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) (cleaned up); *see Towery*, 672 F.3d at 657; *Beardslee*, 395 F.3d at 1067. These factors favor staying Floyd's execution.

### 1.    Floyd is likely to succeed on the merits.

To grant Floyd's motion, this Court must consider the merits of Floyd's underlying claims. *See Roman*, 977 F.3d at 941; *Towery*, 672 F.3d at 657. But, as an initial note, cases denying stays based on this factor involve an established protocol, already fully litigated in prior cases. *See, e.g.*, *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (per curium); *Beardslee*, 395 F.3d at 1072–73; *Rhoades v. Reinke*, 671 F.3d 856, 859 (9th Cir. 2011); *Cooper v. Rimmer*, 379 F.3d 1029, 1033 (9th Cir. 2004); *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1296 (11th Cir. 2016); *Reynolds v. Strickland*, 598 F.3d 300, 301–02 (6th Cir. 2010); *Workman v. Bredesen*, 486 F.3d 896, 906–07 (6th Cir. 2007); *Beaty v. Brewer*, 791 F. Supp. 2d 678, 683 (D. Ariz. 2011).

Floyd is not in the same situation. No court case, in Nevada or anywhere else in the country, has litigated the use of ketamine in an execution protocol. And

11

fentanyl and alfentanil are similarly untested in litigation. This Court's consideration of Floyd's motion should thus take into account the novel and highly experimental nature of Nevada's protocol and allow Floyd a reasonable time to litigate its constitutionality. *See Whitaker v. Livingston*, 732 F.3d 465, 468 (5th Cir. 2013) (noting "case might be different" if, instead of pentobarbital, "the state were using a drug never before used or unheard of, whose efficacy or science was completely unknown").

In any event, even with the limited time the defendants have given Floyd to investigate the novel protocol, he can show a likelihood of success on the merits. Under Supreme Court precedent, Floyd must make two showings to succeed on his Eighth Amendment claim: (1) the execution protocol entails a "substantial risk of serious harm"; and (2) there are "feasible, readily implemented" alternatives that "significantly reduce a substantial risk of severe pain." *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (cleaned up). He can make both showings.

> a.   **Floyd can show a substantial risk of serious harm should he be executed under the current protocol.**

Each of the four drugs and two alternates in Nevada's experimental protocol involve unnecessary risks; these drugs combined create a substantial risk that Floyd's execution will involve unconstitutional pain and suffering.

> (1)   **Fentanyl and alfentanil in high doses cause chest wall rigidity, which will prevent Floyd from breathing.**

The two potential initial drugs, fentanyl and alfentanil, do not reliably block awareness, are largely untested in executions and litigation, and can interfere with reliable assessments of awareness. Moreover, these drugs, especially in high doses

(and without the use of other medications to counteract it), are very likely to cause chest wall rigidity, which prevents breathing and movement.[12] This phenomenon feels like the placement of a heavy object on the inmate's chest. Floyd would experience the chest wall rigidity and the anguish of the sensation of being unable to breath. That experience would continue even after he was given the ketamine. And alfentanil is too short acting to safely serve as a first drug administered in a three- or four-drug protocol. Finally, fentanyl and alfentanil can interfere with consciousness checks by causing the execution team to conflate severe dissociation with unawareness. This is particularly worrisome because the consciousness checks consist only of a verbal stimulus and a "medical grade pinch," which has no quantifiable meaning. ECF No. 93-1 at 59.[13]

### (2) Ketamine is completely untested in executions and its use involves serious side effects.

Ketamine in Nevada's execution protocol serves the crucial role as the anesthetic agent. But ketamine has never been used in an execution protocol, so it is untested in bolus doses. And there is good reason for that: ketamine is disfavored for use as an anesthetic—and not used alone—because of the severe side effects it carries. Specifically, using ketamine—a psychostimulant—risks causing psychosis,

---

[12] When Floyd proffered fentanyl in his complaint he intended it to be a low therapeutic dose for pain relief, not a bolus of fentanyl as provided in NDOC's execution protocol.

[13] Even if Floyd responds to the consciousness check after the execution team administers fentanyl, the execution can still proceed, at the discretion of the NDOC Director—not medical personnel. *See* ECF No. 93-1 at 59 (providing as an option after a response to a stimulus check to "[b]egin with the injection of Ketamine if the IV is patent"). The same is true if Floyd responds after cisatracurium. *Id.* at 60–61.

along with laryngospasms (a spasm of the vocal cords making it hard to breathe), excessive secretions from the mouth causing laryngospasms, and vomiting. Ketamine is also unique as an anesthetic drug as it does not produce a flat-line EEG—i.e., it does not stop brain activity, which is a hallmark of other anesthetic agents and indicates unawareness.[14] In addition, ketamine is a strong acid that in large quantities burns the veins and lungs, causing extreme pain and pulmonary edema. Finally, ketamine, like fentanyl and alfentanil, can interfere with consciousness checks, leading the execution team to continue the execution despite Floyd still being aware and sensate to pain.

