1
2
3
4                    UNITED STATES DISTRICT COURT
5                         DISTRICT OF NEVADA
6                               * * *
7    ZANE M. FLOYD,                        Case No. 3:21-cv-00176-RFB-CLB
8                     Plaintiff,                        **ORDER**
9         v.
10   CHARLES DANIELS, *et al.*,
11                     Defendants.
12
13        Before the Court are Plaintiff's Motion for Temporary Restraining Order, Motions for
14   Preliminary Injunction, and Motion to Stay Execution. ECF Nos. 5, 6, 10.  The Court grants the
15   motions for the reasons below. The Court denies the Motion for Disclosure of Execution Method
16   without prejudice as moot. ECF No. 7. [1]
17
18   **I.    PROCEDURAL BACKGROUND**
19        Plaintiff filed a complaint pursuant to 42 U.S.C. § 1983 on April 16, 2021. ECF No. 1.
20   Plaintiff also filed a motion for preliminary injunction/temporary restraining order and a motion
21   for disclosure of method of execution. ECF Nos. 5-7. On April 21, 2021, Plaintiff filed a motion
22   to stay execution. ECF No. 10. On April 30, 2021, Defendants filed responses to these motions.
23   ECF Nos. 22-29. On May 2, 2021, Plaintiff filed replies. ECF Nos. 30, 32. On May 6, 2021,
24   Nevada Department of Corrections ("NDOC") Director Charles Daniels presented testimony to
25   this Court regarding the Nevada Department of Corrections Execution Manual. ECF No. 48. On
26   June 18, 2021, Plaintiff filed a supplement to its motion for preliminary injunction. ECF No. 98.
27
28        [1] The Court incorporates by reference its prior findings on June 28, 2021 but notes that to
     the extent anything in this order is inconsistent with the Court's oral pronouncement on June 28,
     2021 this order controls.

Defendants responded on June 24, 2021 and Plaintiff replied on June 25, 2021. ECF Nos. 105, 107, 110. On June 28, 2021, the Court held an evidentiary hearing, where Director Charles Daniels testified. ECF No. 114.

## II.     EXECUTION PROCESS UNDER NEVADA LAW

Nevada law outlines a multi-step process which must be followed for an execution to occur. First, after the death penalty has been imposed as a punishment, the prosecuting entity, in this case, the Clark County District Attorney's Office must file a motion in the original criminal matter seeking an Order of Execution and a Warrant of Execution. Nevada Revised Statutes ("NRS") §§176.495, 176.505. Pursuant to Section 176.505, the State can seek an Order of Execution when there are no longer any legal impediments—such as unresolved appellate or habeas disputes—to the execution being carried out. The Order of Execution indicates that the execution will proceed and identifies the timeframe within which the execution must take place. Once the state court issues the Order of Execution, the State can seek a Warrant of Execution pursuant to NRS §176.495 in order to be able carry out the execution. The Warrant of Execution must state the conviction and judgment and confirm the week within which the execution is to take place. Id. Without the entry of these legally required court orders, no execution can take place under Nevada law. See NRS §§176.495, 176.505.

Nevada law provides for only one method of execution—lethal injection. NRS §176.355. Nevada law assigns the NDOC's director the responsibility of selecting the drug or combination of drugs to be used for the execution after consulting with the Chief Medical Officer of Nevada. Id. (emphasis added). The NDOC Director may also consult with any other qualified medical and pharmaceutical professionals to ensure the selected lethal drug or combination of drugs and dosages are sufficient to cause death. NDOC Execution Manual 103.01. Upon determination of the method of lethal injection, the NDOC Director and Deputy Director publish an execution protocol detailing the method of execution, dosages, concentrations, and preparation instructions, among other subjects. Absent a stay of execution, the Director shall execute a sentence of death within the week the judgment is to be executed. NRS § 176.495.

### III.     FACTUAL BACKGROUND

The Court makes the following factual findings.

