3:21-cv-00176-RFB-CLB

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3
ZANE M. FLOYD,                    )
4                                 ) Case No. 3:21-cv-00176-RFB-CLB
              Plaintiff,          )
5                                 ) Las Vegas, Nevada
         vs.                      ) Thursday, December 16, 2021
6                                 ) 10:28 a.m.
CHARLES DANIELS, Director,        )
7 Nevada Department of            ) EVIDENTIARY HEARING, DAY 6
Corrections; HAROLD              ) AM SESSION
8 WICKHAM, NDOC Deputy            )
Director of Operations;
9 WILLIAM GITTERE, Warden,
Ely State Prison; WILLIAM
10 REUBART, Associate Warden
at Ely State Prison; DAVID
11 DRUMMOND, Associate Warden
at Ely State Prison; IHSAN
12 AZZAM, Chief Medical            ***C E R T I F I E D   C O P Y***
Officer of the State of
13 Nevada; DR. MICHAEL MINEV,
NDOC Director of Medical
14 Care, DR. DAVID GREEN, NDOC
Director of Mental Health,
15
              Defendants.
16 _____

17

18              REPORTER'S TRANSCRIPT OF PROCEEDINGS

19            THE HONORABLE RICHARD F. BOULWARE, II,
                 UNITED STATES DISTRICT JUDGE
20

21 APPEARANCES:      See next page

22

23 COURT REPORTER:   Patricia L. Ganci, RMR, CRR
                     United States District Court
24                   333 Las Vegas Boulevard South, Room 1334
                     Las Vegas, Nevada  89101

25 Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

```
                        3:21-cv-00176-RFB-CLB
```

 1  APPEARANCES:

 2  For the Plaintiff:

 3        **DAVID S. ANTHONY, ESQ.**
          **BRAD LEVENSON, ESQ.**
 4        OFFICE OF THE FEDERAL PUBLIC DEFENDER
          411 E. Bonneville Avenue, Suite 250
 5        Las Vegas, Nevada 89101
          (702) 388-6577

 6

 7  For Nevada Department of Correction Defendants:

 8        **D. RANDALL GILMER, ESQ.**
          OFFICE OF ATTORNEY GENERAL
 9        555 E. Washington Street, Suite 2600
          Las Vegas, Nevada 89101
10        (702) 486-3427

11        **DOUGLAS RANDS, ESQ.**
          OFFICE OF ATTORNEY GENERAL
12        100 N. Carson Street
          Carson City, Nevada 89701
13        (775) 684-1259

14
    For Defendant Ihsan Azzam:
15
          **NADIA AHMED, ESQ.**
16        SKLAR WILLIAMS, PLLC
          410 S. Rampart Boulevard, Suite 350
17        Las Vegas, Nevada 89145
          (702) 360-6000

18

19

20

21

22

23

24

25

—3:21-cv-00176-RFB-CLB—

1                           INDEX OF EXAMINATIONS

2   TESTIMONY OF IHSAN AZZAM, M.D., Ph.D.
      Direct Examination by Mr. Levenson....................7
3     Cross-Examination by Ms. Ahmed.......................22

4   TESTIMONY OF JEFFREY PETERSOHN, M.D.
      Direct Examination by Mr. Gilmer....................48

5

6                        PLAINTIFF'S EXHIBIT INDEX

7   Exhibit No.                                        Admitted
    115                                                    48

8                        DEFENDANT'S EXHIBIT INDEX

9
    Exhibit No.                                        Admitted
10  513                                                    48
    514                                                    48
11  514 A                                                  48
    515                                                    48

12

13

14

15

16

17

18

19

20

21

22

23

24

25

—3:21-cv-00176-RFB-CLB—

1      LAS VEGAS, NEVADA; THURSDAY, DECEMBER 16, 2021; 10:28 A.M.

2                              --oOo--

3                    P R O C E E D I N G S

4          THE COURT:  Please be seated.

5          Go ahead, Blanca.

6          COURTROOM ADMINISTRATOR:  Now calling -- now calling

7  Zane M. Floyd versus Charles Daniels, et al., Case Number

8  3:21-cv-00176-RFB-CLB.  This is the time for evidentiary

9  hearing, Day 6.

10         Starting with counsel for plaintiff, please note your

11  appearance for the record.

12         MR. ANTHONY:  Good morning, Your Honor.  David Anthony

13  from the Federal Public Defender's Office for Zane Floyd.  Also

14  appearing with me is my cocounsel, Brad Levenson, and appearing

15  by video link from the Nevada Department of Corrections is Zane

16  Floyd.

17         THE COURT:  Good morning.

18         MR. GILMER:  Good morning, Your Honor.  Randall Gilmer

19  on behalf of the NDOC Defendants in this case, which for

20  purpose -- ease of the record is all defendants that are

21  currently in the case other than Dr. Azzam.  To my right is

22  Senior Deputy Attorney General, Doug Rands, also of the Office

23  of Attorney General also representing the same defendants.

24  Immediately to his right is Director Charles Daniels, defendant

25  in this case.  And on the bench behind me is Natasha Petty,

———3:21-cv-00176-RFB-CLB———

1  legal researcher, Office of Attorney General, as well as Deputy

2  Director Warden Gittere, listed as Warden Gittere, is a

3  defendant in this case.  Good morning.

4          THE COURT:  Good morning.

5          MS. AHMED:  Good morning, Your Honor.  Nadia Ahmed

6  appearing on behalf of Dr. Azzam who's with me and present in

7  the courtroom.  Good morning.

8          THE COURT:  Good morning.  So what's our order of

9  witnesses today?

10         MR. ANTHONY:  Your Honor, my understanding is that

11  we'll be hearing from Dr. Azzam this morning.  And then after

12  that, Dr. Petersohn.

13         THE COURT:  Okay.  So as it relates to the motion to

14  compel, Ms. Ahmed, I assume that Mr. Pomerantz shared with you

15  the contents of our, sort of, ex parte discussion about the

16  testimony.  What I'm going to do at this point is defer.  I want

17  to hear from Dr. Azzam, hear the nature of the questions that

18  are being asked.  And then I will rule as it relates to the

19  motion to compel, specifically, the aspect of the consult part

20  of the communication with Director Daniels, specifically.

21         But I think that the doctor has other relevant

22  testimony, so we can start there.  But I just wanted to make

23  sure, Ms. Ahmed, you were at aware or at least had an

24  opportunity to speak with Mr. Pomerantz about our colloquy

25  yesterday.

3:21-cv-00176-RFB-CLB

1           MS. AHMED:  That is correct, Your Honor.  Thank you.

2           THE COURT:  Okay.  All right.

3           Anything else we need to do before we start with

4 Dr. Azzam?

5           MR. ANTHONY:  Not from plaintiff, Your Honor.

6           THE COURT:  Okay.

7           MR. GILMER:  Your Honor?

8           THE COURT:  All right.  Dr. Azzam, if you want to come

9 up and take the stand, please?

10          Before you take your seat, we need to swear you in,

11 Doctor.

12          COURTROOM ADMINISTRATOR:  Please, raise your right

13 hand.

14          IHSAN AZZAM, M.D., having duly been sworn, was examined

15 and testified as follows:

16          THE COURT:  All right.  You can take a seat, Doctor.

17          If you are comfortable with, you can -- you can take

18 your mask off.  You're behind the Plexiglas.  But you're not

19 required to do so.

20          THE WITNESS:  Thank you.

21          THE COURT:  Okay.  Could you state and spell your full

22 name for the record.  And the microphone, Doctor, is actually

23 that little bar that's in front of you, so that's where you

24 speak.  But don't put your hands on it or shuffle papers on top

25 of it because, otherwise, my court reporter may have a few

———3:21-cv-00176-RFB-CLB———

1 choice words to say to you.

2         THE WITNESS:  My name is Ihsan Azzam, I-H-S-A-N.  The

3 last name is A-Z-Z-A-M, as in Mary.

4         THE COURT:  Thank you.

5         THE WITNESS:  Thank you.

6         THE COURT:  Mr. Anthony -- or Mr. Levenson.

7         MR. LEVENSON:  Thank you.

8          DIRECT EXAMINATION OF IHSAN AZZAM, M.D., Ph.D.

9 BY MR. LEVENSON:

10 *Q.*  Good morning, Dr. Azzam.

11 **A.**  Good morning.

12 *Q.*  What is your title?

13 **A.**  I'm the Chief Medical Officer for the State of Nevada.

14 *Q.*  And as CMO, do you work for the Nevada Department of Health

15 and Human Services?

16 **A.**  Yes, sir.

17 *Q.*  When did you become the CMO for the State of Nevada?

18 **A.**  On May 21st, 2018.

19 *Q.*  And I assume you are a doctor.

20 **A.**  Yes, sir.

21 *Q.*  And how long have you been a doctor?

22 **A.**  Since 1982.

23 *Q.*  And as CMO, can you tell us, generally, what your

24 responsibilities are?

25 **A.**  Sure.  I provide guidance and recommendations for statewide

—3:21-cv-00176-RFB-CLB—

1  public health programs.  I provide advice and technical

2  assistance for the community providers and clinics, local health

3  authorities, regulatory boards like the Board of Medical

4  Examiners, Board of Pharmacy, Board of Dentists.  I provide

5  advice to community coalitions and task forces.

6          (Court reporter clarification.)

7          THE WITNESS:  Advice and consultation guidelines for

8  disease prevention, health education, early detection of disease

9  and control, general public policy, provide lectures at the

10  University of Nevada in Las Vegas and Reno.  I am the liaison of

11  the State of Nevada with the Federal Government, the Centers for

12  Disease Control and Prevention, FDA, and other organizations

13  like the ASTHO, which is the Association of State and

14  Territorial Health Officials.

15          What's the -- this is what I do.  Develop reports,

16  create guidelines for -- for preventing events, emerging

17  diseases like COVID or other emerging infections.

18  BY MR. LEVENSON:

19  Q.  What is your role with regard to COVID in the State of

20  Nevada?

21          MR. GILMER:  Objection, Your Honor.  Relevance.

22          THE COURT:  How -- overruled.  I think it's highly

23  relevant.

24          MR. GILMER:  Okay.

25          THE WITNESS:  When COVID emerged, our role was to

1  prepare the community for a virus or a pandemic which is going

2  to reach our nation and our state.  So we decided to implement

3  the mask based on CDC recommendation and recommended for Nevada

4  residents to be able to telecommute and work from their homes,

5  handwashing, environmental hygiene, and individual hygiene,

6  social distancing.  And later on we recommended the vaccine for

7  every eligible person.  And, eventually, my role is to evaluate

8  the occurrence of this disease, the burden, the medical burden,

9  the societal burden, how many new cases we have every day, how

10  many positive tests, what is the test positivity rate, is it

11  increasing, is it decreasing.  The metrics for evaluating how we

12  are doing with this never-ending pandemic, where we have to

13  evaluate how many hospitalized individuals and, as you know,

14  hospitalization is related to the severity of infection, and how

15  many individuals die, are they vaccinated, are they not

16  vaccinated, something like that.

17          THE COURT:  Dr. Azzam, I just want to go back very

18  quickly.  How did you become the Chief Medical Officer?

19          THE WITNESS:  I applied for the position and ...

20          THE COURT:  So describe the process and what you went

21  through.

22          THE WITNESS:  Originally, I worked as the state

23  epidemiologist up until, I think, 2015.  Then I became the state

24  medical epidemiologist, which is dealing mostly with, like,

25  medical part and generating guidelines for controlling and

—3:21-cv-00176-RFB-CLB—

1  preventing disease, up until 2018.

2          During my period as the state epidemiologist and state

3  medical epidemiologist, I acted as a chief medical officer

4  because several times we didn't really have a chief medical

5  officer.  So I acted, frequently, as a chief medical officer,

6  and when Dr. John DiMuro, who was the Chief Medical Officer

7  before me moved on, I applied for the position and I got

8  interviewed and got selected.

9          THE COURT:  Okay.  And you were interviewed and

10  selected by whom?

11          THE WITNESS:  By the Director of Health and by the

12  Director of Health and Human Services and by the administrator

13  of the Health Division and the Bureau Chief for Community Health

14  and the program manager for the public health preparedness.

15          THE COURT:  And what are the qualifications that are

16  generally required for someone to be the Chief Medical Officer

17  of the State of Nevada?

18          THE WITNESS:  You have to have a medical degree with a

19  doctoral degree and experience in public health.

20          THE COURT:  I'm sorry, you said you have to have a

21  medical degree and a Ph.D.?

22          THE WITNESS:  Yes.  Actually, it's -- there are three

23  qualifications.

24          THE COURT:  Okay.

25          THE WITNESS:  One is you have to be a physician who is

1  licensed with public health experience.  The other one is you

2  have to have -- you have to be a physician who is going to be

3  licensed with public health experience.  And the third one is

4  you to have to be a physician with a terminal degree like Ph.D.

5  And I qualified under the last category.

6          THE COURT:  Okay.  So can you tell me what degrees you

7  actually have and in what fields.

8          THE WITNESS:  I have a medical degree from the

9  University of Cluj-Napoca from Romania, and I got that degree in

10  1982.  I completed my residency in obstetrics and gynecology in

11  1986.  And I completed my Master's in Public Health in 2002 from

12  the University of Nevada Reno and my Ph.D. in Environmental

13  Health and Toxicology in 2010 from the University of Nevada

14  Reno.

15          THE COURT:  Okay.  Thank you.

16          THE WITNESS:  No problem.

17          THE COURT:  Go ahead, Mr. Levenson.

18  BY MR. LEVENSON:

19  *Q.*  Dr. Azzam, you were talking about your graduate

20  certification in public health.  Does -- can you tell us a

21  little bit about that.

22  **A.**  Yes.  CDC requires you as a state epidemiologist to be

23  certified in public health, epidemiology, and biostatistics.  So

24  I had to go to the University of Seattle School of Public Health

25  and Community Medicine for 18 months to get a degree called GCP,

1    which is a Graduate Certificate in Public Health, which is a

2    CDC-sponsored degree.  And I got that, I think, in 1996.

3    Q.  And does that cover the discipline of being an

4    epidemiologist or epidemiology?

5    A.  Yeah, it's on epidemiology and biostatistics and demography.

6    Q.  You were talking about your role with COVID in Nevada.  Can

7    you state, whatever is public, how Nevada is currently doing

8    with its metrics?

9            THE COURT:  Okay.  That, I don't think is relevant,

10   Mr. Levenson.  Let's move on from there.

11   BY MR. LEVENSON:

12   Q.  Have you seen NDOC's 2021 execution protocol?

13   A.  No.

14   Q.  Do you know what drugs are in the protocol?

15   A.  Can you please repeat the question.

16   Q.  Sure.  Do you know what drugs are in the protocol?

17           MR. GILMER:  Objection, Your Honor.

18           MS. AHMED:  Objection, Your Honor, relevance.  The

19   witness has just said he hasn't seen it.

20           THE COURT:  No, I thought he -- he may still be

21   familiar with the drugs that are in it without having seen it.

22   That's what I thought the question was.

23           MR. LEVENSON:  Correct.

24           THE COURT:  Do you know -- without having seen it, do

25   you know what drugs are in the protocol?

———3:21-cv-00176-RFB-CLB———

1          THE WITNESS:  I heard about them during a previous

2    hearing when I was in this court.  Honestly, I don't remember

3    what they were.

4          THE COURT:  Okay.

5    BY MR. LEVENSON:

6    Q.  Dr. Azzam, are you aware of a Nevada statute that requires

7    the director of the Nevada Department of Corrections to consult

8    with the Chief Medical Officer regarding the drug or combination

9    of drugs to be used in the execution protocol?

10   A.  Yes, sir.

11   Q.  And what is your understanding of what that statute requires

12   you to do?

13          MR. GILMER:  Objection, Your Honor.  Asking for a legal

14   conclusion.

15          THE COURT:  Overruled.  I'll allow him to explain what

16   he understands his role to be in the context of the statute.

17          THE WITNESS:  Yeah.  I understand that the director of

18   the Department of Corrections need to consult with the Chief

19   medical officer, which was me, regarding the drugs or the drug

20   selected -- no, they need to consult with me, then they select

21   their drugs.  So I believe that I provided that consultation --

22   that he needs to consult with me.  I don't need to consult with

23   him.