### (3)   Cisatracurium introduces a medically unnecessary risk of pain and suffering.

The third drug is cisatracurium, which will paralyze Floyd before the final killing agent is administered. By paralyzing Floyd, the drug will mask any problems from the administration of the other drugs, while providing no medical benefit—in other words, Floyd could be in extreme pain while also completely paralyzed.

Most importantly, cisatracurium's superfluousness is reinforced by NDOC's decision to make the drug optional in the final protocol. *See* ECF No. 93-1 at 23.[15] "[T]he purposeless and needless imposition of pain and suffering" is by definition "unconstitutional punishment." *Atkins v. Virginia*, 536 U.S. 304, 319 (2002)

---

[14] The closest chemical to ketamine is PCP, which produces similar EEGs.

[15] Ironically, NDOC stayed the execution of volunteer Scott Dozier in 2017 for the *sole* reason that it was enjoined by the state court from *using* Cisatracurium in the execution.

14

(quoting *Enmund v. Florida*, 458 US 782, 798 (1982)); *see Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (pronouncing that a "sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering"); *La ex rel. Francis v. Resweber*, 329 US 459, 463 (1947) ("The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence.").

### (4) Potassium chloride and potassium acetate cause excruciating pain.

The last drug, either potassium chloride or potassium acetate, will induce cardiac arrest and kill Floyd. *See Beardslee*, 395 F.3d at 1071; *Workman*, 486 F.3d at 902. Unlike the other drugs in Nevada's protocol, potassium chloride has been used in several executions. But that does not mean potassium chloride is noncontroversial as an execution drug; to the contrary, it is widely accepted that potassium chloride is "an extraordinarily painful chemical." *Beardslee*, 395 F.3d at 1071, 1074; *see Baze v. Rees*, 553 U.S. 35, 114 (2008) (Ginsburg, J., dissenting) ("Potassium chloride causes burning and intense pain as it circulates throughout the body."); *see also Harbison v. Little*, 511 F. Supp. 2d 872, 883 (M.D. Tenn. 2007), *vacated and remanded on other grounds*, 571 F.3d 531 (6th Cir. 2009).[16] Courts have upheld protocols using potassium chloride *only* because those protocols were in states with recent executions and included anesthetics with an established history

---

[16] Potassium acetate is no better. *See* Matt Ford, *An Oklahoma Execution Done Wrong*, The Atlantic, https://www.theatlantic.com/politics/archive/2015/10/an-oklahoma-execution-done-wrong/409762/.

of use for this purpose—not ketamine. *See, e.g.*, *Beardslee*, 395 F.3d at 1072–73;

*Cooper*, 379 F.3d at 1033; *Workman*, 486 F.3d at 906–07. Nevada's novel,

experimental protocol creates a substantial risk that the potassium chloride or

potassium acetate will be administered while Floyd is not properly anesthetized,

causing Floyd to suffer excruciating pain.

   **b.**   **There are feasible, readily implemented alternatives that significantly reduce the substantial risk of severe pain.**

  There are two alternatives to Nevada's current protocol: (1) execution by

firing squad; and (2) execution by a single-drug lethal injection procedure using a

barbiturate. Both would significantly reduce the substantial risk of severe pain

caused by NDOC's execution protocol. *See Glossip*, 576 U.S. at 877. And both are

available to NDOC in place of the current protocol. *See Bucklew v. Precythe*, 139 S.

Ct. 1112, 1128 (2019) ("An inmate seeking to identify an alternative method of

execution is not limited to choosing among those presently authorized by a

particular State's law. … So, for example, a prisoner may point to a well-established

protocol in another State as a potentially viable option.").

  Turning first to execution by firing squad, this method of execution

eliminates several of the risks inherent in Nevada's current protocol. For example, a

firing squad eliminates risks associated with establishing IV access and preparing

and administering lethal injection drugs. And a firing squad eliminates concerns

with inmates' physical and medical conditions. A firing squad also causes a faster

and less painful death than execution by lethal injection. *See Arthur v. Dunn*, 137

S. Ct. 725, 733–34 (2017) (Sotomayor, J., dissenting) (citing reports that a firing

squad may cause nearly instantaneous death, be comparatively painless, and have a lower chance of a botched execution); *see also Bucklew*, 139 S. Ct. at 1136 (Kavanaugh, J., concurring) (addressing the availability of firing squad as an alternative). And execution by firing squad "is significantly more reliable" than lethal injection. *Glossip v. Gross*, 135 S. Ct. 2726, 2796 (2015) (Sotomayor, J., dissenting). Recent studies have confirmed that execution by firing squad statistically is much less likely to result in "botched" executions than lethal injection.[17] Four states currently authorize execution by firing squad, Mississippi, Oklahoma, South Carolina, and Utah. NDOC has previously had a firing squad execution protocol and used it to execute Andriza Mircovich in 1913.