Plaintiff Zane Floyd is a death row inmate in the custody of the NDOC. On April 14, 2021, the Clark County District Attorney's Office ("DA") filed an application in state court for an "Order of Execution" and a "Warrant of Execution" seeking to execute Plaintiff Floyd the week of June 7, 2021. At the time this application was filed, the State of Nevada had a three-drug execution protocol (the "2018 protocol"). This protocol had been promulgated, under a different director, by the NDOC in 2018. This execution protocol specifically outlined a process of using in sequence the drugs midazolam, fentanyl and cis-atracurium. At the time of the April 14 filing by the DA, the current Director of the NDOC, Director Daniels, and the head pharmacist for the NDOC, Linda Fox, knew that the 2018 protocol could not be used for an execution in June 2021, since the NDOC no longer had midazolam in its possession and could not purchase any. The 2018 protocol was also the subject of litigation in the Dozier capital case.[2] During this litigation, at least one state court judge had declared the 2018 protocol to be unlawful.[3] This ruling was appealed, but the appeal was ultimately dismissed as moot without a ruling on the merits when Dozier committed suicide in prison.[4] At the time this case was commenced on April 16, 2021, the NDOC had already begun developing a new execution protocol. This was communicated to Floyd's attorneys by state officials prior to the filing of this action. In fact, Director Daniels and the NDOC had been informed by the DA's office in the last week of March 2021, that the DA would be filing an application for an execution date in June 2021. Daniels and Fox and other members of the NDOC thus began to develop, in the last week of March 2021, a new execution protocol.

Director Daniels knew as early as the first week in April if not sooner the drugs that would likely be included in the protocol, but the NDOC Defendants chose not to share this information with Floyd.

At the May 6, 2021 hearing, Director Daniels testified credibly that there are many factors

---

[2] See Nevada Dep't of Corr. v. Eighth Jud. Dist. Ct. in & for Cty of Clark, 134 Nev. 1014 (2018).

[3] Alvogen, Inc. v. State of Nevada, No. 18A777312, 2018 WL 4145017, at *1 (Nev.Dist.Ct. July 11, 2018).

[4] See State Dep't of Corr. v. Dozier, 134 Nev. 1014 (2018).

for the NDOC to consider in determining the final execution protocol. He noted that consideration of the drugs to be used, their dosages and sequence was one of several categories of factors that had to be considered to finalize the protocol. He also had to consider the need for appropriately experienced and trained personnel and experts needed for the execution. He credibly testified that it would take him and his staff and experts approximately 90 to 120 days to finalize the protocol based upon the factors and information that would have to be considered. Director Daniels also emphasized that he approaches this process in a deliberate, thorough, and methodical manner; therefore, he would prefer having additional time to finalize the execution protocol.

On June 7, 2021, Nevada Eighth Judicial District Court Judge Michael Villani at the request of the Clark County District Attorney issued a second Order of Execution for Plaintiff Floyd for the week of July 26, 2021. On June 10, 2021, Defendants filed a redacted version of the NDOC finalized execution protocol. According to the protocol, there are two drug combination options. The first is a four-drug combination in the following sequence: Fentanyl or Alfentanil, Ketamine, Cisatracurium, and Potassium Chloride or Potassium Acetate. The second is a three-drug combination in the following sequence: Fentanyl or Alfentanil, Ketamine, and Potassium Chloride or Potassium Acetate. There are actually eight different versions of the drug protocol that can be administered pursuant to the execution protocol.[5] The protocol also specifies dosages, concentrations, and preparation instructions, among other subjects.

On June 24, 2021, Defendants filed declarations of the experts who offered their opinions as to the effect of the different versions of the drug protocol. The experts' declarations not only discussed the properties of each drug in the execution protocol, but also emphasized the fundamental importance of drug dosages and sequences. On June 28, 2021, Defendant Charles Daniels testified again about the NDOC execution protocol. He explained that he decided to have so many different variations of the drug protocol because he was concerned about possible expiration of various drugs identified in the protocol. Due to this possibility as well other possible unforeseen events, Director Daniels believes that it is appropriate to inform Plaintiff a week prior to his execution of what drug protocol will be administered.