24   BY MR. LEVENSON:

25   Q.  Okay.  Did you meet with Director Daniels pursuant to the

—3:21-cv-00176-RFB-CLB—

1  statute?

2  *A.*  Yes, sir.

3  *Q.*  And how many times did you meet with him?

4  *A.*  Three times.

5  *Q.*  Do you remember the dates?

6  *A.*  Yes.

7  *Q.*  And what are those dates?

8  *A.*  The first time it was on March 31st, 2021, and the second

9  time it was on April 20th, and the last time it was in May 25.

10 *Q.*  Before those dates, had you ever met with Director Daniels

11 before?

12 *A.*  No.  Actually, not in person.  We talked over the phone, and

13 we had consultation about COVID and about the masks and about

14 isolation and quarantine, but not related to this case.

15 *Q.*  Okay.

16       Regarding the March 31st meeting, was that by phone?

17 *A.*  Yes, sir.

18 *Q.*  And did Director Daniels tell you what drugs were being

19 considered in the protocol?

20       MS. AHMED:  Your Honor, I would just object.  This may

21 be premature as to this question, but with respect to the

22 specifics of the content of the call, consistent with the

23 parties' or at least the defendants' position, we would assert

24 that this is subject to the deliberative process privilege.

25       THE COURT:  Well, here's what we're going to -- the

1   privilege doesn't cover information.  So the question is how do

2   we address the fact that information may have been provided and

3   may have been provided pursuant to the statute in this case.

4   And I will say this to counsel.  And this, particularly, applies

5   to Dr. Azzam.  I do think the deliberative process privilege is

6   different in this context in which there is a specific statutory

7   role to provide information.  There's no doubt about the fact

8   that information is provided.  The question is how do we allow

9   for that information to be shared.

10          I don't think it's appropriate for Dr. Azzam to testify

11  as to what questions he was asked, but the fact is, the

12  information that he provides, and he's already been identified

13  in the statute as providing information, I don't believe is

14  protected by the privilege.

15          But I do think the privilege protects the back and

16  forth, the colloquy.  So if he was asked certain questions by

17  Director Daniels, I think that certainly would be covered.  But

18  if he gave an opinion, for example, about fentanyl or ketamine

19  or their use and that was information, that, I think, can be

20  shared because information itself is not protected.

21          So, Ms. Ahmed, the question is how do we get at that.

22  And I don't think that he can be asked about the questions, but

23  I don't believe that the deliberative process privilege covers

24  information that's communicated.

25          MS. AHMED:  So then, I guess, Your Honor, with respect

1    to that question, then that is an appropriate objection.  But in

2    terms of information that Dr. Azzam himself provided, you will

3    allow that?

4            THE COURT:  Yes.  So, in other words, he can talk about

5    his -- his information that he may have shared about drugs or

6    not that he may have provided.  He can't say, "Well, these

7    questions were follow-up questions that I was asked.  These are

8    particular inquiries that I was asked," or other answers that

9    might give away or disclose what were the inquiries that

10   Director Daniels or other people might have had.  But he can

11   say, "My view of fentanyl," if he has one, "is X, Y, and Z.  And

12   information was shared."  So I think that's not covered by the

13   privilege as it relates to the privilege's carve-out for

14   information itself.  But I do think that any questions going to

15   what questions were asked of him would be covered.

16           MS. AHMED:  Understood, Your Honor.  Obviously, we've

17   taken a different position in briefing, but we understand -- I

18   understand Your Honor's ruling.  And so I would, obviously,

19   defer to the Court on that.  So as to this question, I would

20   maintain the objection.

21           THE COURT:  I would sustain it as it relates to that.

22           MS. AHMED:  Thank you, Your Honor.

23           THE COURT:  I mean, the real issue is how do we just

24   get at the information.  I don't want us to be going back and

25   forth.  I think Dr. Azzam can share his views of the drugs, but

1   I don't want us to spend 20 minutes trying to get the right

2   question.

3         So my -- my approach would be simply to ask him, and I

4   could ask him, what is his view of the use of these particular

5   drugs, without getting into what he said to -- or what Director

6   Daniels asked him.  And I'll ask counsel's view on that.

7         Mr. -- Mr. Gilmer?

8         MR. GILMER:  Well, I would just like the record to

9   indicate that we join in full in -- in the objection made by

10  Dr. Azzam's counsel.

11        Can you repeat your question, Your Honor?  I apologize.

12        THE COURT:  So my question is, what information -- so

13  what is his medical opinion as to these drugs and their use in

14  the execution protocol?

15        MR. GILMER:  Yeah, so I think we actually had this

16  conversation at one of the very early hearings in this case, I

17  believe, Your Honor.  And I think at that point in time you

18  asked this question.  Obviously, Dr. Azzam is a medical

19  doctor -- has medical doctor training and is licensed in

20  different jurisdictions.  So I think, as you indicated at that

21  point in time, he has experience to give answers pertaining to

22  that that would not have anything to do with what conversation

23  or what information he may or may not have shared with Director

24  Daniels.  So I think your -- what you said is correct.  They can

25  ask that question based upon his knowledge as a doctor and these

1   medications, what his view of them are, and then you don't even

2   have to delve into the communication and conversations he had

3   with Director Daniels.

4          THE COURT:  Well, I'm still going to render an opinion

5   on that, too.  So I will tell you, I want to hear what he has to

6   say.  I want to hear what the follow-up questions are, and then

7   I am going to address the issue of whether or not he can say,

8   which is the final question, which would be, did you share this

9   information.

10          But at some point, we have to address that part.  But

11   let's start with, I think, the more basic part about whether or

12   not he has a view or not of this medications and what it is.

13          So, Dr. Azzam, do you have a view of the use of the

14   sequence of fentanyl or alfentanil and then ketamine and then

15   cisatracurium and then I think it's ...

16          MR. LEVENSON:  Potassium acetate.

17          THE COURT:  Potassium acetate as used in the execution

18   protocol in this case?

19          THE WITNESS:  Your Honor, I don't really have

20   experience on how such medication would work for the purpose of

21   execution.  My experience with medication that all drugs are

22   designed to cure us from diseases, control diseases, like

23   diabetes and hypertension.  Some diseases we cannot cure like

24   diabetes or hypertension, but we can control.  Painkillers like

25   fentanyl and opioids are designed to control pain, reduce human

─3:21-cv-00176-RFB-CLB─

1  suffering.

2        There are no studies to tell us how such medication

3  would behave for execution, and I believe that medication -- it

4  depends on from one person to another, how medications will

5  behave.  So, honestly, I don't know how medications will be used

6  for the purpose of killing.  I only know how medication behave

7  for the purpose of curing and treating and controlling illness.

8        THE COURT:  There you go.

9  BY MR. LEVENSON:

10  Q.  Dr. Azzam, did you give this information to --

11        THE COURT:  We're not going to get into that yet, so

12  let's move onto the next question.

13        MR. LEVENSON:  Just a moment, Your Honor.

14        (Plaintiff's counsel conferring.)

15  BY MR. LEVENSON:

16  Q.  Dr. Azzam, just to clarify.  Your opinion that you just gave

17  was for -- for ketamine?

18  A.  For every medication because there is no medication that is

19  designed to kill people.

20        MR. LEVENSON:  So, Your Honor, I was going to move into

21  an area about COVID and the execution, but that would -- those

22  were the only questions I had as to his opinion on the drugs.

23        THE COURT:  So to the extent -- to the extent I allowed

24  COVID questions related to providing an example of how he may

25  have a role in policy in the state.  I don't see how this is

—3:21-cv-00176-RFB-CLB—

1  relevant to the Court's inquiry here.

2          MR. LEVENSON:  It would be relevant, Your Honor, to

3  effectuate whether it's possible to effectuate or how it's

4  possible to effectuate a safe execution in this environment of

5  COVID.  And as a CMO, he's heavily involved in the policy in

6  this state.  So his opinion should matter whether this can be

7  done in a safe -- a safe way.

8          THE COURT:  Safe as -- I'm sorry.  Safe as to?

9          MR. LEVENSON:  As to -- as to the participants, to the

10  defendant, to anyone who's going to attend the execution, to

11  those working the execution, witnessing the execution, and to --

12  and to Mr. Floyd.

13          THE COURT:  Yes.  Well, first of all, he hasn't seen

14  the execution protocol, so he can't comment on that.

15          And secondly, again, I don't think that that inquiry is

16  before the Court as it relates to how it would be accomplished,

17  and we don't know all of that information yet.  I don't see that

18  that's relevant for the inquiry here or probative.

19  BY MR. LEVENSON:

20  Q.  Dr. Azzam, have you seen the execution chamber -- have you

21  seen the execution chamber at Ely State Prison?

22  A.  Yes, sir, I did.

23  Q.  And have you seen any of the witness rooms at the -- at Ely?

24  A.  No.

25          THE COURT:  Have you participated in any training

—3:21-cv-00176-RFB-CLB—

1  related to the execution?

2        THE WITNESS:  No.

3        THE COURT:  Have you participated in any assistance

4  with preparation of medications related to the execution?

5        THE WITNESS:  No.

6  BY MR. LEVENSON:

7  *Q.*  Based on the size of the execution chamber, what would you

8  want to see for COVID safety?  What would you want to see people

9  do?

10        THE COURT:  Okay, Mr. Levenson.  Maybe I'm not clear

11  about what I was saying about this not being relevant.  So if

12  I'm ruling on something and I say it's not relevant, it doesn't

13  mean that we then ask questions which were exactly what I said

14  shouldn't be asked.

15        MR. LEVENSON:  I'm sorry, Your Honor.  I thought I

16  didn't -- I had not laid a sufficient foundation for him to

17  comment.

18        THE COURT:  No.  I'm saying it's not relevant, is what

19  I'm saying.  I don't find that part to be relevant as it relates

20  to this inquiry that's before me.  And so if you have a specific

21  question and -- because partly I'm not understanding if you're

22  saying, Mr. Levenson, that somehow you don't think that there

23  are protocols that could be put in place to protect, in this

24  case it's your client's particular interests, obviously, that

25  would be relevant.  But I don't think that's an issue that's,

—3:21-cv-00176-RFB-CLB—

1  first of all, been put squarely before me as relates to the

2  briefing or the issues here.  And I also don't think that it's a

3  relevant line as relates to the case law.  So I would move on

4  from there.

5          MR. LEVENSON:  Well, that's the only questions I had.

6  The only other question I had, Your Honor, was whether he had

7  imparted that opinion to Direct Daniels.

8          THE COURT:  Okay.  Well, I'll come back to you to see

9  if you have any follow-up questions.

10         Mr. Gilmer, do you have any questions?

11         MR. GILMER:  I don't have any questions at this point.

12  Perhaps, depending on if Ms. Ahmed does.  Thank you.

13         THE COURT:  Ms. Ahmed, do you have any questions?

14         MS. AHMED:  Your Honor, just a couple.  Thank you.

15          CROSS-EXAMINATION OF IHSAN AZZAM, M.D., Ph.D.

16  BY MS. AHMED:

17  *Q.*  Dr. Azzam, following on the questions that the Court posed

18  to you, so you have not assisted in any way with the preparation

19  of medication or the training related to the execution, correct?

20  *A.*  That's correct.

21  *Q.*  Other than the consultation that you provided to Director

22  Daniels, have you -- without going into the actual consultation

23  itself, have you provided any other consultations to anybody

24  else in relation to the execution?

25  *A.*  No.

─────3:21-cv-00176-RFB-CLB─────

 1  *Q.*  And did you review any drafts or anything related to the

 2  execution protocol?

 3  **A.**  No.

 4  *Q.*  Were you in any way involved with the preparation of the

 5  execution protocol, aside from those consultations with Director

 6  Daniels?

 7  **A.**  No.

 8          MS. AHMED:  Thank you, Your Honor.  I have nothing

 9  else.

10          THE COURT:  Okay.  Anyone have any follow-up questions?

11          MR. GILMER:  I have no further questions -- I have no

12  questions.

13          Thank you for your time, Dr. Azzam.

14          MR. LEVENSON:  Your Honor, we'd like to admit Exhibit

15  186, which is Dr. -- I'm sorry -- Dr. Azzam's deposition, which

16  is Exhibit 186.

17          MR. GILMER:  Your Honor, I think this is different

18  than -- I think this would go in the same context as we had with

19  Ms. Fox and, you know, not an expert deposition.  And so,

20  therefore, it would be an out-of-court statement.  As we had

21  conversations -- follow-up conversations with regard to Ms. Fox

22  because she was unavailable, we did reach an agreement to allow

23  certain portions of that to be admitted.  I think this is a

24  little different.  Dr. Azzam is still here.  Obviously, I can

25  have those conversations later, but at this point I would object

———3:21-cv-00176-RFB-CLB———

1  to its admission.

2          THE COURT:  I would agree with that.

3          Mr. Levenson, if you have questions, you can ask

4  questions here.  But there's no reason to admit a full

5  deposition.  If you want some further testimony, you can go

6  ahead and pursue that.  If we want to just proceed directly to

7  this argument about whether or not the consultation should come

8  in, we could do that now.

9          MR. LEVENSON:  That's fine, Your Honor.

10          THE COURT:  So I'm going to turn to the defendants and

11  ask you this question.  The deliberative process privilege

12  applies in a particular context to protect certain candid

13  conversations of an executive.  This is slightly different.

14  This is a situation in which a statute identifies the person

15  providing the advice, identifies the nature of the advice that's

16  being provided.  So why would this be covered by the

17  deliberative process privilege where -- where the Nevada has

18  explicitly identified publicly who would be providing the

19  information, what information would be provided, at least the

20  nature of it, not necessarily the specifics of it.

21          That's highly different than, for example, some

22  information we've received in this case where there have been

23  individuals, which the Court has shielded, who have provided

24  information.  And the Court has not ordered that the

25  consultation or the name of that person be provided because the

1  deliberative process privilege protected that person.  And you

2  all understand the person to whom I'm referring, or at least one

3  of the people I'm referring.  I'm not talking about that.  This

4  is a different situation.

5       So I want to hear from both counsel about that, because

6  from my standpoint, I have to tell you, honestly, it seems that

7  the legislature intended for this type of consultation given the

8  immense public interest in this particular issue for the CMO's

9  consultation and advice to be public.  Otherwise, why reference

10 the CMO and why say that the CMO had to consult on the actual

11 execution protocol?

12      Ms. Ahmed.

13      MS. AHMED:  Thank you, Your Honor.

14      And, Your Honor, unfortunately I don't -- I don't have

15 the legislative history in front of me relating to that

16 particular statute.  The way I view it, however, Your Honor, is

17 slightly different in that it's -- it's clear that the statute

18 intended for the director to consult with the CMO.  I agree with

19 that.  But it's not -- I don't know that that moves the

20 conversation itself out of the deliberative process privilege

21 from -- from the prospective I have having looked at the cases.

22      Because from -- from my understanding, the way the

23 statute's phrased, it's clear that that conversation is

24 pre-decision for the director.  The director's the one that

25 shall make the ultimate choice.  He has to consult with the CMO,

———3:21-cv-00176-RFB-CLB———

1   and then after that consultation, he makes the choice.  And so

2   for me it seems clearly within the deliberative process

3   privilege because that entire conversation, while -- to Your

4   Honor's point, I get it, that maybe that was the legislature's

5   way of saying, "You're going to have this conversation and that

6   conversation's going to be known."  But it's not clear to me

7   from the statute itself that that's the case.  That we want the

8   actual contents of the conversation to be known as opposed to

9   the statute saying you must have a conversation or consultation

10  with the CMO.  But --

11        THE COURT:  Well, let me ask this question, Ms. Ahmed,

12  about that.  Because what I'm talking about is there are two

13  aspects to this.  One is the privilege is limited.  It's not an

14  absolute privilege.  It's never been associated, for example,

15  with the attorney/client privilege or other privileges which

16  have much greater protection for different reasons.  And I

17  identified the purpose of the privilege because I'm required,

18  when I determine whether or not it should apply, to look at

19  that; to say, is this a situation that the privilege is intended

20  to protect.