A second method of execution would also significantly reduce the substantial risk of pain inherent in Nevada's current protocol—execution solely using a barbiturate such as pentobarbital or sodium pentothal (thiopental). A barbiturate like pentobarbital reliably induces and maintains a coma-like state that renders a person insensate to pain and necessarily precedes death. *See Barr*, 140 S. Ct. at 2591. Thus, when properly administered, barbiturates eliminate the risk of pain and suffering that a prisoner will feel from the administration of other lethal drugs. Several states currently use a single-drug barbiturate protocol as their method of execution. *Id.* And, according to former United States Attorney General William

---

[17] *See* Austin Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty* (2014).

17

Barr, pentobarbital is "widely available."[18] Indeed, several jurisdictions, including Texas, Georgia, and the federal government, have recently used pentobarbital in carrying out executions.

### 2. The balance of the equities weighs heavily in Floyd's favor.

As for the remaining stay factors, there are three interests this Court must balance: Floyd's, the defendants', and the public's. *See Mitchell*, 971 F.3d at 996; *Towery*, 672 F.3d at 657. Because Floyd faces an unconstitutional execution, and the defendants are responsible for the delay to this point, that balance weighs heavily in Floyd's favor.

### a. Floyd will be irreparably injured without a stay of execution.

"In a capital case, the possibility of irreparable injury weighs heavily in the movant's favor." *O'Bryan v. Estelle*, 691 F.2d 706, 708 (5th Cir. 1982); *see Towery*, 672 F.3d at 661; *cf. Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring) ("The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability."). And it is not just imminent execution that Floyd faces; it is an imminent execution involving unconstitutional pain and suffering. There can be no dispute that this factor weighs in favor of a stay. *See Wainwright v. Booker*, 473 U.S. 935, 935 n.1 (1985) (Powell, J., concurring); *Towery*, 672 F.3d at 661.

---

[18] Katie Benner, *U.S. to Resume Capital Punishment for Federal Inmates on Death Row*, N.Y. Times, https://www.nytimes.com/2019/07/25/us/politics/federal-executions-death-penalty.html.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

          **b.**    **Any injury to the defendants is undermined by their delays and significantly outweighed by the harm Floyd faces.**

In general, the defendants have an interest in enforcing Nevada's criminal judgments. *Hill v. McDonough*, 547 U.S. 573, 584 (2006). But the defendants do not have an interest in executing Floyd under an unconstitutional protocol. *See Ray v. Comm'r, Ala. Dep't of Corr.*, 915 F.3d 689, 701–02 (11th Cir. 2019); *In re Holladay*, 331 F.3d 1169, 1177 (11th Cir. 2003). Moreover, the defendants' interest in speedy executions is offset by their own actions in this case—seeking a warrant of execution while having no viable execution protocol in place. Had the defendants developed a protocol and disclosed sufficient information to Floyd about the protocol when preparations for Floyd's execution began months ago, a stay may not have been necessary. *See Towery*, 672 F.3d at 661; *see also Landrigan v. Brewer*, No. 10-02246, 2010 WL 4269559, at *9 (D. Ariz. Oct. 25, 2010) (criticizing defendants for "withholding *all* evidence regarding the drug," while at the same time opposing stay of execution), *aff'd*, 625 F.3d 1144 (9th Cir. 2010), *rev'd on other grounds*, 131 S. Ct. 455 (2010)); *cf. Pizzuto*, 997 F.3d at 902 (expressing concern with states withholding information about execution protocol "to minimize judicial scrutiny"). And Floyd is not seeking to prevent the State from ever carrying out his sentence; he is instead seeking to enjoin the State from executing him unconstitutionally when there are alternatives available that significantly reduce the substantial risk of severe pain. *See Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*, 966 F.2d 460, 462 (9th Cir. 1992) (Noonan, J. dissenting from grant of writ of mandate) ("The state will get its man in the end. In contrast, if persons are put to death in a manner that is determined to

19

be cruel, they suffer injury that can never be undone, and the Constitution suffers an injury that can never be repaired."). Thus, the defendants' interests cannot outweigh the irreparably injury Floyd faces should this Court deny a stay.