---

[5] Appendix A.

## IV.     LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, a plaintiff must establish four elements: "(1) a likelihood of success on the merits, (2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that the public interest favors an injunction." Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc., 758 F.3d 1069, 1071 (9th Cir. 2014) (citing Winter, 555 U.S. 7, 20 (2008)). A preliminary injunction may also issue under the "serious questions" test. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134 (9th Cir. 2011) (affirming the continued viability of this doctrine post-Winter). According to this test, a plaintiff can obtain a preliminary injunction by demonstrating "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," in addition to the other Winter elements. Id. at 1134-35 (citation omitted).

## V.     DISCUSSION

As an initial matter, the Court finds that the Plaintiff has based his argument for an injunction on two different substantive claims—a Due Process claim and an Eighth Amendment claim. The Plaintiff has also argued for an injunction on an entirely equitable basis under the doctrine of judicial estoppel and under the All Writs Act. The Court will consider the due process claim and then the equitable claims and then the Eighth Amendment claim. The Court does note, as will be evident, that the equitable considerations pervade all of the analysis here.

### A.  Due Process Claim

The Court first finds that Plaintiff has raised a Fourteenth Amendment procedural due process claim. While the NDOC Defendants have argued that this claim was not raised, the Court finds that it was raised in the Plaintiff's moving papers seeking injunctive relief.

### 1.  Likelihood of Success on the Merits

This Court also finds that Plaintiff is likely to succeed on the merits of this claim. The Due Process Clause of the Fourteenth Amendment provides that the government may not deprive "any

person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause "confers both substantive and procedural rights." Albright v. Oliver, 510 U.S. 266, 272 (1994). Substantive due process "prohibits States from infringing fundamental liberty interests, unless the infringement is narrowly tailored to serve a compelling state interest." Lawrence v. Texas, 539 U.S. 558, 593 (2003). Procedural due process "'minimize[s] substantively unfair or mistaken deprivations of' life, liberty, or property" by guaranteeing all persons fair procedures by which they may "contest the basis upon which a State proposes to deprive them of protected interests." Carey v. Piphus, 435 U.S. 247, 259–60 (1978). Put simply, "[w]hen government action depriving a person of life, liberty, or property survives substantive due process scrutiny, [procedural due process requires that] it must still be implemented in a fair manner." United States v. Salerno, 481 U.S. 739, 746 (1987) (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)). To invoke the protection of the Due Process Clause, a plaintiff first must identify a protected interest to which such protection extends and demonstrate a governmental deprivation of that interest. See Wilkinson v. Austin, 545 U.S. 209, 221(2005). Once the protected interest is identified, the state "may not constitutionally authorize the deprivation of such an interest...without appropriate procedural protections." Cleveland Bd. Of Educ. v. Loudermill, 470 U.S. 532, 541 (1985). At a minimum, Due Process requires "notice and an opportunity to respond" prior to an individualized determination that eliminates the property interest. See id. at 546-47. "The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." Id. at 333 (1976). "Ordinarily, due process of law requires an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest." Samson v. City of Bainbridge Island, 683 F.3d 1051, 1059 (9th Cir. 2012).

The Court further notes that the Ninth Circuit has recently recognized that a due process claim based upon the failure to provide adequate notice of the details of a lethal injection protocol may be brought by a condemned plaintiff. Pizzuto v. Tewalt, 997 F.3d 893, 904-06 (9th Cir. 2021) (recognizing and addressing condemned inmate's due process claim for failure to provide adequate notice of specifics of lethal injection protocol).