21        That's why I said the privilege is intended to protect

22  candid, which typically means confidential, conversations,

23  right.  And that's also why I was saying I think the privilege

24  would still protect the extent to which Director Daniels may

25  have asked Dr. Azzam questions.

────────3:21-cv-00176-RFB-CLB────────

1          But where the statute is explicitly saying we want the

2     CMO's opinion, right, of a public execution, right, how would

3     that not take it out of, sort of, the type of conversations that

4     the -- that the privilege was designed to protect?  So that's

5     one question.

6          The other question is, and this is a question that I'm

7     going to ask you both, it does seem to me that there's a real

8     issue in this case about whether or not this is actually

9     predecisional or whether or not there is an ongoing process as

10    it relates to the decision that Director Daniels makes.

11         The execution protocol is not final and, in fact, it

12    won't truly be final until there's an actual execution because

13    it allows for multiple decisions by the director up until the

14    very moment even during the execution.  So there's a real

15    question for me, which I also want to get your opinion on, about

16    to what extent does it fall within the deliberative process

17    privilege where there's an ongoing consultive process.  In such

18    case, information would be relevant, particularly information

19    that the director receives.

20         That -- the latter question 's a little bit longer, but

21    why don't you take the first part of that, Ms. Ahmed, and then

22    you can get -- take the second part.

23         MS. AHMED:  I think that the first one went back to the

24    Court's earlier point, which is that information itself is

25    carved out from the -- from the privilege, right?  So I

1  understand the Court's point on that.

2       If specific research was done and specific facts were

3  given, that, I think, Your Honor, nonetheless -- not to be just

4  a broken record, but nonetheless, to me, it all seems protected

5  by the deliberative process privilege because it is -- there's

6  two things.

7       A, this is the CMO going through a process of -- a

8  candid process with the director trying to figure out what will

9  work and what won't, and maybe there was research or maybe there

10 wasn't.  I'm speaking hypothetically.  But, nonetheless, the

11 actual decision is later made by the director.

12      So to me, even though -- and I -- maybe I'm answering

13 the second question more than the first.  But, Your Honor, I

14 mean, to me it seems that the execution protocol, the decisions

15 that are made, the sequence that's put in there, that's all

16 subsequent to the conversation with the CMO, but it is not in

17 any way -- it's exclusively the domain of the director to make

18 that decision.  And it's -- and it's clear from the statute, at

19 least, that that's a decision he shall make after the

20 consultation.

21      So even though the execution protocol itself might be

22 revised, there might be subsequent consultations, the

23 consultations themselves -- themselves constantly, at least in

24 my mind, fit within the deliberative process privilege because

25 it's, "Hey, I'm coming to you with this drug and this drug and

—3:21-cv-00176-RFB-CLB—

1   this drug.  And can we have a candid conversation about how

2   they'll fit?"  To me, that seems squarely within the

3   deliberative process privilege.

4          But I don't want to monopolize this discussion because,

5   as the Court knows, we joined in NDOC's briefing on this.  So I

6   would want an opportunity for Mr. Gilmer to weigh in if I

7   haven't covered anything on that.

8          THE COURT:  Well, it does seem there is one central

9   issue, which I can go back and look at, too, which is there's

10  the question of legislative intent.  I mean, this is a very

11  different type of consultation than some of the other

12  deliberations we've discussed in this case.  And it does seem to

13  me that if the legislature intended for it to be public, then

14  obviously that addresses the issue here.  So, again, if you all

15  have a view about that, that's helpful, too.  But I think,

16  again, because he specifically identified, it's slightly

17  different than someone's who's not.

18         But, Mr. Gilmer, tell me your view about a legislative

19  intent here because of the identification of the CMO, but also

20  just about deliberative process privilege.  And I'm going to go

21  back and look at this, but there is -- there is a strange issue

22  here where the decision is changing and evolving,

23  understandably, and that's the way that it -- it probably

24  should.  But how does that affect the analysis?  So you can take

25  both of those questions.

1          MR. GILMER:  Yes.  Thank you, Your Honor.  And I join

2     in everything Ms. Ahmed said prior to me.  Very good counsel and

3     argument on that point.

4          With regard to your specific question on the

5     legislative intent, and I think I go back to the very first

6     question you asked about, you know, the -- the opinion and that

7     the -- did the legislature intend for the opinion that was

8     provided by the CMO to be shared.  And I would -- based upon my

9     reading of the statute and the legislative intent that I've been

10    able to delve into on that point, I would say the answer to that

11    be would no.

12         And here's the reason why I would say that, because the

13    statute is written so that the -- Director Daniels or the

14    director of NDOC shall pick the drug or combination of drugs

15    after consultation with the CMO.  That's it.  And so that means

16    that the protocol goes into effect by director -- by the

17    director after having that conversation.  It does -- the statute

18    doesn't say that the CMO must agree, the CMO must not agree,

19    that the CMO -- it says consult.

20         And so at that -- the purpose of the statute is to put

21    an emphasis on the director to finalize something after speaking

22    to the CMO, and I think it was very -- it made sense that the

23    Nevada legislature would want a director of Department of

24    Corrections, who's most likely not going to be a doctor or

25    somebody versed in medicine, to have those conversations before

———3:21-cv-00176-RFB-CLB———

1   making a final decision.

2          But, again, there's no duty put on -- on the CMO to

3   agree or disagree with what the director puts forth.  And so I

4   think that that's a little bit different.  Even though that

5   person's identified, that's who the State of Nevada thinks the

6   director should go get information from, but I still think

7   that's different than saying that that means that what the CMO

8   shares with him is -- is, therefore, becoming public because of

9   that.  And I'd like to analogize, obviously, to, like, the

10  President of the United States, for example, conferring with

11  generals or conferring like -- conferring with leaders of

12  Congress under the War Powers Act before they decide whether or

13  not to send troops.

14         Required to do that.  Required to talk to them.

15  Required to share them.  But legislature or Congress didn't say,

16  then, that those communications between the majority and

17  minority leaders of the legislature have to be made public.  It

18  just says that the president has to go talk to them before

19  moving on.  And so I know it's a very different situation, but I

20  think that's a pretty good analogy when referring to the

21  difference between talking and consulting and whether or not

22  it's actually meant to become public because of that.

23         Was there something -- did that answer everything you

24  had, Your Honor?

25         THE COURT:  Look -- yes, I think it did.  I mean, I

1   think that, again, this is -- this is unique and it's different

2   from other conversations we've had as relates to the

3   deliberative process privilege.  I do think it really does turn

4   upon legislative intent here as it relates to what the

5   legislature intended.

6          So let me turn to plaintiff's counsel as it relates to

7   that particular aspect.

8          MR. ANTHONY:  Thank you, Your Honor.

9          First of all, I would say, to be candid with the Court,

10  we're not really -- we're not aware of anything specific in the

11  legislative intent that speaks to this from our own review of

12  the statute.  I don't recall from the committee minutes whether

13  there was any sort of an elaborate discussion of this particular

14  subsection of N.R.S. 176.355 about what exactly they were

15  intending.  So just to be candid with the Court.

16         A couple of things that I would say, Your Honor,

17  though, is that it appears from, at least, the plain language of

18  the statute that the legislature considered this to be an

19  important safety valve, something that the public could look at

20  and rely upon, which was that the director of the Department of

21  Corrections, who is normally concerned with safety and security

22  and rehabilitation, is taking on a very important role here

23  that's very different.  And in that connection, it appears that

24  the legislature wanted the public to know that there was a

25  medical official involved in this consultation.

─3:21-cv-00176-RFB-CLB─

1        When we talk about the deliberative process privilege,

2   Your Honor, it's our understanding that when the issue is the

3   conduct of the Government itself and when that's relevant either

4   to litigation, like litigation that we're currently prosecuting,

5   or whether we're talking about freedom of information, which is

6   kind of a different category, it's our position, and I think the

7   case law bears this out, that when the Government's conduct is

8   in question and whether -- when it's an element in the case, we

9   believe that that's a circumstance where inquiries can be made.

10        Now, I agree that they could be limited.  We're not

11   asking for what did Dr. -- or, excuse me, what did Director

12   Daniels --

13        THE COURT:  So, Mr. Anthony, let me ask you this

14   question, because we may be arguing around some of this actually

15   fairly -- not insignificant, but a matter of semantics.  He said

16   his views as relates to the drugs.  This is really just about

17   one -- one question, right.  But in the context of preserving

18   the privilege, right, would it be more important simply to

19   preserve that?  Because it is a privilege that's a traditional

20   privilege that covers these decisions.  Why, in this context, is

21   it so significant to ask that particular question?

22        MR. ANTHONY:  Because the --

23        THE COURT:  He --

24        MR. ANTHONY:  If the director wasn't given that advice

25   or if he didn't follow the advice of the only medical official

—————3:21-cv-00176-RFB-CLB—————

1  that he's statutorily required to consult, we believe that

2  that's a relevant consideration.

3         THE COURT:  And why wouldn't we wait until we had

4  Director Daniels on the stand?  Because -- and I'm not saying

5  that's not true, but, I mean, when Director Daniels takes the

6  stand, we're going to have lots of conversations about

7  deliberative process and what's been shared or not shared

8  because we have a very full record here.

9         So I don't necessarily disagree that, as it relates to

10  the deliberative process privilege, the Nevada Supreme Court has

11  said where the Government's actions are at issue, the privilege

12  itself is not the same as it would be in other circumstances.

13         But for me the issue is, it's hard to know the

14  significance of the one question until I hear from Director

15  Daniels.  You're right.  You're saying that in the context of

16  the information that he shared or relied upon, but I don't know

17  exactly what he's going to say or what he's going to say about

18  what information he has.  You're perfectly able to and I will

19  permit you to ask him questions about his knowledge and

20  information.  That's not covered by the privilege, right?  And

21  you can ask him different questions about that.

22         In terms of the sources, then we can talk about,

23  perhaps, what we get into that.  But, for me, it seems to me

24  that one of the questions you're asking really relates to, to

25  what extent did the director rely or not rely upon certain

—3:21-cv-00176-RFB-CLB—

1   sources of information in reaching the protocol.  That seems to

2   me to be the deliberative process inquiry for Director Daniels'

3   testimony.  It impacts what Dr. Azzam may or may not have said,

4   but I don't think that I can fully actually even go into that

5   inquiry until I hear from Director Daniels as it relates to the

6   protocol itself.

7        So, I appreciate your argument, but I think that part

8   of what I'm hearing from counsel, and this is why I'm saying

9   this because I'm going to close this argument now is, one, and I

10  agree with this, we've looked at the legislative intent.

11  There's really nothing there, right.  But it seems clear that

12  there was an intention here for at least the director to have

13  access to the information --

14        MR. ANTHONY:  Your Honor?

15        THE COURT:  -- in the context of this case.  It also

16  seems clear that this is different than other aspects of the

17  privilege.  But it also seems clear to me, Mr. Anthony, that the

18  Court would be better situated to make this decision after

19  hearing from Director Daniels.  The Court appreciates the

20  importance of the privilege, as I've said repeatedly, but it's

21  difficult for me to evaluate that determination without hearing

22  from him.

23        So I know I cut off your argument, Mr. Anthony, so I'll

24  let you, sort of, finish it for the record.  But I think that I

25  need to wait until I hear from Director Daniels, and then we can

 1    have this conversation -- because we're going to have the

 2    conversation, I would expect, repeatedly in the context of

 3    different questions to Director Daniels.  And I think it would

 4    be more appropriate, because I do think there is a very

 5    important discussion to be had about the information and sources

 6    that Director Daniels had access to in the context of the

 7    privilege.  But that's not for this particular witness.

 8            MR. ANTHONY:  Your Honor --

 9            THE COURT:  Go ahead, Mr. Anthony.

10            MR. ANTHONY:  -- just a very, very brief comment.  I

11    certainly don't disagree with the Court that it's up to the

12    Court's discretion to hear from one witness to determine whether

13    something should or shouldn't be admissible.  I have no

14    complaints about that.  One other thing that I just wanted to

15    put out there because I didn't want to be remiss, is that I

16    think there's also a very good issue of waiver here because

17    Director Daniels testified about the substance of his

18    conversation with Dr. Azzam.  He already testified in great

19    detail to it and it wasn't privileged, and it all came out at

20    the deposition.

21            He talked about how, when he asked the questions to

22    Dr. Azzam, that Dr. Azzam repeated what we heard him testify to

23    on this --

24            MR. GILMER:  Your Honor, Your Honor.

25            THE COURT:  Okay.  So, Mr. Anthony, if we want to have

1  a conversation about waiver, particularly in the context of his

2  testimony, we can have that conversation.  I mean, let's be

3  clear.  This is about a single question, right?  Dr. Azzam is

4  available to potentially come back and answer that question.  It

5  will take two minutes or less.  It will take longer for us to

6  swear him in than for him to actually answer the question.

7       So I'm not saying we wouldn't call him back, but I

8  definitely think this is really an issue that has to be resolved

9  in the context of Director Daniels' testimony in concert with

10 other questions about Director Daniels' testimony.  I'm not

11 saying there isn't an issue of waiver here.  I actually think

12 there are issues of waiver, but waiver doesn't mean a waiver as

13 to all questions.  That's the other issue.

14      So one of the things that I did want us to talk about

15 today in preparation for Director Daniels' testimony tomorrow,

16 or at least part of it to the extent we get to it -- who knows

17 with these other witnesses -- is covering the different aspects

18 of the inquiry and what's been waived or not waived.  Because

19 waiver is not blanket.  It can be as to certain aspects and not

20 others.  And I really want us to be very specific about this as

21 relates to Director Daniels' testimony moving forward.

22      I do think there are clear areas where he may have

23 waived and he did that intentionally, but there -- there are

24 other areas where -- where he has and Mr. Gilmer has

25 consistently protected, right?  So, for example, the other

———3:21-cv-00176-RFB-CLB———

1  individual I referenced, there's been no waiver with respect to

2  that.  They've consistently protected that particular source of

3  information.

4          Doesn't mean that I may not disclose, at least, some

5  aspects of it, which we talked about previously.  But it does

6  mean that I don't find that there's been a blanket waiver of the

7  deliberative process privilege.

8          So, that goes back to the Court's determination at this

9  point in time that the decision about whether or not to ask

10 Dr. Azzam the one specific question the Court will defer on.

11 And then if we call him back, because I deem that he needs to

12 answer that question, we can have him called back or we can

13 reference portions of other proceedings.

14         I don't know that we need to call him back just for

15 that, but we can talk about that later.

16         So is there any other thing -- any other question or

17 issue we need to address with Dr. Azzam before the Court

18 releases him?

19         MR. ANTHONY:  Not from plaintiff, Your Honor.

20         THE COURT:  Mr. Gilmer?

21         MR. GILMER:  No, Your Honor.  I have some issues

22 pertaining to waiver, but we can defer that until that time.

23 Nothing with regard to Dr. Azzam.

24         MS. AHMED:  Nothing, Your Honor.  Thank you.

25         THE COURT:  Okay.  Thank you, Dr. Azzam.

—————3:21-cv-00176-RFB-CLB—————

1           THE WITNESS:  Thank you.

2           MS. AHMED:  Your Honor, just logistically, if

3  Dr. Azzam's travel plans were to return back home tomorrow,

4  would he be allowed to be excused from the hearing from

5  further -- for the day and tomorrow or do you want him to stand

6  by?

7           THE COURT:  No, no, he's excused from the hearing for

8  today and tomorrow.  And, look, I don't know that we need him to

9  come back to answer this question.  So I'll make that

10  determination.  I think it's a fairly straightforward answer one

11  way or the other.

12           MS. AHMED:  Thank you, Your Honor.

13           THE COURT:  So he's excused.

14           That does raise this issue about Director Daniels and

15  waiver, Mr. Gilmer, since you raised it.  There's certain

16  aspects of the protocol that Director Daniels has clearly talked

17  about that potentially could have been covered.  Or earlier on,

18  actually, in the case, you were asserting the privilege to

19  protect, which later Director Daniels said, "I want to talk

20  about certain aspects, not everything, but certain aspects of

21  that."  It would be helpful to me to know where you all agree or

22  disagree about those certain areas.