### c. The public interest does not support an unconstitutional execution.

The public has an interest in assuring executions proceed humanely and constitutionally. *See In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044, 1059 (S.D. Ohio 2012), *case dismissed* (Mar. 20, 2012); *Coe v. Bell*, 89 F. Supp. 2d 962, 966 (M.D. Tenn. 2000), *vacated on mootness grounds*, 230 F.3d 1357 (6th Cir. 2000) (unpublished table disposition); *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). Although the State may stress the public's interest in the enforcement of criminal judgments, that interest cannot be served "at the expense of a condemned inmate's constitutional rights." *In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d at 1059; *see Ray*, 915 F.3d at 701–02. This factor also weighs in Floyd's favor.

### 3. Conclusion

Floyd is likely to succeed on the merits of his underlying claims. Should this Court deny a stay, however, he faces imminent execution under an unconstitutional execution protocol. Because this irreparable harm strongly outweighs any countervailing interests the defendants might assert, Floyd is entitled to a preliminary injunction and stay of execution.

### C.   This Court is also authorized to grant a stay under the All Writs Act.

In addition to the Court's power to grant temporary injunctive relief, this Court is empowered to grant the requested stay of execution pursuant to 28 U. S.C. § 1651(a), the All Writs Act, which codifies the power of the federal courts to "protect the jurisdiction they already have." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1099 (11th Cir. 2004); *see Hill v. McDonough*, 464 F.3d 1256, 1258 (11th Cir. 2006). A court may issue a writ under the Act whenever it is "calculated in the court's sound judgment to achieve the ends of justice entrusted to it." *Klay*, 376 F.3d at 1100 (cleaned up). An injunction under the All Writs Act "must simply point to some ongoing proceeding, or some past order or judgment, the integrity of which is being threatened by someone else's action or behavior." *Hill*, 464 F.3d at 1258 (quoting *Klay*, 376 F.3d at 1099–1100). Because the "integrity" of this Court's orders setting a final hearing and establishing a plan for factual development in this case "is being threatened," this Court should issue a stay to allow full litigation on Floyd's claims.

### D.   Judicial estoppel

"Judicial estoppel … precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers & Steamfitters Loc. 343*, 94 F.3d 597, 600 (9th Cir. 1996); *see New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001). It applies here to preclude the defendants from opposing a stay when for months they have been solely responsible for the delay in litigating this case—a position this Court adopted

1  by waiting to rule on Floyd's motions and decide whether the deliberative-process

2  privilege shielded information about the protocol from disclosure. *See Rissetto*, 94

3  F.3d at 601–02; *New Hampshire*, 532 U.S. at 750–51. Allowing the defendants to

4  now change their position concerning delay "would derive an unfair advantage" to

5  the defendants and "impose an unfair detriment" on Floyd. *New Hampshire*, 532

6  U.S. at 751.

7  **III.    CONCLUSION**

8          The State is trying to execute Floyd with a new protocol, using a never-

9  before-tried combination of drugs, without allowing adequate time to litigate the

10  protocol's constitutionality. And they are maintaining that position despite delaying

11  both disclosure of the protocol and litigation of Floyd's complaint for months.

12  / / /

13  / / /

14  / / /

Accordingly, for all the reasons provided above, Floyd respectfully requests this Court stay his scheduled execution for a period of time that will allow him to effectively litigate his challenge to the execution protocol.

DATED this 18th day of June, 2021.

Respectfully submitted,

RENE L. VALLADARES
Federal Public Defender

*/s/ David Anthony*
DAVID ANTHONY
Assistant Federal Public Defender

*/s/ Brad D. Levenson*
BRAD D. LEVENSON
Assistant Federal Public Defender

*/s/ Timothy R. Payne*
TIMOTHY R. PAYNE
Assistant Federal Public Defender

**CERTIFICATE OF SERVICE**

In accordance with LR IC 4-1(b), the undersigned hereby certifies that on this 18th day of June, 2021, a true and correct copy of the foregoing PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY OF EXECUTION, was filed electronically with the United States District Court. Electronic service of the foregoing document shall be sent via email addressed as follows:

D. Randall Gilmer
Chief Deputy Attorney General
Office of the Nevada Attorney General
drgilmer@ag.nv.gov
Crane Pomerantz, Esq.
Nadia Ahmed, Esq.
SKLAR WILLIAMS PLLC
cpomerantz@sklar-law.com
nahmed@sklar-law.com

/s/ Sara Jelinek
An Employee of the Federal Public
Defenders Office, District of Nevada

24