The Court finds that the Plaintiff has established a likelihood of success on the merits as to his due process claim. The Court finds that Plaintiff has not been afforded adequate timely notice as to the most recent protocol that would allow him to meaningfully review the protocol and respond substantively to the deprivation of his most sacred property—his life. The Court holds that pursuant to the Due Process Clause, Floyd is entitled to detailed notice as to the manner of his execution. Id. at 906. In this case, the Court finds that this includes all of the substantive details of the execution protocol with the exception of security details at the facility and the names of specific NDOC personnel involved with security aspects of the protocol. The Court finds that, since the beginning of this matter in April 2021, Plaintiff has repeatedly requested the NDOC provide details of the execution protocol, especially as it relates to all of the aspects of the protocol regarding the drugs, drug dosages and drug sequence to be used, the training and background of those involved in the administration of these drugs, and the preparation and training of NDOC staff regarding the execution. From April 16, 2021, to June 10, 2021, Defendants represented that no execution protocol had been finalized and extensive investigation and review was required to do so. Specifically, Defendant Daniels testified about the myriad factors and information that must be considered to create a lawful protocol. This deliberate process included consultation with experts about which drugs can be used, drug dosages, and drug sequences. It was not until June 10, 2021, that the NDOC finalized and published its updated execution protocol. This left the Plaintiff only a little over six weeks to investigate and review the protocol before the week of the execution.

Importantly, the NDOC Defendants, including Director Daniels, never gave the Plaintiff or the Court any indication that the final protocol would have eight different variations and that each of these variations was previously untested. Yet, the Court finds that Director Daniels was aware as early as April that the protocol would involve multiple variations of an untested sequence of drugs.

The Court also finds based upon the record, including all submissions and testimony, that a minimum of three months is required for the Plaintiff to be able to fully investigate and research all of the different variations of the drug protocol and all of the other substantive aspects of the execution protocol. The Court emphasizes here a few of the reasons for this finding. First, the

NDOC Defendants, most notably Director Daniels, confirmed that it took them at least three months to adequately consider all of the different factors, such as drug effects, drug dosages, drug sequences, adequate training for NDOC personnel, identifying experts to advise about the administration of the protocol, and identifying and securing the presence of appropriately qualified personnel to carry out the execution. The Plaintiff is entitled to review and investigate the entire protocol. And the Court credits Daniels' testimony that a full consideration of all relevant factors requires at least 90 to 120 days. As the NDOC kept the entire process largely a secret until June 10, 2021, the Plaintiff should have at least 90 days to review all of the details of the protocol.

The Court finds that such time is also required because of a.) the number of variations of the drug protocol, b.) the fact that ALL of the variations are untested, and c.) the fact that the Director will not decide which drug variation will be administered until a mere week prior to the execution. The Court rejects as unfounded and wholly unreasonable the NDOC Defendants' argument that Plaintiff's prior knowledge of the possibility of certain drugs which eventually were identified in the finalized protocol provides sufficient notice to Plaintiff. The NDOC's Director and own experts repeatedly note that the dosage and sequence of drugs is highly relevant to, if not dispositive of, the constitutionality of the protocol in terms of whether or not any of the variations would cause Plaintiff to unlawfully suffer during administration of the drugs. The Court credits this aspect of their respective statements. And the Court rejects any suggestion that any of the drug protocols are interchangeable such that investigation of one variation would suffice as to other variations of the protocol. The record does not support such a factual or scientific finding and the Court declines to make such a finding.

Finally, the Court finds that the NDOC Defendants have not presented a single credible reason based on this record for believing that the Plaintiff's full investigation and review of the eight untested drug variations in the protocol would take less than at least three months. It took the NDOC at least three months to finalize the protocol and to submit expert testimony in support of the protocol on June 24, 2021. The Court explicitly questioned Director Daniels about his review process and whether there was any reason to believe that the Plaintiff (and his experts) would not require at least the same 90 days to complete their review. He offered no credible explanation as