23           So, for example, conversations with Ms. Fox, that seems

24  to have been, clearly, part of this process.  I think they've

25  all been testified to, essentially, but those would be

—3:21-cv-00176-RFB-CLB—

1  conversations that I think that potentially could have been

2  covered, but that are not covered here where there may be, I

3  think, clear indications of waiver.  But, again, waiver's not

4  blanket, it doesn't cover everything.  I gave the counter

5  example of other sources that have been consistently protected.

6        It would be helpful for me to know ahead of time where

7  there's going to be disagreement so that I can think about that

8  before Director Daniels testifies.  Now, some of this, of

9  course, has to happen while he's testifying.

10        There is going to be a fair amount of testimony from

11  Director Daniels because the protocol is long, and it leaves to

12  him certain decisions that would need to be clarified either by

13  plaintiff's counsel or by the NDOC.  And -- and Director Daniels

14  has indicated, in fact, that parts of this he wants to be able

15  to clarify.  He doesn't want there to be information that isn't

16  clear about that.  So that's the other aspect to this,

17  Mr. Gilmer, in hearing from your client.  Director Daniels has

18  been fairly straight about certain things that he thinks are

19  important for the public to know even if there is a privilege

20  that would cover them.

21        All of that is to say, I would like for you all to meet

22  and confer about this first.  I don't want us to spend two hours

23  tomorrow going over where we agree and disagree.  I think there

24  can be clear areas of agreement here about what's already been

25  discussed, and there may be some areas that are also clearly

—3:21-cv-00176-RFB-CLB—

1  identifiable where there's disagreement.  But I want to repeat

2  what I've said previously.

3        I don't believe information is protected.  So to the

4  extent that the Director Daniels received information about a

5  drug or how it works, Mr. Gilmer, I don't think that's

6  protected.

7        His evaluation of that information in terms of how or

8  what weight he places on it, potentially raises an issue of the

9  source of the information, Mr. Gilmer.  I think -- I will say, I

10 think the source may become an issue depending upon the weight

11 that he places on information or not.  Again, it's hard for me

12 to know without hearing his testimony, but I want to give you

13 all some broad outlines to help guide your conversation.

14       So clearly questions about his understanding of the

15 drugs, how they may or may not work, what the complications may

16 or may not be, what steps may or may not need to be taken, that,

17 to me, is all fair game.  And I see you shaking your head,

18 Mr. Gilmer.  I'm not saying you would object to that.  I don't

19 know that there could be an objection, but I do think that's

20 information that he has in this case.

21       And questions about aspects of the protocol where he

22 may have to make a choice are also going to be important.  There

23 are certain parts of the protocol where Director Daniels may

24 have to make a choice about certain things.  He may have to make

25 a choice about which drugs in the protocol to use.  He may have

—3:21-cv-00176-RFB-CLB—

1   to make a choice about when to stop or start a process, when

2   to -- to set certain types of protocols or procedures that are

3   still left to him to decide.

4       Those questions are open in the protocol and I think

5   it's fair, Mr. Gilmer, for him to be asked about that where the

6   protocol doesn't clearly identify that information, but it's

7   clearly information that he would need to have or may already

8   have in terms of making his decision.

9       The areas that I think there's going to be some

10  disagreement is about any type of specific request about did

11  Dr. Such-and-such tell you X, did this other doctor tell you Y.

12  That, to me, is an area where I suspect there will be

13  disagreement and where the privilege might apply.  And, quite

14  honestly, it's not clear to me where that would necessarily be

15  relevant.  What matters to me is what Director Daniels

16  understood from all of this and what weight he places on it.

17  That might then open the door, potentially, Mr. Gilmer, to

18  certain questions about why he thinks certain things are more

19  likely than others.  I think that's also fair.

20      But trying to recreate which doctor said what at

21  different times to me, I don't know that that's productive or

22  would be appropriate to disclose in the context of the

23  privilege.  I'm providing this guidance because I'm hopeful that

24  this will help to narrow the conversation because, Mr. Anthony

25  and Mr. Levenson, there really isn't that much that I can see,

—————3:21-cv-00176-RFB-CLB—————

1  other than this conversation, that would be covered by the

2  privilege that would be information you'd want to have that

3  you're not going to be able to ask him, right?  A lot of this is

4  just about the protocol.  What do these things mean?  What does

5  he know?  How would he decide this?

6          They haven't objected to that.  They're not -- as far

7  as I know, that's not an objection that's raised.  The objection

8  for the deliberative process privilege, as I've seen it so far,

9  has been relayed -- has been raised as it relates to providing a

10  delineation of specific information from specific people, which

11  is what the privilege, typically, is designed to do.  But it has

12  not been, as I've seen recently, once the protocol's finalized,

13  designed to shield all aspects of Director Daniels' knowledge.

14          So, Mr. Gilmer, any comments on that?

15          MR. GILMER:  Your Honor, I thank you for the guidance

16  for us to talk about for the meet and confer.  Not -- not

17  bouncing in, but I think this is very similar to a conversation

18  we had, I think, on November 5th at one of the hearings where I

19  had said -- I think you had asked me about -- or maybe it was

20  last time we were here.  And I said, I think the information

21  that Director Daniels used is probably, at this point, something

22  that's fair game, but where he got that from and the source of

23  that is where the disagreement is.  So I think in that agree in

24  that aspect.  And hopefully we'll be able to limit that with

25  regard to that.

3:21-cv-00176-RFB-CLB

1          The only thing I wanted to say with regard to waiver --

2 and, Mr. Anthony, I apologize if I -- if I talked over you, but

3 I was just concerned that he might be giving information out

4 inadvertently that was discussed there.  I think the waiver with

5 regard to Dr. Azzam is a -- is a more difficult question,

6 because as the Court will recall, we called you during that

7 deposition and you ordered Director Daniels to answer some

8 questions.

9          So -- and the way Mr. Anthony portrayed that, I thought

10 it made it sound as if he voluntarily did that, but, obviously,

11 we did it under a Court order.  So I think that's a different

12 issue for us to discuss at a later time.

13          THE COURT:  I agree.  And that's a common practice in

14 depositions, for information to be ordered to be answered for

15 efficiency purposes, that's later protected, right, when a

16 privilege is asserted.  And that is never construed as a waiver

17 where the Court orders an answer to the question, but the

18 objection is preserved, and that's exactly my recollection of

19 what happened.  I did order answers, and I said that the

20 objections were preserved and that I would rule on them later.

21          So I agree with that, and I don't think that that

22 constitutes waiver simply because he answered.  Now, if he

23 answered a question where there was no objection, that's

24 different.  I don't -- I wasn't present at the deposition in its

25 entirety, as you know.  So you can still argue waiver.  I'm not

3:21-cv-00176-RFB-CLB

1  saying that.  But where I've ordered a witness to answer over an

2  objection, that's not waiver and that information can still be

3  protected even though it was disclosed in a deposition.

4          And that's standard practice as relates to deposition

5  privileges.  Otherwise, we'd have to take them multiple times,

6  and that's not efficient.

7          So, let's move on from here.  Who's our next witness

8  then?

9          MR. GILMER:  Your Honor, at this point, the next

10  witness would be Dr. Jeffrey Petersohn.  And I -- I'm very

11  hopeful that we'll be able to get through his testimony today.

12  So before we begin, it might be helpful if we knew what our

13  endpoint was going to be so it can help me frame my questions,

14  because I know the Court is very -- very fair in giving each

15  person equal time.  So if we know what time we're going to

16  stop -- it said 4 or 5 on the -- on the -- on the trans -- or on

17  the schedule.

18          Dr. Petersohn has a 7 o'clock flight.  So we can go

19  right to 5 p.m. if that works for the Court's schedule, and it's

20  just going to help as we call him to know how much time we have.

21          THE COURT:  So let's -- let's use 4 as our target.

22          MR. GILMER:  Okay.

23          THE COURT:  We've received a fair amount of information

24  in this case, and so what I don't want you all to do is to go

25  over some more of the more basic information, right?  Is

1  fentanyl or whatever an analgesic?  I mean, basic information

2  that has been established by all experts, right, I don't know

3  that we need to be going over with this particular witness.  So

4  I would ask you to look at your outlines and be specific.

5          So let's use 4 as our target stopping point, even

6  though we may go beyond that.  And we may go beyond that partly

7  just to deal with administrative issues, so I want to save some

8  time at the end for that.  So even if we went past 4, we

9  wouldn't go past 4:30.  We may stay to 5 because I want us to be

10  prepared for Director Daniels' testimony and anything else we

11  may need to address as it relates to other issues for the coming

12  weeks.  So with that, let's use 4 as a target.

13          Dr. Petersohn, why don't you come on up to the stand.

14          MR. ANTHONY:  Your Honor?

15          THE COURT:  Yes.

16          MR. ANTHONY:  Could I have a quick break, two minutes,

17  five minutes tops?

18          THE COURT:  Sure.  We'll take a five-minute break if

19  you would like to do that, Mr. Anthony, sure.

20          MR. ANTHONY:  Thank you so much, Your Honor.

21          THE COURT:  Of course.

22          (Recess taken at 11:26 a.m.)

23          (Resumed at 11:39 a.m.)

24          THE COURT:  Please be seated.

25          All right.  Doctor, if you could stand so we can swear

———3:21-cv-00176-RFB-CLB———

1    you in.  And raise your right hand, please.

2            JEFFREY PETERSOHN, M.D., having duly been sworn, was

3    examined and testified as follows:

4            MR. GILMER:  Good morning --

5            THE COURT:  Hold on.  Can you state your full name and

6    spell it for the record.

7            And, again, if you're comfortable with it, while you're

8    behind the Plexiglas, you can take your mask down.  You don't

9    have to do that, but if you would like to, you can.

10           THE WITNESS:  Thank you, Your Honor.

11           THE COURT:  So could you state --

12           THE WITNESS:  Yes, my full name is Jeffrey Petersohn,

13   J-E-F-F-R-E-Y, P-E-T-E-R-S-O-H-N.

14           MR. GILMER:  Thank you, Dr. Petersohn.

15           Your Honor, at this time to speed things along and

16   consistent as we have been doing this throughout, I would ask

17   that the following exhibits be admitted.  And those would be

18   Exhibit 513, which was Dr. Petersohn's initial report in this

19   matter; Exhibit 514, which is his C.V., curriculum vitae;

20   Exhibit 514 A, which is his list of testimony that was attached

21   to the C.V.; Exhibit 515, which is his rebuttal report in this

22   matter; and also his deposition, which was Plaintiff's Proposed

23   Exhibit 115.

24           THE COURT:  Okay.

25           Any objections?

—————3:21-cv-00176-RFB-CLB—————

1          MR. ANTHONY:  No objection.

2          THE COURT:  Okay.  Those will be admitted.

3          MR. GILMER:  Thank you.

4          (Defendant's Exhibits 513, 514, 514 A, 515, and

5     Plaintiff's Exhibit 115 are admitted.)

6          MR. GILMER:  And, Your Honor, also hopefully to speed

7     up this process a little bit, I was able to have a conversation

8     with Mr. Anthony before we began.  And I thank Mr. Anthony for

9     his professional courtesy in this regard.  Mr. Anthony indicated

10    that -- that plaintiff's position and we can stipulate that

11    Dr. Petersohn is an expert for purposes of anesthesiology.

12    Obviously, they reserve any rights to object to any particular

13    question with regard to the scope.  But I think that will help

14    speed up the process with regard to the voir dire process.

15         THE COURT:  I appreciate that.  Thank you.  So the

16    Court will also recognize Dr. Petersohn as an expert in

17    anesthesiology.

18         THE WITNESS:  Thank you, Your Honor.

19         THE COURT:  Of course.

20         MR. GILMER:  Thank you.

21          DIRECT EXAMINATION OF JEFFREY PETERSOHN, M.D.

22    BY MR. GILMER:

23    Q.  Good morning, Dr. Petersohn.

24    A.  Good morning, sir.

25    Q.  We thank you for having you here today.  And I'm not going

1  to belabor much about your C.V. and your credentials since we

2  have that stipulation and have it in the record.  But I did just

3  want to give a brief background so the Court knows who -- who's

4  giving answers today.

5          So could you please tell us where you attended post

6  high school education?

7  *A.*  Yes.  I hold an undergraduate degree in biophysics from the

8  Johns Hopkins University, having graduated with a Bachelor of

9  the Arts.  I did my medical degree, my M.D., at Hahnemann

10 University College of Medicine in Philadelphia.  I trained in

11 internal medicine at Hahnemann, and then in the middle of my

12 training IN internal medicine, decided to switch into

13 anesthesiology.  I completed the anesthesiology residency at

14 Hahnemann and have been in the private practice of

15 anesthesiology and its subspecialties since completing that

16 training.

17 *Q.*  So I just want to confirm then, in answering that question,

18 you can -- you also gave us information regarding your

19 internship and residencies?

20 *A.*  That's correct, sir.

21 *Q.*  Thank you.

22          And what -- where do you currently work, Dr. Petersohn?

23 *A.*  My present practice has offices in Linwood, New Jersey, and

24 also in Englewood, Colorado.

25 *Q.*  And what type of -- how would you describe your practice to

—3:21-cv-00176-RFB-CLB—

1   the Court?

2   *A.*   My present practice is devoted exclusively to interventional

3   anesthesiology and addressing and solving issues and concerns

4   and problems of patients who have pain.

5   *Q.*   And does that -- does that practice -- this might sound like

6   a silly question to you, and maybe it is.  But does that require

7   you to perform operations and be in the OR setting or --

8   *A.*   Yes, I do not just operative procedures, some of which

9   involve injections and others of -- others of which are more

10  conventional surgical procedures, including discectomies and

11  foraminotomies, some things people might consider to be

12  neurosurgery --

13         THE COURT:  Dr. Petersohn, I'm going to ask you to slow

14  down just a little bit.

15         THE WITNESS:  Sorry.

16         THE COURT:  That's all right.

17         THE WITNESS:  I perform some procedures that are

18  distinctly surgical, a variety of injection procedures, and I

19  prescribe, and in some cases, administer many classes of

20  medications.

21  BY MR. GILMER:

22  *Q.*   And where do you currently hold medical licenses?

23  *A.*   I hold medical licenses in New Jersey, Pennsylvania, and

24  Colorado.

25  *Q.*   And are you a member -- are you board certified in

—3:21-cv-00176-RFB-CLB—

1  specialties?

2  *A.*  Not only am I board certified in anesthesiology by the

3  American Board of Anesthesiology, I hold a subspecialty

4  certificate of added qualifications in pain medicine from the

5  American Board of Anesthesiology.  And I also hold certification

6  from the American Board of Pain Medicine.

7  *Q.*  And are you also ACLS certified?

8  *A.*  Yes, both ACLS and BLS training, and I recertify every two

9  years.

10  *Q.*  And can you tell us what ACLS and BLS stand for?

11  *A.*  Yes.  Basic life support is BLS, and that is, essentially,

12  how does one perform CPR.  Advanced cardiac life support is

13  ACLS, and that is more concerned with how does one manage the

14  airway, what drugs of choice are used in resuscitation and in

15  what sequence and in what indications.  And we maintain those.

16  Those are required to be updated every two years.

17  *Q.*  And, Dr. Petersohn, not to belabor the point further, if we

18  were to look at your C.V., would we be able to see an up-to-date

19  information pertaining to professional memberships and

20  organizations and committees that you would be a part of?

21  *A.*  Yes, I've served on a variety of national and regional

22  committees.  Most recently I was immediate past president of the

23  New Jersey State Society of Interventional Pain Physicians.  And

24  I have been both a lecturer and senior workshop instructor for

25  the American Society for Regional Anesthesia and Pain Medicine.

—3:21-cv-00176-RFB-CLB—

1  *Q.*  And, Dr. Petersohn, I'm going to also ask that you just slow

2  down a bit.  We don't want to get the court reporter upset with

3  us.  Thank you.

4       And you've been retained at -- by my office as an

5  expert?

6  *A.*  I have.

7  *Q.*  And what are your rates that you charge?

8  *A.*  I charge $400 per hour for most of the work that we do.

9  *Q.*  And are these your standard rates?