to why the Plaintiff's process would take less time. He did not present any credible argument that there were aspects to the NDOC's review that required additional time but that would not have to be considered by the Plaintiff.[6] And the Court finds based upon his testimony and the record, that the review took three months due primarily to considerations that Plaintiff would also have to review including: type of drugs, dosages of the drugs, sequence of the drugs, the expert personnel required to monitor and administer the drugs, the equipment necessary to administer the drugs, the appropriate safety procedures should there be issues with the process, etc. If the Court were to accept the NDOC Defendants' position, it would mean that the Plaintiff would only have approximately 35-40 days to complete his review the execution protocol and submit his arguments for timely consideration by this Court. There is nothing in this record which suggests that such a timeframe is adequate, fair, or reasonable.

In sum, taking into consideration the entire record in this case, the Court finds that Plaintiff is likely to succeed on the merits of his due process claim as to adequate and fair notice of the details of the method of execution. The Court finds that the process due to Plaintiff is at least three months and that Plaintiff has not been afforded that time. A person condemned to death by the government is entitled to fundamental fairness and due process. He must have adequate notice and time to meaningfully investigate and respond to an execution protocol. Here, fundamental fairness and due process requires Plaintiff Floyd and his counsel to be afforded three months to investigate and review the new execution protocol.

### 2.  Irreparable Harm

The Court finds that absent preliminary injunctive relief, Plaintiff will be irreparably harmed by being put to death in an unconstitutional manner—without due process. Short of injunctive relief, Plaintiff will be executed in less than 30 days. There can be no greater irreparable and permanent harm than death. Plaintiff will be irreparably harmed if his execution is not carried

---

[6] Based upon the Court's comparison of the 2018 protocol and the current execution protocol and Daniels' testimony, the Court finds that the crucial substantive differences can be seen in the drug protocol and its safe administration. The other portions of the two execution protocols appear to be largely similar which would underscore the point that it was the drug protocol and its administration—issues which the Plaintiff would need to investigate—that represent the significant difference between the two execution protocols.

out in "a constitutional manner." <u>Beaty v. Brewer</u>, 649 F.3d 1071, 1072 (9th Cir. 2011). Therefore, Plaintiff has established irreparable harm warranting injunctive relief.

### 3. Balance of the Equities

The Court finds that the balance of equities overwhelmingly tips in Plaintiff's favor. The Court first reiterates its finding that Plaintiff has not been afforded a fair and adequate opportunity to fully investigate the execution protocol. The Court further elaborates here that it finds that the NDOC Defendants are directly and principally responsible for Plaintiff's inability to fully investigate and research the drug protocol. While the NDOC Defendants professed in filings and testimony that they wanted to be fair to Plaintiff in terms of disclosing information and transparent in the process. That is far from what transpired in this case. The Court finds that the NDOC Defendants knowingly and deliberately chose not to disclose information about the execution protocol that they knew would be helpful to the Plaintiff's ability to investigate the protocol, especially the specific drugs, dosages, and drug sequences. The Court finds based upon his testimony and the records in this case that Director Daniels knew as early as the first week in April or sooner what drugs would likely be in the final protocol. The Court also finds that he and the NDOC Defendants knew that this information could have been shared pursuant to a protective order. The NDOC Defendants also knew that the failure of the NDOC to provide such information would essentially prevent the Plaintiff from being able to adequately investigate the execution protocol that would be used to take Floyd's life. While the NDOC Defendants asserted that the protective shield of the deliberative process privilege was necessary to guard the NDOC's deliberations. The Court now having the benefit of considering the full record, including Director Daniels' testimony and the most recently disclosed drug purchase records, finds that the NDOC used this privilege primarily out of fear that drug manufacturers would bring suit to enjoin use of their drugs in the execution. Setting aside whether the NDOC appropriately invoked the privilege, the Court finds that the NDOC could have disclosed to the Plaintiff drug information as to the drugs to be used, the sequence of drugs and dosages in early April pursuant to a protective order and still protected its "deliberative process." The Court finds that the NDOC and its Director have

knowingly disregarded the constitutional inadequacy of their notice to the Plaintiff because of their fear of litigation from drug manufacturers.