10 *A.*  Yes, they are.

11 *Q.*  And so the rate you're charging my office is the same as you

12 charge anyone else?

13 *A.*  Yes, it is.

14 *Q.*  Dr. Petersohn, I'm going to move ahead now, and if you at

15 any point in time want to look at the protocol, just let me know

16 and we can go to that.  But I think I'm going to be asking you

17 general questions that won't require you to look at it.  But,

18 again, this isn't a memory test, so just let us know if you need

19 to look at it and we can put it up.  It's been admitted as an

20 exhibit.

21 *A.*  Thank you, Mr. Gilmer.

22 *Q.*  Have you had an opportunity to review the NDOC protocol with

23 regard to the execution in this case?

24 *A.*  I have.

25 *Q.*  And do you recall what drugs NDOC plans to use as part of

——3:21-cv-00176-RFB-CLB——

1   that lethal injection?

2   *A.*   Yes.  It's fentanyl or alfentanil, ketamine, cisatracurium

3   with an option to use it or not use it, and then one of the

4   salts of potassium, either acetate or chloride, whichever is

5   readily available.

6   *Q.*  And so far, the experts that have testified, and plaintiffs

7   can correct me if I'm wrong, but I believe so far all of the

8   experts have said that for purposes of this protocol, while

9   there might be some subtle differences with regard to fentanyl

10  and alfentanil, they're not -- not really anything that we need

11  to get into.  Do you agree with that?

12  *A.*   I agree, sir.

13  *Q.*  So if I use fentanyl while I'm asking a question or

14  alfentanil, please know that I'm referring to both and please

15  clarify if there's a concern pertaining to that.  Okay?

16  *A.*   The drugs are very similar in effect.

17  *Q.*  Do you recall the dosages of the drugs that you just

18  referenced?

19  *A.*   The dosage of the fentanyl begins with an additional dose

20  of -- initial dose of 2,500 micrograms, and that may be

21  repeated.  The dose of ketamine, I think it was going up to

22  1,000 milligrams.  And the dose of cisatracurium, I think, was

23  up to -- perhaps it was 200 milligrams, if memory serves, and

24  then 240 milliequivalents of potassium.

25  *Q.*   I think you -- I think the protocol will show that you have

—3:21-cv-00176-RFB-CLB—

1  a very good memory with regard to those numbers.

2       You mentioned the drugs also, but I didn't ask you for

3  the specific sequencing.  Do you recall the sequencing of the

4  drugs that you referenced?

5  *A.*  I do.  It was exactly the sequence in which I reported the

6  use of the drugs.

7  *Q.*  So that would be fentanyl or alfentanil, then moving onto

8  ketamine, then moving onto, possibly, cisatracurium, and finally

9  the potassium chloride or acetate?

10  *A.*  Yes.

11  *Q.*  Did you discuss these drugs, the dosages and the sequencing,

12  in your report?

13  *A.*  I did.

14  *Q.*  And you prepared an expert report in this case.

15  *A.*  Yes, I did.

16  *Q.*  Without reviewing those reports, and, again, we can go to

17  those reports and probably will in a minute, do you recall which

18  areas you were asked to opine on by my office?

19  *A.*  I was asked in a general fashion to opine as to the -- the

20  choice of drugs that were used, the expectable effects of the

21  drugs that were used, complications or problems that might

22  reasonably be foreseen with the use of these drugs, and I was

23  asked to comment as to whether this would be considered a humane

24  or painless procedure, and to comment on various methods of

25  assessment and the timing and such relevant to the protocol.

1          I did not design the protocol.  I have had no role in

2     advocating for or against its use, and I have agreed,

3     specifically, to address these drugs in terms of their

4     expectable effects and side effects or complications so that

5     this protocol, if it is used, is as humane as possible.

6          THE COURT:  So, Dr. Petersohn, you know, as I have

7     learned in this process about some of these drugs, one of the

8     things we've heard from different experts is that some of these

9     drugs like fentanyl and ketamine, we understand how they operate

10    on the body.  We don't actually understand why they work the way

11    that they work.  And so one of the things that some of the

12    anesthesiologists have talked about is, we've observed the

13    effects and we understand the effects because we see them when

14    we use them.  But we don't always understand -- we don't have a

15    clear understanding of why they work as well as they do in terms

16    of producing sedation.  Would you agree with that?

17         THE WITNESS:  Well, I would be happy to give Your Honor

18    a lengthy treatise on the particular mechanisms of action of

19    each of these drugs.  I think, with respect, I would disagree

20    that we have an extraordinarily good understanding of why these

21    drugs work.

22         And as time has gone on and we have moved from the

23    introduction of these drugs in the 1960s, here we are 50 years

24    later, and for each of these drugs, we have a very good idea as

25    to how these drugs work.  We have physiological --

—3:21-cv-00176-RFB-CLB—

1          THE COURT:  Well, let me ask you -- so let me be more

2     specific.  So one of the issues is chest wall rigidity.

3          THE WITNESS:  Yes, sir.

4          THE COURT:  But not understanding why that actually

5     happens.  I've gotten different answers from different

6     anesthesiologists as to why that would occur in the context of

7     the use of these drugs.

8          THE WITNESS:  I can answer that for you, sir.

9          THE COURT:  Okay.  So -- because different

10    anesthesiologists have said, "It's a phenomenon that we've seen.

11    We don't know why it occurs in some people and not other people,

12    but we do know why it occurs.  We don't understand exactly why

13    some people might have it and other people might not."

14          So can you explain that?

15          THE WITNESS:  Yes.  The -- the issue here has to do

16    with the action of fentanyl and related compounds on an area of

17    the brain called the locus coeruleus.  This is well outlined in

18    a 2019 article in the Journal of Experimental Pharmacology and

19    Therapeutics.

20          THE COURT:  Wait.  So you have to -- even though I know

21    you want to answer me, you have to lean a little bit towards the

22    bar so she can hear you clearly.

23          THE WITNESS:  And the author -- first author is

24    Toralva, T-O-R-A-L-V-A.  What we know about these drugs, Your

25    Honor, is that these drugs affect the system in the brain which

—3:21-cv-00176-RFB-CLB—

1  maintains resting skeletal muscle tone.  And the way these drugs

2  work is that by suppression of certain aspects of the

3  functioning of this circuitry within the brain, it increases the

4  muscle tone resulting in rigidity.  And at the same time that it

5  does that, it also depresses the connectivity of the brain in

6  such a way that it produces unconsciousness.

7       So the phenomenon of rigidity and the phenomenon of

8  unconsciousness are intimately linked, and they are virtually

9  the same thing because they were created by the same center in

10 the brain.

11      The key here is to understand that when you get

12 rigidity, you have to get unconsciousness.  The reason that you

13 see this in some clinical applications and not in others, these

14 drugs are highly soluble in fat, and brain tissue has a great

15 deal of fat, and the drug goes into the brain relatively

16 quickly.  Depending upon the speed and the total dose of

17 fentanyl that's administered, there is a huge difference in how

18 much of this drug is present at these small centers in the brain

19 that create these phenomenon.

20      So when you give 50 or 150 micrograms of fentanyl over

21 a couple of minutes, maybe 250 over three or five minutes, you

22 don't necessarily reach a level in the brain high enough to

23 create rigidity or loss of consciousness.

24      When you use a very large dose sufficient that the

25 amount of this fentanyl in the area of the brain is high enough,

1    it then causes these phenomenon.  So when we're looking at --

2              THE COURT:  I'm sorry.  So -- my understanding of what

3    you're saying is that if you have a high enough dose of

4    fentanyl, you're always going to have chest wall rigidity.

5              THE WITNESS:  It depends.  If you were to give 2,500

6    micrograms over a five-hour surgical procedure, you'd probably

7    never see it as long as you gave it very slowly.  Because the

8    peak level would never rise high enough to activate those

9    centers and to produce the phenomenon of rigidity and loss of

10   consciousness.  That's why when you look at old case reports

11   about a rareness during anesthesia, there's a lot of anesthetic

12   given at the very beginning of the procedure and relatively

13   little, or perhaps none, later on in the procedure.

14             So the level doesn't stay consistently high enough to

15   produce rigidity and loss of consciousness, which are completely

16   and temporarily linked phenomenon.

17             So when we give a large dose of fentanyl and we give it

18   rapidly, the level of that fentanyl rises dramatically and it's

19   sufficient to then act on this area in the brain which produces

20   both rigidity and a loss of consciousness.

21             If we give that same dose slowly over a matter of

22   hours, we never reach that threshold where we activate the

23   center in the brain that makes this thing happen.

24             THE COURT:  Okay.  So that's helpful.  So what you're

25   saying, if I'm understanding you correctly, is that this dose

1   you would expect based upon your expert opinion that there would

2   be chest wall rigidity, but that the dose would have already

3   induced a deep level of sedation by that point or

4   unconsciousness.

5          THE WITNESS:  That's correct.  It would induce

6   unconsciousness, and this is completely separate from the

7   respiratory depression issues.

8          THE COURT:  Okay.  And so -- but you would expect there

9   would also be chest wall rigidity in this case.

10          THE WITNESS:  Yes, because those two phenomenon are

11   linked and they are both produced by the same center in the

12   brain at the same time.

13          THE COURT:  But you're saying that people may not

14   recall any discomfort as it relates to the chest wall rigidity

15   because they would already be unconscious?

16          THE WITNESS:  Because the unconsciousness occurs at the

17   same time as they develop the chest wall rigidity, you have no

18   appreciation, no perception of this.  And that's been shown

19   experimentally in papers, including Streisand, that the

20   individuals who developed chest wall rigidity have no

21   recollection of having developed it.

22          THE COURT:  That leads me to another question, which is

23   very unique in this circumstance.  These drugs also have an

24   amnesic effect, correct?

25          THE WITNESS:  Normally, we don't think of fentanyl as

-3:21-cv-00176-RFB-CLB-

 1    having an amnesic effect.  But if it's at a high enough level

 2    that it produces unconsciousness, then that also decouples the

 3    ability to make memories.

 4        THE COURT:  So part of the issue here, Doctor, which is

 5    very different than in other situations, your patients wake up.

 6        THE WITNESS:  We intend for that to happen.

 7        THE COURT:  Right.  This is a situation where that's

 8    not the intent.

 9        THE WITNESS:  Exactly, sir.

10        THE COURT:  And I say that because the amnesic effect

11    wouldn't be relevant here because there's no after for this

12    procedure, right?

13        THE WITNESS:  Your Honor's correct.

14        THE COURT:  So there's a real question for me about

15    whether or not in that situation the person would experience

16    what they're experiencing, but not have had the benefit of the

17    amnesic effect of the drug such that they wouldn't remember it

18    even if it was a negative experience.  How do you address that

19    potential?  Because it does seem to me where we've had these

20    cases that have said there's been some awareness of what may

21    have happened, even in some of these cases, I think, it was with

22    fentanyl, right.  It raises the question for me that in a

23    situation in which you're not seeking to keep someone alive,

24    that if your purpose is for them to actually die, in that moment

25    where they're not going to benefit from the amnesic effect of

1   pain or suffering that they may encounter, they could experience

2   it and we would never know because they would have already died.

3          THE WITNESS:  Well, it's a very good question that Your

4   Honor poses.  But in the circumstances of the operation of the

5   protocol as it is presented, the phenomenon of profound sedation

6   occur within seconds.  And when the rigidity of the chest

7   occurs, there is an immediate decoupling of the ability to

8   process sensory information and the emotional aspect of

9   information, which would be supplied by an area of the brain

10   called the thalamus, that goes away.  And the pathways that the

11   brain uses to support consciousness just turn off.  It's like

12   flicking a light switch.  So --

13          THE COURT:  So you're talking about being sort of brain

14   dead.

15          THE WITNESS:  Well --

16          THE COURT:  Because there's differences -- I think

17   there's references to being brain dead and then being -- other

18   parts of your body sort of being dead where you can still have

19   brain activity, but your body is not functioning in other ways.

20   So I'm trying to figure out, as I learn in this process and

21   hearing from different doctors, what you mean when you say that.

22          THE WITNESS:  What you're talking about here is a

23   complete decoupling.  And with certain drugs like ketamine,

24   ketamine interferes with the ability to process any information

25   from the external world, and it also interferes with the actions

—————3:21-cv-00176-RFB-CLB—————

1  of the limbic system which provides us with the emotional

2  content of an experience.

3       So ketamine acts on the NMDA system to completely sever

4  that.  Now, the cortex is operating, but it has no input.  It

5  has no awareness.  And this is what we call dissociative

6  anesthesia.  So with ketamine, you have a complete severing of

7  any of the inputs and the ability to assign any emotional

8  quality to any experience --

9       THE COURT:  So you're saying --

10      THE WITNESS:  -- of the cortex.

11      THE COURT:  -- you can't perceive, which is a

12  fundamental aspect to either pain or suffering, what's happening

13  in the other parts of your body.  Even if you could perceive

14  them that they would create those feelings, you can't because

15  ketamine interference with the brain's ability to be able to

16  receive the information that would allow it to formulate those

17  feelings or thoughts.

18      THE WITNESS:  Yes.  That's accurate.  And the way

19  fentanyl works is that fentanyl, at high doses administered

20  relatively expeditiously, when you have this phenomenon -- I

21  mean, first of all, the profound sedation occurs relatively

22  quickly.  People just don't care.  They find themselves

23  euphoric.  If you're standing at the table doing anesthesia,

24  they'll tell you, "Well, I feel like I'm, you know, starting to

25  go here," and it's not -- not typically a difficult event.  It's

————3:21-cv-00176-RFB-CLB————

1  often pleasurable, in fact.

2          But when you are increasing the amount of ketamine --

3  I'm sorry -- the amount of fentanyl in the bloodstream quickly,

4  you will get this chest wall rigidity, but the same phenomenon

5  that creates the chest wall rigidity at that point turns off

6  consciousness.  It completely eliminates the part of the brain

7  that says, "Hi, I'm awake."  All right.  So if you're not awake,

8  if you're -- you know, you have a decoupling of any of the

9  external inputs from the phenomenon that we call consciousness,

10 so ...

11         THE COURT:  So let me ask you a question about that.

12 How do we know that?  Is it because you observe the chest wall

13 rigidity and the level of unconscious or is it because of

14 self-reporting?  Because one of the other issues that concerns

15 me, Doctor, is that if you're relying upon self-reporting to

16 make the determination about whether or not chest wall rigidity

17 occurs during unconsciousness, but if there's an amnesic effect

18 of the drugs, you actually have a missing input as to data.

19 Because even the person wouldn't remember that it occurred

20 before they were unconscious because they don't remember.

21         So part of my concern about some of these studies is

22 there's a self-reporting aspect to the side effects that may be

23 masked by the amnesic effect of the drugs.  So in this

24 situation, as I've said to you, we're not going to have that

25 situation.  So one of the -- my concerns as relates to some of

1  these studies is they all depend upon, it seems to me, and this

2  is what I've seen, if there's a complication from the effect of

3  the anesthesia, the person reporting that they had a

4  complication.

5       Would there be some other way that we'd be able to know

6  that as it relates to the studies so that I could feel confident

7  that the studies are capturing in real-time a potential

8  complication without relying upon, sort of, the amnesic effect,

9  essentially, to say there is no complication?  Does that make

10  sense?

11       THE WITNESS:  Well, Your Honor asked a very difficult

12  question.  And part of the challenge we have is that for us to

13  do some of these -- these studies stretches the limits of what

14  would be considered ethical investigations.

15       So we have good clinical studies that show us the

16  phenomenon of chest wall rigidity occurring.  We also have --

17       THE COURT:  Can I just stop you for a second because

18  there's also an issue about, how do they know chest wall

19  rigidity is occurring?  Is it the difficulty of intubating

20  someone?  Is it the limbs?  In your experience, one, have you

21  seen it and how did you identify it?  And, two, how do studies

22  identify it?

23       THE WITNESS:  Yes, I have seen chest wall rigidity.  I

24  have seen myoclonic motions with these drugs.  I have -- I have

25  been there, done that, as it says.