The Court also finds that the NDOC would not suffer any prejudice with respect to the issuance of a stay. First, the Court finds that the NDOC Defendants have indicated that other than purported additional expenses associated with moving the execution date the NDOC has no particular interest in the date of the execution so long as it can lawfully carry out the judgment of execution. Second, the Court finds that the NDOC will not in fact incur any additional expenses or hardship with the imposition of an injunction. The Court did not find credible Director Daniels' vague, inconsistent, and conclusory assertions that there are expenses that have been incurred that would not have been incurred regardless of the execution date. The Court finds that these initial expenses would be the same if the execution date was in October. The Court thus finds that any expenses that have been incurred by the NDOC to date would have to be incurred regardless of whether the execution occurs in July or October.

The Court also rejects the NDOC's argument in its last filing that the NDOC would suffer prejudice with a stay because certain of the drugs in the drug protocol—potassium chloride— would expire in July of this year. This argument was revealed to be inaccurate at best when the Court ordered the NDOC to subsequently file the entire inventory with expiration dates of the drugs in the execution protocol. This more complete listing confirms that the NDOC has a sufficient inventory of unexpired drugs to be able to carry out an execution pursuant to the protocol through November of this year. Indeed, the Court finds, based upon Director Daniels' own testimony, that the very reason that the execution protocol includes so many drug variations is to account for differences in expiration dates for the various specified drugs. The Court thus holds that the NDOC Defendants will not suffer any prejudice if a stay is issued in this case.

The Court also finds the equities tip very heavily in Floyd's favor due to the undisputed and irrevocable finality of his punishment. Even if the Court were to find that the NDOC Defendants would somehow be inconvenienced by a stay, this inconvenience would pale in comparison to Floyd's interest in preventing his unlawful execution.

### 4. Public Interest

The Court also finds that the public's interest is either neutral or tilts in favor of an injunction. Although, the public, including the State of Nevada, has an interest in seeing finality in its criminal judgments, the public has an equal interest in ensuring that that the imposition of the ultimate state sanction—death—is done in a constitutional manner. Indeed, the public has a very strong interest in the enforcement of the protections of the Due Process Clause which was enacted to *protect the public* from any unfair or wrongful government deprivation of life or liberty. The public's interest in the imposition and finality of a death sentence is based upon an implicit assumption that such an ultimate sanction was implemented in a fair and just manner. Here, where the Court has found that the imposition of the judgment of death in July would render the process fundamentally unfair, the public's interest in the finality of the judgment is offset by the public's interest in the justness and accountability of such a punishment and its interest in the enforcement of the Due Process clause.

Moreover, the Court finds that the public's interest in the finality of the judgment would not be undermined by a three-month delay where the punishment itself was imposed over 20 years ago. The Court is not reversing the judgment or invalidating the judgment of death with its order. Rather, it is simply ordering a delay to ensure that the judgment of death is carried out in a fair and just manner which is consistent with the public's interest in the enforcement of the Due Process Clause. Indeed, the Court concludes that before the public could have an interest in the finality of any judgment, it must first be affirmed to the public that such judgment will be implemented in a fair, transparent and equitable manner.

The Court also finds that the equities tip in Plaintiff's favor because Plaintiff has been very diligent in pursuing information about the execution protocol. The Court finds that the Plaintiff has consistently and regularly sought information about the protocol from various state sources. The Plaintiff pursued this information and his claim in an extremely timely manner. The Court finds that this is not a case in which the Plaintiff has delayed or waited until the last minute to bring his claim and seek a stay or an injunction. See Nelson v. Campbell, 541 U.S. 637, 649-50 (2004) (court must consider the "extent to which the inmate has delayed unnecessarily in bringing

1  the claim"). Floyd brought his claim in a timely manner and with compelling expert evidence based

2  upon the extant execution protocol.