—————————3:21-cv-00176-RFB-CLB—————————

1          But --

2          THE COURT:  So how did you -- how did you see it?

3          THE WITNESS:  Chest wall rigidity --

4          THE COURT:  I'm sorry, how did you see it?  Was it

5     through the -- trying to intubate someone or was it through --

6     through their arms?

7          THE WITNESS:  Well, in the context of an anesthetic for

8     a surgical procedure, we have a mask over the patient's face.

9     We have a hand on -- on the bag.  We're delivering oxygen to the

10    individual.  And what you will see is as the fentanyl starts to

11    work, the patient will gradually take shallower and slower

12    breaths.  And we will supplement this by putting a bit of force

13    on the bag and inflating the -- the lungs to maintain adequate

14    oxygenation.

15          It may rather suddenly occur that when we're trying to

16    squeeze the bag, we're not getting any air in.  And that's the

17    phenomenon that we refer to as rigidity.  Okay?

18          So this is a phenomenon that we observe because we are

19    paying attention, in the case of a surgical anesthetic, to the

20    compliance of the chest wall and our ability to ventilate the

21    patient.

22          THE COURT:  Got it.

23          THE WITNESS:  That's very different from this protocol

24    where, number one, there is no oxygen enrichment that's being

25    provided nor are we actively managing the individual's airway

1  and breathing and gas exchange.  So these are totally different

2  contexts.

3          The same phenomenon occur, it's just in one case you

4  are actively managing these because you know they can occur or

5  they might occur.  And in the case of the NVDOC protocol, it's

6  essentially irrelevant to the operation of the protocol.

7          THE COURT:  Well, but -- and that raises another

8  question, though, which is you are supplying oxygen.

9          THE WITNESS:  That's correct.

10          THE COURT:  How would you know in a situation where

11  you're not supplying oxygen that the person wouldn't experience

12  some sensation of what was occurring in terms of the breathing

13  earlier than what's reported?  Because in all of these cases

14  they have to be provided oxygen because it would be unethical

15  for them not to be doing it, unless there was some sort of

16  mistake, obviously, with the procedure.

17          THE WITNESS:  Right.

18          THE COURT:  But part of this I'm being asked to rely

19  upon studies that are not recreating what will happen here,

20  right?  And so how do we know, for example, there aren't going

21  to be complications that occur because you're not giving

22  supplemental oxygen and they may -- and they may occur much more

23  quickly because you're not supporting the person?

24          THE WITNESS:  Well, there are two -- two sources that

25  we can look to for this.  There is an extensive literature on

———3:21-cv-00176-RFB-CLB———

1    overdose experiences, and as Your Honor may be aware, there were

2    over 100,000 overdose deaths last year in the United States.

3    Approximately two-thirds of these involved opiates, principally

4    fentanyl and heroin and fentanyl family drugs.  And what we know

5    is that when -- when the EMTs arrived on the scene, that over

6    half the patients had no pulse.

7           What's interesting is when you look at the experience

8    in Vancouver, Canada, where they have supervised injections or

9    safe injection sites, as it were, and you have staff that are

10   trained to recognize these and intervene as necessary, what you

11   find is that there are a fair number of individuals who have

12   developed chest wall rigidity, who have -- there are a few that

13   actually will develop these myoclonic movements or posturing,

14   which is a response that shows us that parts of the brain have

15   just stopped working, which is consistent with our knowledge of

16   how this works.

17          But what's most remarkable is that there's no sensation

18   really, truly reported that this is considered a painful

19   experience by those who awaken or who are resuscitated when

20   they're -- they're interviewed at a later point.

21          THE COURT:  Right.  But that goes to my other question

22   though, Doctor.  Wouldn't it be -- the best way to measure that

23   be in the moment that the person may be -- before they either

24   pass out or they -- or they became unconscious where they may be

25   experiencing the loss of breath, wouldn't the best way to

1   measure that to be to figure out in the context of that type of

2   an overdose, what are they experiencing in that moment?  Because

3   the amnesic effect will have kicked in, right, by the time that

4   they have been resuscitated, and then you see my problem

5   because --

6           THE WITNESS:  I think I understand Your Honor's

7   concern.  The profound sedation produced by fentanyl occurs

8   within seconds.

9           THE COURT:  Okay.

10           THE WITNESS:  The -- the individual also has a profound

11   depression of the interest in breathing.  So there is no

12   subjective sensation of suffocation or shortness of breath.

13   That's only generated when you have a desire to breathe.  So

14   since a high dose of fentanyl rapidly administers suppresses

15   that (verbatim), there is no sensation that you're short of

16   breath.  You have the euphoric sensation of the fentanyl, but

17   there is no sensation of being short of breath.  There's no

18   sensation of pain, because you've already blocked those

19   receptors.

20           THE COURT:  So, Doctor, how can you -- how can you say

21   that there is a euphoric sense, but no sense of loss of breath?

22   How can both those things happen at the same time?

23           THE WITNESS:  Well, we can extrapolate from our

24   experience with lower doses of fentanyl looking at the sensation

25   of euphoria.  And we routinely see our patients following the

—3:21-cv-00176-RFB-CLB—

1  administration of an anesthetic, and I have never in -- in doing

2  several thousand anesthetics using fentanyl, I have never had a

3  patient report that they felt short of breath.  And I think the

4  sensation of euphoria or of a lack of any sense of malaise or

5  disease, if you would put it that way, that is -- that's pretty

6  much universal with these drugs.

7          And in this context of this protocol, because you're

8  using such a large dose --

9          THE COURT:  Right.  So I guess in those patients,

10  though, they're receiving oxygen, though, right?

11          THE WITNESS:  Well, those patients are receiving

12  oxygen.  So one would presume that if there were an opportunity

13  because they -- they wouldn't have the effect of a decrease in

14  oxygen, if there were an opportunity for the brain to function

15  normally and to retain those memories or to experience those,

16  you would expect that surgical patients would report this if it

17  were occurring.

18          THE COURT:  You mean in the moment that it was

19  happening.

20          THE WITNESS:  In the moment it was happening or they

21  would recall it at a later point.  And we have no evidence that

22  either of those occurs in the patients that we care for for

23  surgical anesthetics.  So in a patient who is participating -- a

24  patient or an inmate who is participating in the NVDOC protocol,

25  the expectation here is that because in those individuals who do

—————3:21-cv-00176-RFB-CLB—————

 1  have full oxygenation and do have maintenance of normal airway

 2  mechanics, since this group does not experience dysphoria or

 3  dis-ease or discomfort, it would be even dramatically less

 4  likely that an individual who has reduced oxygen in the blood,

 5  which translates to an inability of the brain to function, it is

 6  highly unlikely, even more so than in the population that we

 7  take care of surgical patients, it is most improbable,

 8  completely improbable, that the individual would experience

 9  discomfort or uneasiness or anything painful that would be

10  related to the initiation of this protocol with fentanyl.

11          THE COURT:  Okay.  Thank you, Doctor.

12          Sorry, Mr. Gilmer, but we just got on a little bit of a

13  roll there.  But that was very helpful.  I appreciate that.

14          MR. GILMER:  No, that's -- that's quite alright, Your

15  Honor.  I was hopefully scratching out questions as you were

16  asking.

17          THE COURT:  Well, again, I want counsel -- just so you

18  all can be aware, you can probably tell from my questions,

19  right.  We don't need to go into does fentanyl when properly

20  administered create some level of sedation.  I think there's

21  some agreement about that.  But what we're focussed on here are

22  complications.  What we're focussed on here is what could happen

23  that could create suffering.

24          I don't think there's a disagreement that in the

25  administration of these drugs, they can create sedation, but

1   there are potential questions for the Court about at these

2   doses, which have never really been tried in this type of a

3   setting whether or not there could be a real potential for

4   substantial and significant complications.

5           And so, again, I want you all to focus your questions

6   with Dr. Petersohn on that.  We don't need to cover ground where

7   there's some agreement about some aspects of these drugs.  I

8   just say that because it would be helpful, for me, to be able to

9   explore that.  That's why I asked those particular questions,

10  because to me that's -- that's what's going to be helpful.

11          So, again, thank you, Doctor.  I appreciate that.

12          THE WITNESS:  My pleasure, sir.

13          MR. GILMER:  Thank you, Your Honor.

14  BY MR. GILMER:

15  *Q.*  I think Your Honor -- in the questions that the Court was

16  asking you, it started with chest wall rigidity.  But I think we

17  may have had some discussion regarding respiratory depression in

18  there as well.  Am I correct in that?

19  *A.*  Yes, sir.

20  *Q.*  Is there anything else to add with regard to the answers

21  that you gave the Court pertaining to respiratory depression and

22  whether or not that would cause any discomfort or pain?

23  *A.*  Respiratory depression does not cause discomfort.  In fact,

24  precisely the opposite.  The brain suffering a lack of oxygen or

25  with the accumulation of carbon dioxide impairs the function of

1  the cortex first, so there can be no conscious appreciation

2  without the cortex functioning.  And with the progressive and

3  rather rapid decrease in oxygenation, the remainder of the brain

4  will gradually cease to function.

5          THE COURT:  Doctor, let me ask you about that, in part,

6  because, obviously, this has become, unfortunately, more

7  prevalent in the context of COVID, this sensation of not being

8  able to breathe which has been described, obviously, frequently

9  in literature and public statements related to COVID.  Why is

10  that not the same here?  Why is it -- why is this different?  Is

11  it because of the drug's interference with the processing of the

12  respiratory depression?

13          But it does seem to me that, you know, in these people

14  experience some type of complications from COVID, there is this

15  sense of feeling of not being able to breathe.  Can you tell me

16  how that's different?

17          THE WITNESS:  Yes, the difference here is that with the

18  use of these medications, these depress the brain's generation

19  of a signal that there is decreasing amount of oxygen or that

20  the amount of carbon dioxide is building up.  So these drugs

21  directly depress the brain's perception and, ultimately, the

22  brain initiation of inspiration.

23          THE COURT:  I see.  So what you're saying is that the

24  person may be experiencing exactly the same thing that a person

25  who may be suffering complications from COVID are experience --

1  experiencing in terms of the inability to get full breath, but

2  their brain is not able to access the fact that that's happening

3  so they can't form a perception about the loss of breath that

4  may be described by people when they -- when they are having a

5  COVID complication.

6          THE WITNESS:  No.  I respectfully would suggest that's

7  incorrect.

8          THE COURT:  Well, that's why you're here.

9          THE WITNESS:  If I may, sir?

10         THE COURT:  Yeah.

11         THE WITNESS:  The sensation of shortness of breath,

12 with COVID, that's generated from certain receptors in the lung.

13 They're called J receptors.

14         THE COURT:  Okay.

15         THE WITNESS:  Okay?  So that's one kind of a problem

16 where it's a peripheral input that says, "Hey, you know, you

17 feel short of breath because the lung is basically generating

18 that -- that sensation."

19         With the normal sensation when we're short of breath,

20 it's because there's centers in the brain that respond to

21 alterations in oxygen tension, carbon dioxide tension, and PH

22 that tell us that we have to breathe.  But without the brain

23 having a signal that there's something wrong, we never develop

24 that subjective sensation of shortness of breath.

25         So we never -- with the use of fentanyl in particular,

1  individuals don't have a sense of being short of breath.

2  There -- there is no sensation that you have to breathe,

3  therefore, there is no sensation of being short of breath.  If

4  you take the example of a deepsea diver and these folks do -- do

5  rhythmic breathing, and then they go under water for extended

6  periods.

7         The -- the issue here is what gives us that subjective

8  sense of shortness of breath.  It's the sense that we have a

9  decrease in oxygen tension and that we're motivated to breathe

10  because of that.  If we don't have a sensation that we need to

11  increase that oxygen tension, we have no sense that we're short

12  of breath.  So drugs like fentanyl suppress that by reducing the

13  inputs to the brain that say, "Hey, dummy, take a breath."

14         THE COURT:  Right.

15         THE WITNESS:  All right.

16         THE COURT:  So then explain to me, if it's reducing the

17  inputs, how is it all -- is that what's also reducing the

18  breathing?  Because -- because you're talking about two separate

19  things, right.  One is not getting input to the brain about the

20  fact that you have reduced oxygen.

21         THE WITNESS:  Correct.

22         THE COURT:  But the other is, why is there reduced

23  oxygen in the first place?

24         THE WITNESS:  The brain doesn't have -- the brain

25  doesn't figure out, necessarily, why there is reduced oxygen.

——————3:21-cv-00176-RFB-CLB——————

1  The brain responds to --

2          THE COURT:  No, I understand that.  What I'm saying,

3  but why is there depressed respiratory -- a depressed

4  respiratory effect, apart from the fact that there's

5  interference with the -- the brain perceiving that?  Because one

6  is the brain's -- you're saying these drugs interfere with the

7  perception.

8          THE WITNESS:  Correct.

9          THE COURT:  But if they didn't interfere, still, why is

10  there -- why is there depressed respiratory function anyway?

11          THE WITNESS:  There -- well, first of all, there are a

12  couple things here.  There are some effects of opiate drugs,

13  including Morphine and fentanyl, on the brain that -- I'm sorry

14  -- on the lung that decrease the sensation of shortness of

15  breath.  So, for instance, in the circumstance of pulmonary

16  edema, you can give someone Morphine, you can give someone

17  fentanyl, and that will reduce the sense of shortness of breath

18  and, to a degree, will in some cases alter the pulmonary

19  pressure and will actually improve pulmonary edema.

20          If you're looking at the effect on the brain, fentanyl

21  has effects on these, what are called, Mu opiate receptors.  And

22  some of these will suppress the sensitivity of the brain to

23  falling levels of oxygen by reducing that.  There is no

24  motivation to take a breath.  There is no sensation of shortness

25  of breath because you just don't have the input that says, "Your

————3:21-cv-00176-RFB-CLB————

1  oxygen's falling, you got to take a breath."

2          And at the doses that we're using in this protocol and

3  with the speed of injection, you then have the effects on this

4  other portion of the brain that disconnects consciousness.

5          THE COURT:  So okay -- so, again, I appreciate --

6          THE WITNESS:  So all of these things are going along at

7  the same time.

8          THE COURT:  So if I understand you, there's two parts

9  of the brain that are being affected.  One is in terms of our

10 ability to breathe, we rely upon parts of the brain that tells

11 us, essentially, sort of, what our gas levels are.

12         THE WITNESS:  Yes.

13         THE COURT:  And then send signals, even unconsciously,

14 to our lungs and our chest to try to compensate or deal with

15 that in terms of our breathing.  And you're saying, one, the

16 drugs interfere with that, sort of, adjustment system such that

17 if there's a reduction over time, it's not steadily increasing.

18 So it will just continue to reduce and reduce.  And the other

19 thing you're saying is that at the same time that's happening

20 there's a separate part of the brain that would perceive the

21 sensation of that reduced oxygen that's also being impeded by

22 these drugs.  Is that a fair summary?

23         THE WITNESS:  That's a fair way to look at this.

24         THE COURT:  Right.

25         THE WITNESS:  And then you've got the third part where

1  the -- the operation of the fentanyl, there are specific nerve

2  cells in the brain that help maintain normal skeletal tone and

3  they maintain or allow consciousness to occur.  And with high

4  doses of fentanyl that are administered relatively rapidly, you

5  suppress the action there.  So that's what gives you not only

6  the chest wall rigidity, it gives you the complete disconnection

7  and the loss of consciousness.

8           THE COURT:  Okay.  Thank you, Doctor.

9           THE WITNESS:  You're welcome, sir.

10 BY MR. GILMER:

11 *Q.*  Dr. Petersohn, at one point during those excellent questions

12 and your answers there was discussion about reduced oxygen.  Is

13 that -- is that -- is reduced oxygen connected to hypoxia?

14 *A.*  Yes.

15 *Q.*  And based upon the level of fentanyl called for in the NDOC

16 protocol, how quickly would you anticipate hypoxia to occur?