3

4      **B. Judicial Estoppel**

5      The Court also finds that NDOC Defendants are judicially estopped from opposing the

6  Plaintiff's request for an injunction or stay. "Judicial estoppel is an equitable doctrine that

7  precludes a party from gaining an advantage by asserting one position, and then later seeking an

8  advantage by taking a clearly inconsistent position." Hamilton v. State Farm Fire & Cas. Co., 270

9  F.3d 778, 782 (9th Cir. 2001). Courts "invoke[ ] judicial estoppel not only to prevent a party from

10 gaining an advantage by taking inconsistent positions, but also because of general consideration[s]

11 of the orderly administration of justice and regard for the dignity of judicial proceedings, and to

12 protect against a litigant playing fast and loose with the courts." Id. (citation and internal quotation

13 marks omitted).

14     The Court finds that the NDOC Defendants should be judicially estopped from taking

15 contrary positions which would result in an inequity in this litigation. Specifically, this Court did

16 not order, as requested by the Plaintiff, that the NDOC and Director Daniels disclose the drugs

17 under consideration and drafts of the drug protocol prior to it being finalized and made public,

18 because the NDOC and Director Daniels asserted that their deliberative process needed to be

19 protected and because Director Daniels argued that it would take to him 90 to 120 days to research

20 and finalize the execution protocol. This Court did not order such disclosure because the Court

21 was persuaded by Director Daniels that this amount of time was the minimum necessary to be able

22 to research and finalize an execution protocol that was constitutional. The Court finds that the

23 NDOC Defendants are now taking the contrary position that the Plaintiff needs only approximately

24 35-40 days[7] to complete his research and analysis of the same execution protocol.

25     Defendants assert that Plaintiff has had more than enough time to investigate and review

26 the execution protocol because he received the protocol on June 10, 2021, and was generally made

27

28 [7] This estimation takes into consideration the date of the public dissemination of the protocol, June 10, 2021, and the execution date of July 26, 2021, and the fact that for any research to be reviewed by the Court there would have to be filings and proceedings at least ten days prior to the execution.

aware of the drugs that NDOC was considering before Defendants published the protocol. This Court disagrees because in fact it was not until June 24, 2021, when Plaintiff became aware of the fundamental aspects of the protocol through Defendants' experts' declarations. Specifically, the declarations reference the importance of which drugs are used, what their dosages are, and the significance of the sequences of drugs. The Court finds that Defendants seek to assert an inconsistent position that, if accepted by the Court, would wrongfully disadvantage the Plaintiff.[8] See New Hampshire v. Maine, 532 U.S. 742 (2001).

The Court furthers finds that its analysis with respect to judicial estoppel overlaps with its analysis regarding the Plaintiff's argument for an injunction under the All Writs Act. The equitable considerations of the Court for these doctrines is substantially similar in this case. The Defendants argue that such an extraordinary writ does not apply here because there is no past order or judgment. However, there is indeed a Second Supplemental Order of Execution issued by Judge Villani. Therefore, the party seeking the stay, Plaintiff Floyd, is seeking a stay or injunction regarding an order of execution whose effect would undermine this Court's ability to resolve the federal claim before it. See Makekau v. State, 943 F.3d 1200 (9th Cir. 2019); Hill v. McDonough, 464 F. 3d 1256, 1258 (11th Cir. 2006). The Court thus finds that its reasoning supporting the issuance of an injunction pursuant to the doctrine of judicial estoppel supports an injunction pursuant to the All Writs Act. As judicial estoppel is an equitable doctrine based upon the Court's inherent power to maintain the integrity of the case before it and as the Court has found that estoppel is warranted based upon equity, an injunction would concomitantly be appropriate based upon the All Writs Act.