17 *A.*  If you were looking at a pulse oximeter in someone who is

18 breathing room air and just watching as -- as this -- this plays

19 out, you would start to see a reduction in the -- the amount of

20 oxygen in the bloodstream, what we call hypoxemic.  You would

21 start to see a decrease in oxygen saturation probably within 30

22 to 60 seconds.  And some of that has to do with the fact that

23 the machine averages the signal over periods of five to 15

24 seconds.  So the reduction in the oxygen in the blood occurs

25 relatively quickly and goes from levels that are consistent with

—3:21-cv-00176-RFB-CLB—

1  life to levels that are inconsistent with consciousness.  And

2  relatively quickly, after about four minutes when you're not

3  breathing, that's it.  And it's considered unrecoverable

4  neurologic function.

5  Q.  And also just to clarify briefly, if you could put 533 up on

6  the screen briefly.

7       You mentioned the Streisand article at one point when

8  talking to the Court.  Is this the article that you're referring

9  to?

10 A.  This is the article, sir.

11 Q.  And that's in the record at 533.  I just wanted to confirm

12 that that was the same article that you were referring to.

13 A.  Yes, sir.

14 Q.  Now, does -- is fentanyl or alfentanil generally have what's

15 referred to as a ceiling effect?

16 A.  Well, in theory all drugs have a ceiling effect, but it's a

17 little bit like the number of grains of sand in the beach.  We

18 know that that's a finite number, but no one has actually been

19 able to count is precisely.  And it's the same way.  When we

20 finally have enough drug on board that we fully saturate all of

21 the sites for these drugs to have an effect, that would be the

22 ceiling dose.

23      THE COURT:  So could the ceiling dose be below what's

24 called for in this protocol?

25      THE WITNESS:  (Pause.)  It's possible.  It is certainly

1   possible and I think it's expectable.  We often look at dosing

2   in regard to what is required, for instance, with -- with an

3   anesthetic to prevent the sensation of pain associated with an

4   incision or with medical pinch.  So we tend to look at the

5   effective dose for 95 percent of the population.  And we tend to

6   look at how effective these medicines are and what dose is

7   required in terms of establishing parameters to guide human

8   administration of these medications in the therapeutic context.

9          THE COURT:  And let me just ask one quick question.

10  Have you ever given these medications and these doses in this

11  sequence this quickly to any patient ever?

12         THE WITNESS:  The only drug that I have given in

13  anywhere near this dose would be just fentanyl as part of an

14  anesthetic for cardiac surgery.  And --

15         THE COURT:  Would you give it in this time period?

16         THE WITNESS:  No, no.  You would stretch this out over

17  a longer period, but high-dose fentanyl is a very common drug

18  that's used for cardiac anesthesia.

19         THE COURT:  In the time frame that's in the protocol,

20  what's the largest dosage that you've ever given of fentanyl?

21         THE WITNESS:  I think we're probably talking 500, but

22  no more than 1,000 micrograms.

23         THE COURT:  Okay.  And what about ketamine?

24         THE WITNESS:  Never.  I've never given anywhere close

25  to these doses for the purposes of a surgical anesthetic.

1          THE COURT:  Okay.  So you're saying that you would

2     expect that you would hit a ceiling effect for both of these

3     drugs, particularly in this sequence?

4          THE WITNESS:  We're looking at circumstances where for

5     each of the drugs that are discussed, we are looking at having a

6     dosing that is going to far exceed any conventional clinical

7     experience.  So we're overdosing each of these drugs in order to

8     be -- be assured that the design of the protocol will be carried

9     out.

10          THE COURT:  So that, of course, leads to one of the

11     questions I have to ask, which is, how do we know what will

12     happen at that point?  And I say that because the body, at least

13     from what when I've read, has different ways of dealing with

14     medications which it can no longer either absorb or process.

15     How do we know that once these drugs reach their ceiling effect,

16     they may not have some other effect that we can't anticipate

17     because the body has never intentionally been exposed to this

18     dosing in this sequence --

19          THE WITNESS:  Well --

20          THE COURT:  -- ever.

21          THE WITNESS:  -- it's an interesting question that Your

22     Honor asked, but we come pretty close to these overall doses of

23     fentanyl.  So we have a very good idea of how the body is going

24     to handle this dose of fentanyl.  And we have so much experience

25     with the use of fentanyl in conventional clinical contexts that

—3:21-cv-00176-RFB-CLB—

1  it would be disingenuous for anyone to opine that we have no

2  reasonable knowledge or predictive ability to foresee what will

3  happen with that drug.

4         THE COURT:  Well, but here's what I'm saying about

5  that.  I'm not talking about whether or not you have a

6  reasonable or educated guess about this because you haven't had

7  this experience.  The question is, how much of a possibility is

8  there that in this time period where you're talking about, sort

9  of, the rapid, relatively speaking, administration of very high

10 doses of these medications that there couldn't be something that

11 we couldn't predict just simply because that's never been

12 something that's been done and our experience is based upon a

13 completely different situation in which people are being

14 monitored and maintained, there's been titration of these drugs.

15        And so what I'm trying to figure out is, how useful is

16 that information of predicting this very different circumstance.

17 So tell me why you think, for example, administering that amount

18 over hours would be equivalent to centering it in three minutes.

19        THE WITNESS:  Well, I think I understand Your Honor's

20 question.

21        We certainly have very good evidence from the

22 literature on drug overdoses with opiates as to what to expect

23 with these very high doses.  And what we can see in this

24 population and what we see to a degree in -- in cardiac

25 anesthesia is the production of chest wall rigidity.  That's not

 1  at all uncommon.

 2       And we also see that the profound sedation and the

 3  target expectable effects of these drugs, the sedation, the

 4  profound suppression of any desire to breathe, the profound

 5  somnolence -- and we refer to it as euphoria.  I wouldn't call

 6  it joyous, but the lack of a sensation of discomfort.  Those

 7  effects are so profound and they occur so rapidly after the

 8  administration of the drugs, Your Honor's concern that there is

 9  some sort of off-target effect that we would not reasonably

10  expect is not a reasonable speculation.

11       There is no evidence to suggest that that would ever

12  occur, because we have experiences with very high doses, even if

13  the context of the administration is drawn out a little bit.  We

14  have a very good sense, especially from animal studies where

15  some of these super therapeutic doses have been looked at or,

16  for instance, where drugs like carfentanil were used, which is

17  far more powerful and more potent than fentanyl itself or

18  alfentanil.  We have experience and laboratory information as to

19  how these drugs act.

20       THE COURT:  So in those studies, you're saying they've

21  given these types of dosages?

22       THE WITNESS:  In -- in situations, especially with use

23  of carfentanil, the equivalent doses that are given are very

24  consistent with the kinds of things that we're seeing here.  And

25  Julie and Stanley did a lot of this research, I believe, in

———3:21-cv-00176-RFB-CLB———

1    1970s-1980s at University of Utah.  So there is certainly a body

2    of information about this.

3         And I think this is pretty well-known within the field

4    of anesthesiology.  With regard to ketamine --

5         THE COURT:  Let me ask you just quickly since you

6    referenced those studies, at those levels of carfentanil being

7    administered, were there any complications observed besides

8    chest wall rigidity of these animals?

9         THE WITNESS:  There is a famous video of Dr. Stanley

10   spraying carfentanil in a cage with a monkey, and the monkey

11   very quickly becomes sedated and collapses.  And after a period

12   of -- of time, the monkey regains function, I believe.

13        So there is some evidence as to what we might expect

14   here.

15        THE COURT:  Okay.  Thank you, Doctor.

16        THE WITNESS:  Sure.

17        THE COURT:  And one, sort of, final question.  It seems

18   to me that one of your sources for this conclusion relates to

19   the fact that it appears based upon the overdoses, which may

20   approach some of these higher doses of some of these drugs,

21   although albeit a synthetic or polluted version of some of these

22   drugs.  Even in those contexts from what you've seen in terms of

23   the studies, you haven't seen anything that would suggest a

24   consistent identifiable complication beyond chest wall rigidity.

25   Is that right?

———3:21-cv-00176-RFB-CLB———

1            THE WITNESS:  Well, if one looks at the overdose

2    studies, most of these, there are a fair number that result in

3    death.  But in the situations that someone would develop chest

4    wall rigidity or even some of this, what we call, myoclonus,

5    which are, sort of, uncoordinated or unpurposeful movements,

6    these do reverse with large doses of Naloxone, Narcan.  So we

7    have evidence as to how to manage these.  But I think --

8            THE COURT:  Well, that wouldn't be happening here,

9    right?

10           THE WITNESS:  No, no.  We would not anticipate that --

11           THE COURT:  They wouldn't be administered --

12           THE WITNESS:  -- in the proper operation of this

13   protocol.

14           THE COURT:  Right.  So -- and describe to these me

15   these body movements and why they occur.

16           THE WITNESS:  These occur because that -- that little

17   portion of the brain that is responsible for maintaining normal

18   resting skeletal muscle tone is depressed by high doses of

19   fentanyl.  And because that -- that is depressed, that's where

20   you get the chest wall rigidity, and that's where you get

21   these -- these, we call, posturing.  So that's -- that's part of

22   the expectable response to opiate drugs.

23           THE COURT:  When you say "posturing," can you tell me

24   what that means and what that looks like.

25           THE WITNESS:  You might see an individual who would

1  have their limbs in flexed positions or, alternatively, in fully

2  extended, what we refer to as decorticate and decerebrate

3  posturing.  And these are the results of suppression of function

4  of certain components in the brain that we tend to think of as

5  maintaining protective postures or behaviors.  So this is all

6  done as the individual's completely unconscious -- unconscious.

7  There's no pain or suffering that we are aware of that goes on

8  with this.  And, in fact, if you interview a trauma patient who

9  has been successfully resuscitated and such, they have no

10  recollection of any of the events that occur.

11        THE COURT:  But -- but would you expect to see

12  posturing and movements at these dosage in this protocol?

13        THE WITNESS:  My sense is that we would expect to see

14  chest wall rigidity, and I think because the dose here is so

15  large and it's being administered quite rapidly, I think the

16  likelihood of seeing posturing is pretty remote.

17        THE COURT:  And would you expect in this case the --

18  the administration of the fentanyl and the ketamine to cause

19  death before the potassium is administered?

20        THE WITNESS:  It is possible.

21        THE COURT:  Okay.  Because of depressed breathing.

22        THE WITNESS:  Because of depressed breathing, the lack

23  of supplementary oxygen, yes.

24        THE COURT:  Thank you, Doctor.

25        Go ahead, Mr. Gilmer.

———3:21-cv-00176-RFB-CLB———

1  BY MR. GILMER:

2  *Q.*  And I think the record is clearer previously, but you

3  mentioned that you would expect to see the chest wall rigidity

4  in answer to the Court's question.  Is it still fair to say,

5  though, that you wouldn't expect any awareness or discomfort

6  because you believe the person's under profound sedation?

7  *A.*  The individual will have no consciousness so they cannot

8  experience pain or suffering.

9  *Q.*  I want to move on.  I think we may have touched on it

10  briefly with the Court's questions, but I want to ask some

11  questions to you about pulmonary edema.

12  *A.*  Yes.

13  *Q.*  You were here for Dr. Zivot's testimony?

14  *A.*  I was.

15  *Q.*  And at one point in his testimony -- and I'm going to quote

16  right from it.  We can put it up if we need to, but this is from

17  his transcript, at 1117, ECF number 263, Page 122.  It begins at

18  line 18.  Dr. Zivot said, "And I speculate that that acid then

19  travels to the lungs and may be the source of the problem with

20  execution because pulmonary edema is seen in midazolam

21  injections as well.  The PH of midazolam is like 2.5 to 3.5,

22  another pretty strong acid."

23         Do you remember that testimony?

24  *A.*  I remember that testimony.

25  *Q.*  Do you agree with Dr. Zivot's speculation that PH levels

——3:21-cv-00176-RFB-CLB——

1  have something to with the pulmonary edema that might occur?

2  Assuming -- or, actually, let me back up.  Do you believe

3  pulmonary edema will occur in this instance?

4  *A.*  It may very well occur, but I believe that Dr. Zivot's

5  explanation for it is outrageous and has no science to support

6  it.

7  *Q.*  And can you please explain why you have that opinion.

8        THE COURT:  Well, why don't you -- first, it would be

9  helpful to explain why you think it will actually occur.  And

10  then you can talk -- you can answer the second question, but it

11  would be helpful for me to understand.

12        THE WITNESS:  There are a couple of reasons that you

13  could have pulmonary edema.  One of them is that in the dying

14  brain or even in a brain that's still functioning but not

15  necessarily conscious, the vocal cords may snap shut as a

16  protective response.  This is when we drink water, the vocal

17  cords close to prevent us from inhaling water.  So that's a

18  normal physiologic reaction that we count on every day when we

19  consume meals and beverages.

20        But in a situation with high-dose opiates or in a

21  situation where there's little secretions on the airway and we

22  don't have a completely normal protective reflexes, sometimes

23  the vocal cords snap shut.  And when the vocal cords snap

24  together and we take a deep breath, this is what's called

25  negative inspiratory pressure pulmonary edema.  In other words,

1  the physics of generating negative pressure allows fluid that's

2  in the blood vessels around the alveoli and the lung, the air

3  sacs, to be drawn into those air sacs.  It's not exactly

4  drowning.  It's not the way -- it's not as severe typically as

5  in a COVID patient initially, but it's something that in

6  clinical anesthesia we will address with intubation of the

7  airway, positive pressure, and drugs that will help to remove

8  the edematous fluid.

9          In this circumstance, we have an unconscious

10  individual, and the problem here is the fact that the -- there

11  is no consciousness, there is no pain, there is no suffering,

12  doesn't mean that part of the brain says, "Oh, diaphragm, move,

13  take a deep breathe in," but it has no way of knowing that the

14  airway is already occluded as a protective reflection.

15          THE COURT:  So, Doctor, I'm a little confused, though,

16  because I thought you said the brain was essentially saying,

17  "Don't breathe."  But you're saying part of the brain is saying,

18  "Breathe."  Part of the brain that's monitoring the gases is

19  saying, "Well, you're not breathing properly."  So help me

20  understand that -- that dichotomy.  Because on the one hand

21  you're saying there's some part of the brain, even when the

22  person's unconscious, that's telling the diaphragm to move.

23          THE WITNESS:  Well, here's the problem, Your Honor.

24  It's a graded response.  So if you go from breathing 20 times a

25  minute to breathing once in two minutes, when you take an

————3:21-cv-00176-RFB-CLB————

1   attempted breath after a period of time, you may be completely

2   unconscious, but it doesn't mean that you have absolutely no

3   signal from the brain that says, "Breathe."

4          Now, there's no sensation that you're short of breath.

5   The individual is unconscious.  So there's no perception of

6   pain, there's no sensation of suffering, but this is just a

7   phenomenon that occurs in a dying individual.  This happens --

8   somebody falls overboard, you know, into cold water, and they

9   suddenly take a gasp.  The vocal cords oppose.  That phenomenon

10  will last for several minutes.  They never have a chance to --

11  to breathe again.  They're dead.  They're -- this is the

12  mechanism of sudden death that occurs in these kinds of

13  circumstances.

14         And the individual takes -- tries to take a breath

15  against a closed glottis, they can't do it, and death results.

16  So we know a good deal about how this phenomenon works.

17         THE COURT:  But not -- in that situation, a person's

18  actually aware of that happening.

19         THE WITNESS:  Uhm.  Yes.  Here's a situation where you

20  have someone that is not conscious and there is still some

21  action that says, you know, to the diaphragm, "Go ahead and take

22  a breath in."  Now, it's not a deep normal breath that the

23  individual would take because they don't have the drive to

24  breathe fully, but even a vestigial attempt to breathe against

25  vocal cords that are closed will generate the negative pressure

—————3:21-cv-00176-RFB-CLB—————

1  which will create this pulmonary edema.

2          THE COURT:  Okay.  I guess -- and so you would expect

3  that that would happen here, but it would happen after the

4  person who is subjected to the protocol was unconscious.

5          THE WITNESS:  That's correct.

6          THE COURT:  Okay.  One other question I have, I don't

7  know if you've actually studied or looked at other executions

8  where they used opiates where they had to administer multiple

9  doses.  Have you looked at that?

10          THE WITNESS:  I have heard of these, but I have not

11  separately studied these, Your Honor.

12          THE COURT:  Okay.  Well, you have heard about them

13  being described you saying?  You've heard of them?