### C.  Eighth Amendment Claim

The Court's consideration of the Eighth Amendment claim raised by the Plaintiff must be done in the light of the Court's findings as to judicial estoppel and the equities in this case. As the Court previously noted at the last hearing, the Plaintiff has not presented evidence by medical

---

[8] The Court does not find that Defendants acted in bad faith or are judicially estopped from imposing the execution.

experts as to the most recent protocol. However, the Court has now found that Defendants must be estopped from opposing the Plaintiff's request for a stay because the Plaintiff's inability to fully investigate the new execution protocol, including an analysis by medical experts, is a direct result of the NDOC Defendants' failure to timely disclose significant details of the execution protocol, including the drugs under consideration for the protocol. The Court now extends its estoppel ruling and remedy to this claim as well. The Court finds the Defendants must not be permitted to be able to argue the merits of this claim based upon their recent submission of June 24, 2021, until the Plaintiff has had a full and fair opportunity to respond to this recent evidence. By way of illustration, at the most recent hearing, the Defendants repeatedly noted and argued that the Plaintiff had not submitted any new medical or scientific evidence focused on the new protocol. This argument demonstrates the inequity as to the current state of a merits analysis if it were conducted by the Court. The Plaintiff's inability to fully investigate the merits of the new protocol resulted from the NDOC Defendants' release of the protocol 47 days before the execution date. The Court notes that with his initial filings for injunctive relief based upon the earlier execution protocol (the 2018 protocol) in effect at the time this case was initiated, Plaintiff included substantial medical and scientific testimony from several medical experts. This evidence persuasively presented a likelihood of success on the merits or at least a serious question going to the merits as to the lawfulness of the 2018 protocol. Specifically, these experts raised cogent medical arguments as to the impropriety and unconstitutionality of the use of fentanyl and cisatracurium in a lethal injunction protocol. However, this expert evidence only addressed these two drugs being used in the current protocol and involved a different sequence of administration. The Court finds that it would be inequitable to force the Plaintiff to rely upon this incomplete expert evidence when its incompleteness derives from the Defendants' own deliberately delayed disclosure. The Court thus judicially estops the NDOC Defendants from being able to rely upon their most recent expert submissions in opposing the Plaintiff's request for an injunction.

## VI.     CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Motions for Temporary Restraining

1   Order, Preliminary Injunction, and Stay of Execution (ECF Nos. 5,6,10) are GRANTED.

2   Defendants are enjoined from implementing any execution warrant or order as to Plaintiff Zane

3   M. Floyd prior to **October 25, 2021**.

4         **IT IS FURTHER ORDERED** that Plaintiff's Motion for Disclosure of Method of

5   Execution (ECF No. 7) is DENIED as moot.

6         **IT IS FURTHER ORDERED** that should this Court's order be vacated by an appellate

7   court, the Court will schedule an evidentiary hearing the week of July 19, 2021.

8         **IT IS FURTHER ORDERED** that week of October 4, 2021, this Court will have an

9   evidentiary hearing in this case.

10

11         DATED: <u>July 6, 2021</u>.

12   _____

13         **RICHARD F. BOULWARE, II**
           **UNITED STATES DISTRICT JUDGE**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 16 -

**<u>Appendix A</u>**

*Table 1 NDOC Four-Drug Protocol*

| **1.** | Fentanyl | Ketamine | Cisatracurium | Potassium Chloride |
|---|---|---|---|---|
| **2.** | Fentanyl | Ketamine | Cisatracurium | Potassium Acetate |
| **3.** | Alfentanil | Ketamine | Cisatracurium | Potassium Chloride |
| **4.** | Alfentanil | Ketamine | Cisatracurium | Potassium Acetate |

*Table 2 NDOC Three-Drug Protocol*

| **1.** | Fentanyl | Ketamine | Potassium Chloride |
|---|---|---|---|
| **2.** | Fentanyl | Ketamine | Potassium Acetate |
| **3.** | Alfentanil | Ketamine | Potassium Chloride |
| **4.** | Alfentanil | Ketamine | Potassium Acetate |