14          THE WITNESS:  Yes, I have, sir.

15          THE COURT:  How would you -- and some of them were

16  not --

17          (Court reporter clarification.)

18          THE COURT:  Some of them were not at quite these doses,

19  but they were high doses.  How would you explain the situation

20  in which the person was still conscious potentially and had to

21  be administered multiple doses.

22          THE WITNESS:  Well, there are two phenomenon.

23          THE COURT:  Okay.

24          THE WITNESS:  One of them, Your Honor, is simply lack

25  of adequate intravenous access.  So in many cases, drugs have

—————————3:21-cv-00176-RFB-CLB—————————

1  been administered, but instead of going directly into the

2  vascular system by the vein, they are pooling under the skin

3  where absorption is very slow.  And, of course, you're not going

4  to have the rapid effect that you would anticipate with the

5  proper operation of the -- the present protocol.

6           The other is there are, certainly, variations in an

7  individual's response to drugs, and it's important that when you

8  select an initial dose level that you select a dose level that's

9  high enough that it makes it completely unexpectable that you're

10  going to not have that response, which is the reason for the

11  protocol's existence.

12           You also in this protocol --

13           THE COURT:  Let me stop you for a moment there.  We've

14  had prior testimony, and I don't know if you've been listening

15  to the testimony, from a pharm M.D., a clinical pharmacologist,

16  who had indicated that there's a way to be able to test for how

17  resistant someone might be to the effects of some of these

18  drugs.  Do you agree that that exists?

19           THE WITNESS:  There are ways to look at that, but in

20  the circumstance where the dosage you have chosen is so

21  overwhelming, even in the circumstance where you might have

22  genetic variations in susceptibility or where you might have

23  someone who has -- who's been abusing opiates in the past, then

24  you would expect a decreased response.  But these are few and

25  far between.  And by choosing a sufficiently large dose, you

—3:21-cv-00176-RFB-CLB—

 1  can, essentially, obviate the likelihood that you will not have

 2  an inadequate response.

 3          THE COURT:  But if, Doctor, we don't have real tests of

 4  how often these doses are administered in this rapid time frame,

 5  how often -- how would we know that such situations are few and

 6  far between if, in fact, we don't have any way to know that in

 7  terms of studying it?  So we can look at overdoses, but, again,

 8  those are, certainly, not ideal situations, one, because the

 9  nature of what's actually been either ingested or somehow taken

10  into the body.  It's certainly going to be different than the

11  pure form of some of these medications.

12          But how would you know, for example, this information?

13  Again, because that's a central question for me, which is we're

14  doing a lot of extrapolating because we don't, generally, for

15  ethical reasons ever give these types of medications in these

16  dosages.  So how would you know that the people who may be

17  resistant to them at these doses are few and far between?

18          THE WITNESS:  Well, Your Honor, we do have, as I

19  mentioned, what is called an ED-95 the expected dose that will

20  adequately deliver the intended effect.  And we have this for a

21  variety of drugs, not just the drugs in this protocol.

22          THE COURT:  Okay.

23          THE WITNESS:  But in the circumstance that we have --

24  have this, because of the way the response to these drugs can

25  vary, we're dealing with what we would refer to as the end of a

———3:21-cv-00176-RFB-CLB———

1   curve.  And we've got a pretty good idea as to how far that's

2   going to go out.  And by choosing a sufficiently high dose, it

3   essentially renders it to a reasonable standard impossible that

4   we are not going to have the desired effect, presuming that the

5   IVs work properly, that we -- we will have the effect that the

6   protocol is designed to achieve.

7           THE COURT:  What would happen if the drugs were not

8   properly administered?  What would happen if you had sought to

9   administer this dose and it went into the muscle, and people

10  didn't realize that, instead of the vein?  What would happen?

11          THE WITNESS:  Well, you would be relatively quickly

12  aware.  You would see, for instance, that you don't -- the drips

13  in the chamber, in the IV chamber, would stop.  So you would

14  know very quickly when you are not administering a drug into a

15  vein.  And it's my understanding that this protocol requires

16  redundant intravenous access, so you have two IVs.  So you would

17  switch to your other IV set and administer drugs through the

18  other IV set.  And, again, you --

19          THE COURT:  How long does that take, by the way?

20          THE WITNESS:  To switch a syringe?

21          THE COURT:  Yes.

22          THE WITNESS:  Fraction of a second.  We do it all the

23  time.

24          THE COURT:  So is it -- what would it involve just from

25  a mechanical standpoint, just so I understand?

———3:21-cv-00176-RFB-CLB———

1        THE WITNESS:  We grab the syringe, rotate it

2   counterclockwise, move over to the other tubing, insert it,

3   rotate it clockwise, and inject.

4        THE COURT:  Right.  Well, you -- but that -- you're

5   presuming, and this is an important part of this, that the

6   person would have to have some experience with using these types

7   of syringes and this setup as relates to intravenous medication.

8        THE WITNESS:  They really don't need to have a great

9   deal of experience.  It's my understanding that there is an EMT

10  in the room and, gosh, you know, these folks are experts in

11  field resuscitation, management of airways, administration of

12  drugs through IVs.  The people who are drug administrators, they

13  certainly have, you know, training to be able to go and attach

14  and detach --

15       THE COURT:  Hold on.  Well, let me ask, have you been

16  provided information about the background and training of the

17  drug administrators?

18       THE WITNESS:  I have not.

19       THE COURT:  Okay.  So, again, I just -- part of this is

20  we're starting from, basically, not scratch because there's a

21  presumption that they would be trained, but I'm trying to figure

22  out what types of training or education or background they would

23  need.  And so you're saying that someone would, at least, need

24  to have some familiarity with being able to -- to switch

25  syringes.  You think that that can be training that would be

—3:21-cv-00176-RFB-CLB—

1  available for a variety of different medical professionals, but

2  they would have to have that experience at least.

3          THE WITNESS:  I've been advised that the -- it is the

4  intention of the warden to make sure that there are not just

5  training, but there are run-throughs to ensure that everyone

6  knows what should be done, how it should be done, and,

7  essentially, mock experiences so that when the protocol is used,

8  everyone understands what to do, what to look for, how to do it.

9  You could certainly --

10          THE COURT:  And let me ask you, would you be concerned

11  if that didn't occur?

12          THE WITNESS:  If there weren't training?

13          THE COURT:  Yes.

14          THE WITNESS:  Yes, I would be.

15          THE COURT:  So the second question is, who advised you

16  as to what the training would be?

17          THE WITNESS:  I believe in conversations with

18  Mr. Gittere, he advised that the -- the State has a formal

19  program that it will put in place to ensure that individuals are

20  trained to be able to do this properly.

21          THE COURT:  Okay.  Were you presented with that

22  program?

23          THE WITNESS:  I was not.

24          THE COURT:  Okay.  I just want to check.  Mr. Gilmer,

25  is there any presentation of a formal program by Deputy Director

PATRICIA L. GANCI, RMR, CRR

1  Gittere?

2          MR. GILMER:  No, Your Honor, this was -- not to speak

3  for Dr. Petersohn, but my understanding the only time he's ever

4  spoken to DD Gittere was during site inspection.  So I believe

5  these were questions that were asked during the site inspection.

6          THE COURT:  That's fine.  Again, I wanted to make sure

7  that there's not something that's there.

8          Is there at this point in time an actual formal

9  training protocol, Mr. Gilmer?

10          MR. GILMER:  I do not know the answer to that.  We will

11  have an opportunity to hear from DD Gittere.

12          THE COURT:  Why don't we just ask him?  He's here.

13          MR. GILMER:  Sure.

14          DD Gittere?

15          Not at this time.

16          THE COURT:  Okay.  And part of this is, again, I'm not

17  ruling one way or another ab out when that would have to be, but

18  I want to be clear in the record, Mr. Gilmer, about when things

19  do or do not exist.  Because in the past, as you know, there's

20  been statements that the State may or may not have had

21  information that they didn't share and then you later responded

22  to.

23          I didn't want you to be in a situation in which the

24  State was somehow accused of not providing information that it

25  had.  And, again, I'm not ruling way one or another about the

─3:21-cv-00176-RFB-CLB─

1   timing of that, but I didn't want there to be somehow this

2   perception that there existed something that hadn't been

3   produced.  As you know, that has been the subject of some back

4   and forth in this case.

5          MR. GILMER:  Yes, and I appreciate you looking out for

6   the State in that regard, Your Honor.

7          THE COURT:  No, again, because I just wanted to be

8   clear.  And, again, we can talk about when or how.  I'm not

9   getting into that.  I'm not making any determination about the

10  appropriateness or not of the timing of that at this point.  But

11  I just want to be clear about what documents do or do not exist

12  so we don't have any disagreement about that and we don't have

13  statements back and forth about that.  And so that's why I asked

14  those questions at this point in time.

15         Now, the other thing I was going to say to you all,

16  it's about time for us to take a lunch break.  I think,

17  actually, we're going to have to switch out some -- some staff

18  here.  Is there any reason why we couldn't take a break now and

19  come back to finish up with Dr. Petersohn?

20         I'll try not to ask so many lengthy questions, but

21  you've been very helpful in clarifying some of the things that

22  have been left unanswered for me at least, Dr. Petersohn, so I

23  appreciate that.

24         But, Mr. Gilmer, I know that I have, sort of, used a

25  lot of the time.  But I do think, as I've said, a lot of this

1  time has been around issues that, in fact, have been discussed

2  by both sides.  So I'll give you an opportunity to think about

3  what you think may be left.

4          But, again, for the Court, really, I am focussed on the

5  issues that I've talked about as it relates to, sort of,

6  complications, administration, who may or may not need to be

7  part of the training, what types of training.  These are all

8  questions that we've talked a little bit about, but that are

9  going to be the focus of some of my questions, just to give you

10 all some sense of that.  I'm sure they would be of yours as

11 well, but I just wanted to give you some information about that.

12         Mr. Gilmer, apart from the Court, what -- how much more

13 time do you think that you would need?

14         MR. GILMER:  Oh, Your Honor, I will have a better

15 answer for that after our break.  And I am fine, obviously, with

16 the Court's indulgence, the shorter the better as far as I'm

17 concerned.  But I think you have done a very good job of going

18 through most of my questions.  I think there's just a few other

19 things I'd like to ask pertaining to ketamine, specifically, and

20 then the site inspection, and then also in response to some

21 additional things that Dr. Heath or Dr. Zivot said.

22         THE COURT:  So then it looks like we'll have maybe

23 another hour, let's say, for direct to be generous.

24         MR. GILMER:  Yeah.  And I'm hopeful it will be --

25 again, obviously, wanting the Court to be able to ask whatever

―3:21-cv-00176-RFB-CLB―

1  questions the Court needs, I think I can definitely get it done

2  even before an hour.

3           THE COURT:  Okay.  And then maybe an hour and a half or

4  so from cross.  I don't know.  Maybe longer.  I'm not sure.

5  Again, I would suspect, Mr. Anthony and Mr. Levenson, some of

6  the questions have been asked by the Court that you all had

7  asked previously as relates to things like chest wall rigidity,

8  but I will let you look at your outline.

9           Assuming we get through Dr. Petersohn's testimony

10  today, who would we have after that, if anyone, or would we

11  break for the day?

12           MR. GILMER:  We can discuss that, Your Honor.

13           (Defense counsel conferring.)

14           MR. GILMER:  We could -- I know at one point the Court

15  said that they might have some questions for Deputy Director

16  Gittere.  We were planning on calling him tomorrow but -- you

17  know.  So I'm not sure we're totally prepared, but we could,

18  obviously, put him up today.

19           THE COURT:  I don't have any questions for Deputy

20  Director Gittere at this point in time.

21           MR. GILMER:  Oh, okay.

22           THE COURT:  I think that we may have some later based

23  upon what may happen later in this case.  But, you know -- in

24  the coming week or so.  But as relates to this particular

25  series, I don't have any questions for Deputy Director Gittere

—3:21-cv-00176-RFB-CLB—

1  at this point in time.  I know that we have to come back at some

2  point to Dr. Yun.  I'm not sure when we would do that, but I

3  think that's tomorrow.

4       MR. GILMER:  Yeah, he's not available today, Your

5  Honor.  Just as far as for the Court's clarification, the only

6  other witnesses we would call would be, potentially, Deputy

7  Director Gitter and then, obviously, we know the Court wishes to

8  hear from Director Daniels.  We do not intend to call any other

9  witnesses given the previous stipulation we've agreed to with

10  plaintiff's counsel with regard to Chief Pharmacist Fox -- Fox's

11  deposition being admitted pursuant to the redactions.

12       THE COURT:  Okay.  That makes sense to me.

13       Mr. Anthony?

14       MR. ANTHONY:  Nothing much to add, Your Honor, except

15  we had spoken a while ago about the unnamed medical doctor, so I

16  just don't want to be remiss and let that go away.

17       THE COURT:  So it's not going away, but here's what I

18  will tell you.  I'm going to hear from Director Daniels first.

19  I think many of the evidentiary issues that have been raised can

20  be addressed with Director Daniels' testimony as to whether or

21  not these additional witnesses may or may not be necessary.

22       I do think, Mr. Anthony and Mr. Levenson, I would like

23  for you when we come back from lunch to explain to me why I

24  shouldn't dismiss Dr. Azzam from this case.  That doesn't mean

25  he wouldn't be available as a witness, but I have to tell you,

—3:21-cv-00176-RFB-CLB—

1  I'm not clear why he would remain as a defendant in this case.

2  I'm just saying that so you all can be prepared to explain that

3  to me when we come back.

4          With that, we will take our lunch break, and then we'll

5  come back.  I'd like for you all, it's 1 o'clock now, to be able

6  to be back by 1:45, but we'll start at 2.

7          Mr. Gilmer, I'm sure you and Deputy Director Gittere

8  can make sure that also Mr. Floyd has his lunch.  I think he's

9  already provided the lunch.

10          MR. GILMER:  Provided at breakfast, Your Honor, so I

11  presume he has it.  We'll confirm.

12          THE COURT:  Okay.  Anything else then before we break?

13  Mr. Levenson and Mr. Anthony?

14          MR. ANTHONY:  Your Honor, I guess one thing we also

15  wanted to keep track of was the discussion that we had about the

16  provisions of Florida law.  I think that we had discussed them.

17  I don't remember if the context was about judicial notice or if

18  it was regarding admission of exhibits.  But I also wanted to

19  make sure that we kept track of that as well, because we had

20  several of those regulatory provisions and statutes that we

21  believe governs the performance of a pharmacist under Florida

22  law.  And we have those as exhibits that we could refer to.

23          THE COURT:  Well, they're Florida statutes.  So here's

24  what I will say to you.  If you want to be able to make

25  arguments to me based upon existing regulations and statutes, I

―3:21-cv-00176-RFB-CLB―

1   don't need to take judicial notice of that, you can simply argue

2   them to me.  And they can argue in response whether or not those

3   are appropriate interpretations.  But I don't need -- I don't

4   need to take judicial notice of that.  I'll allow you to argue

5   that if you want to argue that about a particular witness and

6   their relevant knowledge or bias.  You can do that.  Both sides

7   can do that.

8           If it's public records or statutes, you don't need my

9   permission to do that.  So to the extent that you think that

10  it's required, I certainly will allow.  If you're asking for

11  leave to make those arguments, I'll give you leave to make those

12  arguments and for them to respond.

13          MR. ANTHONY:  Thank you, Your Honor.

14          THE COURT:  All right then.  Thank you all.  We'll be

15  adjourned.

16          (Recessed at 12:59 p.m.)

17

18

19

20

21

22

23

24

25

3:21-cv-00176-RFB-CLB

1                              --oOo--

2                   COURT REPORTER'S CERTIFICATE

3

4        I, PATRICIA L. GANCI, Official Court Reporter, United

5   States District Court, District of Nevada, Las Vegas, Nevada,

6   certify that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled matter.

8

9   Date:  December 16, 2021.

10                              /s/ **Patricia L. Ganci**

11                              Patricia L. Ganci, RMR, CRR

12                              CCR #937

13

14

15

16

17

18

19

20

21

22

23

24

25

PATRICIA L. GANCI, RMR, CRR